# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| CARMELO ROMAN, RICARDO ROMAN RIVERA and SDM HOLDINGS, INC. Individually and on Behalf of All Others Similarly Situated, | Civil Case No. 3:12-cv-1663 |
| Plaintiffs, | |
| vs. | |
| UBS FINANCIAL SERVICES, INC. OF PUERTO RICO; UBS TRUST COMPANY OF PUERTO RICO; PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.; PUERTO RICO FIXED INCOME FUND III, INC.; PUERTO RICO FIXED INCOME FUND V, INC.; PUERTO RICO INVESTORS BOND FUND I, INC.; PUERTO RICO AAA PORTFOLIO BOND FUND, INC.; PUERTO RICO AAA PORTFOLIO BOND FUND II, INC.; MIGUEL A. FERRER, and CARLOS J. ORTIZ, | JURY TRIAL DEMANDED SECURITIES CLASS ACTION |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs, Carmelo Roman, Ricardo Roman Rivera and SDM Holdings, Inc. individually and on behalf of all others similarly situated ("Plaintiffs"), by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of UBS Financial Services, Inc.'s press releases,

Securities and Exchange Commission ("SEC") filings and cease and desist proceedings, analyst reports, media reports, and other publicly disclosed reports and information about the defendants.

## INTRODUCTION

1.      This action arises out of a scheme perpetrated by UBS Financial Services, Inc. of Puerto Rico ("UBS PR" or the "Company"), Miguel A. Ferrer ("Ferrer"), and Carlos J. Ortiz ("Ortiz") (collectively "Defendants") relating to the marketing and sale of  hundreds of millions of dollars of non-exchange-traded closed-end funds ("CEFs" or "securities") to Plaintiffs and other similarly situated class members.

2.      The CEFs at issue are underwritten, marketed, and sold by UPS PR to Puerto Rico residents.   Since 1995, Defendant UBS PR has been the primary underwriter of fourteen separately organized, closed-end fund companies' CEFs with a total market capitalization of approximately $4 billion and nine co-managed, closed-end fund companies' CEFs with more than $1 billion in total market capitalization.  The majority of these CEFs' holdings of Puerto Rico securities are Puerto Rico municipal bonds.  The CEFs were marketed mainly to retail customers in Puerto Rico, including individuals and retirees who depended on dividend income from those CEFs for retirement expenses.

3.      The CEFs represented the single largest source of revenue for UBS PR.  For example, between 2004 and 2008, the CEF business generated 50% of annual total revenues for UBS PR.  During 2008, UBS PR's CEF business produced approximately $94.5 million for the firm.  Defendants, through their marketing and sale of their securities, touted safety and security of these investments and represented that the sales price represented the value of the underlying investments as well as the demand by the market.

4. However, during the class period, Defendants knew, but did not disclose to Plaintiffs, material facts about the truth behind this lucrative CEF business. Specifically, Defendants misrepresented and/or did not disclose in the offering documents and related communications: (a) that CEF prices were set solely at the discretion of Defendant Ortiz and not based on market forces such as supply and demand; (b) that as the dominant CEF broker-dealer, UBS PR controlled the secondary market for CEFs and that any sales that investors wanted to make depended on UBS PR's ability to solicit additional customers or its own willingness to purchase shares into its inventory; (c) that UBS PR was purchasing millions of dollars of CEF shares into its own inventory while promoting the appearance of a liquid market, and thereby artificially propping up prices and creating the appearance of liquidity; and (d) that UBS PR's parent company was pressuring UBS PR to reduce its inventory of CEF shares as it was well beyond internal limits. Specifically, as discussed below, UBS PR and the Defendants promoted the CEFs' "extraordinary 'market returns'" and low risk and volatility, while simultaneously not disclosing that CEF share prices and liquidity were dependant on UBS PR's continued manipulation and support of the market. Defendants' actions artificially inflated the value of these securities and their manipulation of the market for these securities directly harmed Plaintiffs and the Class.

5. As described in detail below, internal e-mails and other documents show that, particularly during 2008 and 2009, Defendants made uniform misrepresentations and omissions of material facts to Plaintiffs and other retail customers in Puerto Rico regarding CEFs, and all the while were aware that investor demand was significantly declining and/or insufficient to support the volume of inventory.

6.     To offset any potential losses UBS PR could face with these CEFs, in the spring of 2009, UBS PR's parent firm ordered the Company to substantially reduce its inventory of CEF shares.  To satisfy this directive, Defendants launched a plan they termed "Objective: Soft Landing," whereby UBS PR routinely offered and sold its CEF shares at prices that undercut pending customer sell orders.  Specifically, unbeknownst to Plaintiffs and other class members, between March and September 2009, UBS PR sold *75% of its inventory to investors at the expense of its supposed efforts to sell its clients' holdings.*  Defendants concealed how they were setting secondary market prices and artificially manipulating demand to create the appearance of liquidity of the market, all the while it was withdrawing market support, selling its holdings to the detriment of its clients who were likewise attempting to sell.  Therefore, by September 2009, when UBS PR completed its CEF inventory reduction, the market prices of certain funds had declined from 10-15%.

7.     Individual Defendants Miguel Ferrer, UBS PR's Chairman and CEO from 2003 through 2009 and later its Vice Chairman, and Carlos Ortiz, UBS PR's Managing Director in charge of Capital Markets and supervisor of the trading desk for CEFs, for their part, touted the CEFs as safe, liquid investments with high, stable prices, and which yielded consistently higher returns than similar funds.  They specifically promoted the liquidity of the CEFs in a supposedly robust secondary market in which investors could sell their shares for income, if necessary.  However, Ferrer and Ortiz knew, but did not disclose, that prices were set under Ortiz's direction solely as a means of keeping the investment attractive, and that UBS PR controlled the secondary market, making any sales desired by investors largely dependent on UBS PR's ability to solicit additional customers to purchase such shares, or on its willingness to purchase shares into its inventory.  Defendants likewise did not disclose that in order to prevent a collapse of the CEF

market, Ferrer and Ortiz directed UBS PR, for much of 2008, to purchase millions of dollars of CEF shares into its own inventory to create the appearance of liquidity, prop up prices, and maintain yields.  In other words, they created an illusion of a safe and secure market.  Once UBS PR reduced its inventory (which it did), it ceased its artificial support of the market for these securities.  Once the SEC announced its investigation into UBS PR and the Individual Defendants, the value of CEFs plummeted.

## JURISDICTION AND VENUE

8.     Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "Exchange Act").  The claims asserted herein arise under §§10(b) and 20(a) of the Act and Rule 10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

9.     This Court also has subject matter jurisdiction over the Commonwealth and common law claims as this action is brought as class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005, there are over 100 Class members, the matter in controversy exceeds $5 million, exclusive of interest and costs, and the action is a class action in which some members of the Class are citizens of states different than Defendants.

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  UBS Puerto Rico is headquartered in San Juan, Puerto Rico and the Company conducts business in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

11.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

Plaintiffs

12.     Plaintiffs Carmelo Román and Ricardo Román Rivera as set forth in the accompanying certification and incorporated by reference herein, purchased UBS Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; and Puerto Rico Investors Bond Fund I, Inc. securities at artificially inflated prices during the Class Period and have been damaged thereby.

13.     Plaintiff SDM Holdings, Inc., as set forth in the accompanying certification and incorporated by reference herein, purchased UBS Puerto Rico Fixed Income Fund V, Puerto Rico Mortgage Backed and US Government Securities Fund, Puerto Rico Fixed Income Fund III, Puerto Rico AAA Portfolio Bond Fund, and Puerto Rico AAA Portfolio Bond II securities at artificially inflated prices during the Class Period and has been damaged thereby.

Defendants

14.     Defendant UBS Services Inc. of Puerto Rico ("UBS PR") is a Puerto Rico corporation with its principal place of business in Hato Rey, Puerto Rico.  It is a broker-dealer, registered since 1982, and a subsidiary of UBS Financial Services, Inc. ("UBSFS"). It is the largest broker-dealer in Puerto Rico, with approximately 49% of total retail brokerage assets.  It employs roughly 230 financial advisors and has nineteen branch offices throughout Puerto Rico.

15.     Defendant UBS Trust Company of Puerto Rico is an affiliate of UBS Financial Services Incorporated of Puerto Rico.  UBS Asset Managers of Puerto Rico is a division of UBS Trust Company of Puerto Rico and provides advisory services for the CEFs.  According to Company sales documents, UBS Asset Managers of Puerto Rico is a leading asset manager in Puerto Rico, and, as of September 30, 2011, managed, or co-managed, approximately $9.7 billion in fund assets.

16.     Defendant Puerto Rico Investors Tax-Free Fund IV, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

17.     Defendant Puerto Rico Fixed Income Fund III, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

18.     Defendant Puerto Rico Fixed Income Fund V, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

19.     Defendant Puerto Rico Investors Bond Fund I, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

20.     Defendant Puerto Rico AAA Portfolio Bond Fund, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

21.     Defendant Puerto Rico AAA Portfolio Bond Fund II, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

22.     The Defendant CEFs named in ¶¶17-23 are referred to herein, collectively, as the "Funds."

23.     Defendant Miguel A. Ferrer ("Ferrer") is a citizen of Puerto Rico.  From 2003 until October 2009, Ferrer served as UBS PR's Chairman and Chief Executive Officer ("CEO").  Although he was temporarily terminated in October, 2009, he was then re-hired as the Vice Chairman three months later.  Mr. Ferrer made specific oral and written representations to Plaintiffs and to broker dealers, concerning CEFs that were contrary to the then-existing facts, which were known to Defendants.  Ferrer had a direct financial interest in the CEFs performing well as his compensation was based on UBS PR's revenue, which was closely tied to the CEFs success or failure.  Ferrer also controlled all important aspects of UBS PR's CEF business during 2008 and 2009.

24.     Defendant Carlos J. Ortiz ("Ortiz") is a citizen of Puerto Rico.  Since 2004, he has been UBS PR's Managing Director of Capital Markets with the duty of supervising the firm's CEF trading desk.  Mr. Ortiz solicited, offered, and sold the CEFs at issue to Plaintiffs.  Mr. Ortiz made specific oral and written representations to Plaintiffs concerning CEFs that were

contrary to the then-existing facts, which were known to Defendants.  Ortiz's compensation was based, in part, on the performance of UBS PR, which derived much of its revenue from CEFs.

25.     Defendants Ferrer and Ortiz are collectively referred to as the "Individual Defendants."

## DEFENDANTS' FRAUDULENT SCHEME

### UBS PR's Marketing and Sales of CEFs Through 2008

26.     As stated above, since 1995, UBS PR has been the primary underwriter of a combined 23 closed-end fund companies' CEFs with a combined total of over $5 billion in market capitalization.  They represent the largest, single source of revenue for UBS PR.  UBS PR also offered a "dividend reinvestment program," which became a key selling point of the CEFs, whereby investors could elect to receive dividend reinvestment shares – issued by the CEFs at the Net Asset Value of Funds ("NAV") – and then immediately sell them back to UBS PR at the then-existing market price to earn a premium of up to 45%.  Many retirees enrolled in this program and relied on dividends to support their retirement income.

27.     UBS PR marketed CEFs, including the Funds, to investors who were seeking stable, liquid investments.  Defendants also knew that an efficient market was important to promoting the dividend reinvestment program, which relied on liquid, high market price premiums relative to the Funds' NAVs.

28.     Unknown to Plaintiffs, though, in 2008 and 2009, the pricing of CEFs was left to the discretion of UBS PR and the Individual Defendants – namely Oritz.  Defendants priced the CEFs to reduce volatility and maintain high premiums to NAV, and not at market value.  In fact, under the guidance of the Individual Defendants, Defendants used the CEF inventory account to purchase any excess supply of shares for which UBS PR could not find customers.

29.     UBS PR had no substantive written or formal CEF pricing procedures or guidelines.  Instead, the process was left to the discretion of Ortiz.  At the direction of Ortiz, and with Ferrer's knowledge, UBS PR priced CEFs to create the illusion of stability. The goals of pricing was not to find an objective market price, but to achieve high and stable CEF prices and "appropriate" yields for each Fund class.  UBS PR also used its CEF inventory account to purchase shares for which it could not find customers to keep prices at consistently high premiums.  Thus pricing was dictated by UBS PR's own interests irrespective of market realities.

30.     Despite internally knowing that CEFs were priced at the sole discretion of UBS PR and were not in any way based on market conditions, thus making them inherently volatile, Defendants continued to claim that market forces, such as supply and demand, were actually determining CEF prices.  For example, UBS PR produced a January 2008 brochure entitled "UBS Family of Funds" which it posted on its website stating that "[m]arket forces such as supply and demand and the yield of similar type products determine the price of closed end fund shares."

31.     Similarly, UBS PR sent Plaintiffs and other Class Members monthly account statements that described "market values" of customers' CEFs.  These were misleading in that the true price of UBS PR CEFs actually had nothing to do with market value, but were simply the price that Defendants thought they should be.

32.     Defendants similarly made misrepresentations about the risk, volatility, and liquidity of CEFs.  For example, at a June 2008 investor conference, Defendants touted CEF's "extraordinary market returns" and low risk and volatility. However, they failed to disclose that share prices and liquidity were entirely dependent on UBS PR's support and manipulation of the CEF secondary market.

10

33.     Indeed, UBS PR's own inventory was directly tied to the returns and risk of CEFs, unbeknownst to investors.  In 2008, UBS PR knew there was a supply and demand imbalance in the CEF secondary market, with customers placing an increasing number of sell orders.  At the same time, UBS PR was approaching the $40 million internal limit for its own inventory, while there were $16 million in unexecuted customer orders to sell shares at prices lower than UBS PR's bid.

34.     Rather than lower CEF prices to reflect the supply/demand imbalance and volatile market, Defendants instead obtained an increase in the inventory limits from UBSFS to $50 million in December 2008.  This allowed UBS PR to artificially inflate demand.  Therefore, UBS PR increased its own inventory without lowering prices to hide the reality of a failing market from investors.  In fact, Oritz would not agree to price the CEF shares in line with actual supply and demand.  He told UBSFS' Chief Risk Officer that he did not want to decrease Fund prices.

35.     At the same time, though, Defendants continued to tout the safety and returns of CEFs.  In fact, despite knowing that there was a "weak secondary market" and "product fatigue" for CEFs, Ferrer directed his subordinates during the second half of 2008 to boost investor demand for CEF shares in 2008.  For example, on August 29, 2008, he told UBS PR executives "[i]t is clear to me that we have to 'fix' this."  He further dictated that they needed to generate a story for the CEFs that financial advisors could used to increase sales, and he ordered two new offerings of CEFs to generate buzz.

36.     The two new primary CEF offerings would total $66 million.  The two funds were Puerto Rico Fixed Income Fund VI, Inc. and Puerto Rico AAA Portfolio Bond Fund II, Inc., both of which were underwritten by UBS PR.  These new offerings meant additional

broker-dealer commissions and asset management fees, as well as a direct benefit to Ferrer, as his compensation was based on revenue performance of the CEF companies in part.

37.     In furtherance of this push, UBS PR prepared a presentation to the sales force in connection with the new CEF offerings ordered by Ferrer.   That presentation contained a myriad of reasons why customers should invest in the new fund, including that "[f]und inventory levels are lower, trading volumes are at all-time high (annualized), and prices/yields are aligned with current market conditions."

38.     The prospectuses for the new CEF offerings likewise failed to disclose to investors that there was a serious market supply and demand imbalance, that UBS PR was using its inventory account to support CEF market prices and liquidity to prevent price declines and maintain stable yields, and that CEF prices and liquidity were utterly dependent on the efforts of UBS PR's sales force to maintain customer demand for CEFs.

39.     Indeed, even though Ferrer was well aware of the weak market, decreasing demand, and high volatility of CEFs, numerous emails show him misstating the strength, stability, and liquidity of the CEF market in 2008, without ever disclosing to the UBS PR sales force that UBS PR was keeping the CEF prices artificially high by increasing its CEF inventory.

40.     For example, despite knowing about the CEF market's illiquidity and in an effort to manipulate the market, Ferrer sent an email to UBS PR's financial advisors on September 10, 2008 in an effort to dispel their concerns about the two new CEF offerings.   In that email, he wrote:

> Not to worry!! No one should feel discomfort for our opening new Fund opportunities; because the local marketplace [is] in ***a very rapid consolidation***…We have put in place a growth strategy in a consolidating market!   ***It is bold, but it is right.***   This move should have little direct effect on secondary market activity, ***and*** if any, a positive one.

[Emphasis added.]

41.     In a similar email, Ferrer told other UBS PR executives he was directing UBS PR's Investment Banking department to move forward with the two new primary CEF offerings, regardless of the high CEF inventories, stating "***I want these [two primary offerings] to happen right away.*** I do not want to keep postponing new availability for reasons of inventory, no way!" (emphasis in original)

42.     Defendant Ortiz followed the same line in that he ordered that inventory sheets circulated to financial advisors should be changed to falsely reflect a maximum of 50,000 shares per fund, rather than the actual number of shares the firm owned.

43.     In 2008, therefore, despite knowing that UBS PR was teeming with CEFs to the point of exceeding its own inventory limits; that this was propping up the market for CEFs, and that there was a serious supply and demand imbalance for CEFs, Defendants made new offerings of CEFs and continued—indeed ***increased***—their campaign to tout the liquidity and safety of CEFs. Ultimately more than 600 investors purchased shares as a result of these offerings. UBS PR continued to purchase shares into inventory through the fall of 2008 and into early 2009.

**UBS PR Is Forced to Reduce Inventory**

44.     Defendants' scheme could not, however, continue unbridled. In March, 2009, when UBS PR sought another temporary increase in inventory levels from $50 million to $55 million to buy shares from selling customers (based on the imbalance in the market), UBSFS' Chief Risk Officer rejected the request and directed UBS PR to begin reducing inventory levels back to the former $30 million limit. In connection, the same Chief Risk Officer spoke to UBSFS senior executives and observed, dubiously, that, even though there was a supply and demand imbalance in the CEF secondary market, CEF prices ***somehow remained high***. In fact, he noted a "significant difference between NAV and the price quoted by the trading

desk….in some cases over 40%." He also raised concern that, because the inventory levels at UBS PR had not been reduced, "there is a significant likelihood that clients wishing to sell the shares received through the dividend reinvestment program will be unable to do so."

45.     In response, senior executives at UBSFS directed a review of UBS PR's pricing method for the market values of CEFs. The review resulted in the following conclusions: that UBS PR was the sole CEF liquidity provider; that UBS PR should reduce its CEF inventory to limit its risk exposure and "promote more rational pricing and more clarity to clients"; and that prices should be transparent and based on supply and demand.

46.     On May 29, 2009, UBSFS' Chief Risk Officer directed UBS PR to further reduce its CEF inventory to $12 million. Plaintiffs and other investors and customers were utterly unaware of the investigation or the inventory limits debacle at UBS PR. In fact, UBS PR did not disclose to Plaintiffs or its other customers that it was substantially reducing the use of its inventory to support the CEF market, based on orders from UBSFS. In fact, it continued to accept customer limit orders without disclosing that it was undercutting those limit orders to sell UBS PR's shares first in order to meet internal mandates. This was also a serious conflict of interest that was not disclosed in that UBS PR controlled the market for CEFs, and customers had to compete with UBS PR to sell shares in a market UBS PR both dominated and controlled.

### "Objective:  Soft Landing" Is Launched

47.      In response to UBSFS' inquiry and mandates, in 2009 UBS PR launched a strategy to reduce its inventory that was termed "Objective: Soft Landing" by Ortiz in one memo. The goal of Objective: Soft Landing was to manipulate the market for CEFs by ***purchasing the minimum amount of shares possible from clients*** and to lower UBS PR's price ***to keep ahead of any client open orders***. In addition, part of the plan was to solicit new and

existing customers to buy CEF shares without disclosing UBS PR's decisions to manipulate the market by reducing its inventory by lowering CEF share prices below those of customer orders. Traders were instructed to eliminate pending marketable limit orders by reducing CEF prices to just below the customers' pending sell orders, enabling the sale of UBS PR's CEF inventory first. The "objective" of Objective: Soft Landing was, thus, to reduce CEF inventory at all costs, including at the expense of investors/customers.

48.     Despite the manipulation of CEF pricing through Objective: Soft Landing, Defendants continued to falsely represent and tout CEFs as operating in a safe, liquid market. For example, in March 2009, UBS PR held an investor conference about CEF's superior returns and consistent liquidity levels. Thus, in the face of orders from UBSFS to reduce inventory and to make transparent and fair market value pricing for CEFs, Ferrer urged UBS PR's sales force to "call your client, [because] the information presented will offer comfort to holders of Puerto Rico bonds and Funds." In an email the morning of the conference, Ortiz told Ferrer and other executives that UBS PR should present the message to investors that the secondary market had "shown resiliency (high liquidity, stable price) during these times."

49.     At that conference, despite earlier telling UBSFS that the market was imbalanced, Defendants told investors that CEF liquidity was increasing and CEF prices were stable, the result of supply and demand in an open market. Ferrer hosted the conference and Ortiz made a presentation about the CEF secondary trading market, misrepresenting that CEF liquidity was increasing, and that CEF prices were the result of supply and demand in an open market. These statements were, of course, false in that there was a severe supply and demand imbalance; UBS PR had been manipulating the actual market for CEFs using its own inventory to support CEF prices and disguise the lack of liquidity in the market; UBSFS had recently ordered UBS PR to

reduce inventory; and to comply with this directive, UBS PR was lowering share prices and buying fewer customer shares.

50.     The day after the March 2009 investor conference, Ferrer sent an email to the UBS PR sales force stating "Wow!  What a show.  Our clients received a huge dose of comfort on their investments, the right consideration in view of what we believe the local market for bonds (and funds) is headed.  This will offer you another opportunity to do right for your own client base by showing each client how he or she can benefit from the opportunities at hand.  The ball is now in your court."

51.     In the ensuing months, Defendants tried to artificially prop up CEF demand while concealing the liquidity problems and inventory reduction.  Ferrer actually directed UBS PR's sales force to solicit customers to buy CEFs.  For example, in an April 24, 2009 interview published in *El Vocero,* Ferrer stated that CEF share prices had been stable and performed well. That same day, Ferrer sent an email to financial advisors directing them to tell their customers that CEFs would continue to trade at significant premiums to NAV and provide the "reinvestment kickers" of the dividend reinvestment program. These misstatements enticed Plaintiffs and class members to re-invest in CEFs.

52.     From April to August, 2009, Ortiz conducted multiple sales meetings with financial advisors to encourage them to solicit their customers to invest in CEFs.  The percentage of investors' CEF purchases that were solicited by a financial advisor rose 20% during that same period.

53.     Plaintiffs and other class members were never informed that there was a serious illiquidity in the secondary market, and that UBS PR was significantly reducing CEF market prices in order to sell its inventory.

54.     As a result, UBS PR was able to reduce its inventory to $12 million by September 30, 2009.  However, on the same day, there were approximately $72 million in unexecuted customers sell orders that had accumulated over the prior months.  Therefore, UBS PR was able to reduce its inventory only at the expense of investors and customers.

55.     By selling 75% of its inventory and ceasing to use its inventory to support the CEF secondary market, UBS PR caused prices to decline.  Therefore, investors were induced to purchase CEFs that had significantly declined in value.  In fact, the difference in value of the funds from the height of their prices on March 1, 2009 to the prices at the end of September, 2009 was more than $500 million.

56.     Plaintiffs' injuries are the direct and proximate cause of Defendants' fraudulent activities. Such injuries were reasonably foreseeable by Defendants.  In fact, Defendants were actively and secretly trying to minimize UBS PR's CEF inventory for the very same reasons.

57.     As a result of Defendants' fraudulent activities, Plaintiffs have suffered millions of dollars of damages because the CEFs have declined in value or they possess unexecuted sell orders.  Moreover, as a foreseeable consequence of Defendants' actions Plaintiffs purchased millions of dollars of CEFs that had a value that had dramatically declined far below the value of what Plaintiffs paid for them.  In addition, Plaintiffs have been injured as a result of the illiquidity of tens of millions of dollars invested in CEFs.  UBS PR's inventory dump harmed investors who sold, or attempted to sell, shares during that dump in that customers waited weeks or months for UBS PR to execute their sell orders at significant losses, while some customers' sell orders were never even executed.

**SEC Investigates Defendants**

58.     On May 1, 2012, the SEC announced an Order Instituting Administrative and Cease-and-Desist proceedings against Defendants, attached hereto as Exhibit A.  The papers filed by the SEC make similar allegations to those contained herein concerning misrepresentations surrounding the CEF market and finding that Defendants "willfully violated Section 17(a) of the Securities Act, which prohibits fraudulent conduct in the offer and sale of securities, and Sections 10(b) and 15(c) of the Exchange Act and Exchange Act Rule 10b-5, which prohibit fraudulent conduct in connection with the purchase or sale of securities."

59.     The SEC ordered UBS PR to retain an independent third-party consultant to review UBS PR's CEF practices and policies. It also censured UBS PR and ordered it to pay disgorgement of $11.5 million, prejudgment interest in excess of $1 million, and a $14 million civil penalty.  It also launched an investigation and proceedings against Ferrer and Ortiz.

## LOSS CAUSATION / ECONOMIC LOSS

60.     As detailed herein, Defendants made false and materially misleading statements during the Class Period that artificially inflated the price of CEFs and operated as a fraud or deceit on the Class.  As further detailed herein, the price of CEFs and individuals' abilities to sell CEFs fell when Defendants' prior false statements, material misrepresentations, and fraudulent conduct began to reach the market.  As a direct result, Plaintiffs and the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## SCIENTER

61.     Defendants had both the motive and opportunity to conduct fraud during the Class Period.  Defendants had actual knowledge of the falsity of the statements they made and/or acted in reckless disregard of the truth or falsity of such statements.  As alleged herein, Defendants violated the federal securities laws by, *inter alia,* knowingly and/or recklessly disregarding that

the documents and statements issued or disseminated by the Individual Defendants were false and materially misleading, and that such statements or documents would be issued or disseminated to the investing public.

62.     Defendants also received information reflecting the true facts regarding CEFs sold by UBS PR, had control over, received and/or modified UBS PR's false and materially misleading statements, or were otherwise privy to confidential proprietary information about CEFs sold by UBS PR reflecting the true state of CEFs and the Company and contradicting public statements made by the Individual Defendants and/or the Company.

## NO SAFE HARBOR

63.     To the extent Defendants made or issued oral or written forward-looking statements accompanied by purported statutory "safe harbor" warnings, such warnings were ineffective to shield those statements from liability.  Defendants are liable for false or materially misleading, forward-looking statements made during the Class Period because the speaker or issuer knew that the forward-looking statement was false or misleading, and/or such forward-looking statements were authorized and/or approved by an executive officer who knew that the forward-looking statement was false.  Defendants also did not make or issue contemporaneous, meaningful, and cautionary "safe harbor" statements identifying important factors that could cause actual results or circumstances to differ materially from those in the forward-looking statements.

## CLASS ACTION ALLEGATIONS

64.     Plaintiffs bring this Action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased or acquired the Funds from UBS PR during the period from January 1, 2008 to May 1, 2012 (the "Class Period") (the

"Class").  Excluded from the Class is UBS PR, the Individual Defendants, any entity in which a Defendant has, or had, a controlling interest, members of the Individual Defendants' families and the legal representatives, agents, affiliates, heirs and successors-in-interest or assigns of any such excluded party.

65.     Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and all members of the Class sustained damages as a result of Defendants' misconduct alleged herein.

66.     Plaintiffs will fairly and adequately protect the interests of the Class and has retained competent counsel with significant experience in class action litigation and litigation involving alleged violations of the federal securities laws.  Plaintiffs has no interests that are contrary to, or in conflict with, those of the Class that Plaintiffs seeks to represent in this Action.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, including because joinder of all members of the Class is impracticable and damages suffered by individual Class members may be relatively small whereas the expense and burden of individual litigation make it virtually impossible for the members of the Class to individually redress the wrongs done to them by Defendants.  There will be no difficulty in the management of this Action as a class action.

68.     There is a well-defined community of interest in the questions of law and fact involved in this Action.  The questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members are:

    (a)     whether Defendants' acts and omissions complained of herein violated the federal securities laws;

    (b)     whether Defendants misrepresented material facts;

(c)    whether documents, including, *inter alia*, the Company's press releases and prospectuses issued, and Defendants' other public statements made during the Class Period contained misstatements of material fact, or omitted to state material facts, necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(d)    whether the price for the Funds was artificially inflated during the Class Period due to the false and materially misleading statements, including non-disclosures, complained of herein;

(e)    whether Defendants represented that CEFs were safe and liquid, or thus had characteristics, benefits, or qualities that they, in reality, did not have;

(f)    whether Defendants' acts and practices in connection with the marketing, advertising, and sale of the Funds violated the Puerto Rico Securities Act;

(g)    with respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, whether Defendants acted with the requisite state of mind in making false and materially misleading statements, including non-disclosures, in press releases and other public statements;

(h)    with respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, whether Defendants named in such claims are controlling persons of UBS PR; and

(i)    whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure of such damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

69.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment.  Defendants, by suppressing information, failing to disclose that the

Funds' prices were set solely at the discretion of Defendants  and not based on market forces, failing to disclose that UBS PR controlled the secondary market for the Funds, failing to disclose that UBS PR was artificially propping up prices and creating the appearance of liquidity, failing to disclose that UBS PR was well beyond internal limits, failing to timely disclose known defects of the Funds and misrepresenting their products as liquid and safe, actively concealed from Plaintiffs and the Class the true risks associated with the Funds.

70.     As a result of Defendants' actions, Plaintiffs and the Class were unaware, and could not have reasonably known or learned through reasonable diligence; (1) that Plaintiffs and the Class were exposed to the risks described above, and/or (2) that those risks were the direct and proximate result of Defendants' acts and omissions.

71.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality, state of the market and nature of the Funds and the risks and volatile nature inherent in them.  The Defendants were under a duty to disclose the true riskiness, liquidity, and nature of the CEF market because (1) this information was non-public and the Defendants had, and continue to have, exclusive control over it, and (2) Defendants knew that the information was not available to the Plaintiffs or the Class.

72.     Plaintiffs and the Class had no knowledge that Defendants were engaged in the wrongdoing described herein.  As a result of the fraudulent concealment by the Defendants, the Plaintiffs and the Class could not have discovered previously that UBS PR manipulated the market for the Funds until the SEC announced its investigation in May 2012.  There is no way that Plaintiffs and the Class, who are unsophisticated investors, could have discovered the fraud prior to this date.

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against UBS PR and the Individual Defendants**

73.     Plaintiffs repeat and realleges each and every allegation set forth above as if fully set forth herein.

74.     Plaintiffs brings this Claim pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC on behalf of Plaintiffs and members of the Class who purchased the Funds from UBS PR during the Class Period against UBS PR and the Individual Defendants.

75.     Throughout the Class Period, Defendants, individually and together, directly and indirectly, by the use and means of instrumentalities of interstate commerce: employed devices, schemes and artifices to defraud; made untrue statements of material fact; materially misrepresented facts, including by omitting to state material facts necessary to make statements not misleading; and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class.  Such acts were in violation of Section 10(b) of the Exchange Act and Rule 10-b5 promulgated thereunder by the SEC.

76.     Defendants' false and materially misleading statements were made with scienter and were intended to, and did:  deceive the investing public, including Plaintiffs and the Class; artificially create, inflate, and maintain the market for, and market price of, the Funds; and cause Plaintiffs and the Class to purchase the Funds from UBS PR at artificially inflated prices.

77.     Defendants were individually and collectively responsible for making the statements and omissions alleged herein by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material facts, and/or omitted

23

material facts necessary to make the statements contained therein not misleading.  Defendants also made materially false and misleading oral statements to investors.

78.     During the Class Period, Defendants were executives at UBS PR and had access to, and were provided with, non-public information concerning the Company and the Funds. Each of them knew, or recklessly disregarded, the adverse facts specified herein and omitted to disclose those facts.

79.     As set forth herein, Defendants made false statements and materially misleading statements, including by omitting to state material facts, knowingly and intentionally, or in an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the Class who purchased the Funds from UBS PR during the Class Period.  Throughout the Class Period, Defendants had a duty to disclose new, material information that rendered their prior statements to the market materially false and misleading.  There is a substantial likelihood that disclosure of these omitted facts would have been viewed by Plaintiffs and the Class, as reasonable investors, as significantly altering the 'total mix' of information available about the Company and its CEFs.

80.     As a result of the dissemination of the false and misleading statements and failure to disclose material facts, set forth above, the market price for the Funds was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, and relying directly or indirectly on those statements or upon the integrity of the market in which the Funds were sold, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, Plaintiffs and other members of the Class acquired the Funds from UBS PR at artificially high prices and were damaged thereby.

81.     Defendants made the false and materially misleading statements, including omissions of material facts, complained of herein in connection with the purchase or sale of the Funds from the Company.

82.     Plaintiffs and the Class purchased the Funds from UBS PR at artificially inflated prices during the Class Period in ignorance of the false and materially misleading nature of Defendants' statements and upon the integrity of the market price for the Funds.  Plaintiffs and the Class would not have purchased the Funds from UBS PR but for Defendants' fraud.

83.     As described in detail herein, the market price for the Funds (and the ability to even sell such CEFs) declined materially upon public disclosure of the facts that Defendants had previously misrepresented or omitted to disclose.

84.     Plaintiffs and the Class were damaged as a direct and proximate result of their purchases of the Funds from UBS PR at artificially inflated prices and the subsequent decline of the value of the Funds when the truth about them was disclosed.

85.     Accordingly, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, and are liable to Plaintiffs and the Class.  This claim was brought within two years after discovery of Defendants' fraud and within five years of the making of the statements alleged herein to be false and/or materially misleading.

### COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

86.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

25

87.   Plaintiffs bring this claim pursuant to Section 20(a) of the Exchange Act against the Individual Defendants on behalf of Plaintiffs and the Class who purchased the Funds from UBS PR during the Class Period.

88.   As set forth herein, UBS PR is liable to Plaintiffs and the Class who purchased the Funds from UBS PR based on the false and materially misleading statements, including omissions, set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

89.   Throughout the Class Period, the Individual Defendants were controlling persons of UBS PR within the meaning of Section of 20(a) of the Exchange Act and culpable participants in the fraud at UBS PR, as set forth above.

90.   Each Individual Defendant exercised control over UBS PR during the Class Period by virtue of, *inter alia*, their executive positions with the Company, the key roles they played in the management of UBS PR, and their direct involvement in the Company's operations, including its marketing and sale of the Funds.

91.   Given, then, the Individual Defendants' personal and collective responsibilities for managing UBS PR during the Class Period, the Individual Defendants were regularly presented to the market as the persons responsible for UBS PR's day-to-day business and operations and the Company's overall strategic direction, and in particular for their CEF operations.  The Individual Defendants were responsible for presenting results, setting guidance for future reporting periods, and assuring the market about the state of the Company and its investment vehicles.  At UBS PR, the Individual Defendants had ultimate responsibility for, and control over, the Company's internal activities and public statements, and no one else at UBS PR exercised similar degrees of responsibility and control.

26

92.     As set forth herein, the Individual Defendants' false and materially misleading statements, including omissions, artificially inflated the market price of the Funds during the Class Period.  As more fully described above, the presumption of reliance available under the "fraud on the market theory" applies under such circumstances.  Plaintiffs and the Class relied upon either the integrity of the market or upon the statements and reports of the Individual Defendants in purchasing the Funds from UBS PR at artificially inflated prices.

93.     Accordingly, each of the Individual Defendants are liable to Plaintiffs and the Class, each of whom has been damaged by the underlying violations of the federal securities laws.  This claim was brought within two years after discovery of the Individual Defendants' fraud and within five years of the making of the statements alleged herein to have been false and/or materially misleading.

## COUNT III

### Puerto Rico Securities Act - 10. L.P.R.A. §890
### (Against All Defendants)

94.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

95.     Defendants marketed and sold the Funds to Plaintiffs, making untrue statements of fact, as well as omitting material facts concerning the market demand, liquidity, safety, and returns for the Funds.  Defendants made these untrue statements of fact regarding the Funds in publicly-disseminated materials, and omitted to disclose the true state of the market for the Funds in such materials.  Defendants knew, or recklessly disregarded, that the untrue statements of fact described herein were false and materially misleading when making such statements.

96.     Defendants made untrue statements of fact regarding the Funds for the purpose of inducing Plaintiffs and other class members to purchase the Funds.  Based on Defendants' untrue statements of fact, Plaintiffs and other class members purchased the Funds.

97.     Defendants violated 10 L.P.R.A. §890(a)(2), and Plaintiffs and the Class are entitled to damages and interest.  Specifically, that section provides that any person:

> shall be liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards as provided by the regulations approved to such effects the Financing Board created by §§ 2001 et seq. of Title 7, starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security.

98.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the class have suffered damages in connection with their purchase of the Funds.

## COUNT IV

### Fraudulent Inducement
### (Against All Defendants)

99.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

100.    In marketing the Funds to Plaintiffs, Defendants made untrue statements of fact specified above.  Defendants also made untrue statements of fact regarding the Funds in publicly-disseminated materials, as specified above.  Defendants knew that the untrue statements of fact described herein were false and materially misleading when making such statements.

101.    Defendants made untrue statements of fact regarding the Funds for the purpose of inducing Plaintiffs to purchase them.  Based on Defendants' untrue statements of fact, Plaintiffs purchased the Funds.

102.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their purchase of the Funds.

## COUNT V

### Negligent Misrepresentation
### (Against All Defendants)

103.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

104.    As alleged above, Defendants made a series of misrepresentations contained in oral presentations, written presentation materials, sales pitches, and published documents during the relevant time period concerning the state of the CEF market, and specifically touting the liquidity of the Funds.

105.    The information Defendants provided to the Plaintiffs was false and misleading because, at that same time, in reality, Defendants were aware that there was a serious imbalance in the CEF market and that Defendants were artificially manipulating the CEF market.

106.    Defendants failed to exercise reasonable care in obtaining and communicating to Plaintiffs this information concerning CEFs, but instead, provided the faulty and false information in order to induce Plaintiffs to purchase the Funds.

107.    In response thereto, Plaintiffs justifiably relied on the information provided to them by the Defendants concerning CEFs and bought, collectively, millions of dollars of the Funds that have now declined in value.

108.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages in connection with their purchases of the Funds.

## COUNT VI

### Fraudulent Misrepresentation

29

**(Against All Defendants)**

109.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

110.    As alleged above, Defendants engaged in fraudulent acts and practices by conveying false and misleading information to Plaintiffs in oral presentations, written presentation materials, sales pitches, and published materials during the relevant time period concerning the state of the CEF market, and specifically touting the liquidity of the Funds.

111.    Defendants conveyed the information concerning the sate of the CEF market and the liquidity of the investments as statements of fact.

112.    However, as alleged above, evidenced by oral statements, internal e-mails, and reports at UBS PR, Defendants knew that their statements to Plaintiffs concerning the viability and liquidity of the Funds were untrue or, at a minimum, made the statements with reckless disregard for the truth of the matter.

113.    Defendants made these fraudulent statements concerning CEFs in order to induce Plaintiffs to purchase the Funds.

114.    In response thereto, Plaintiffs bought, collectively, millions of dollars of the Funds that have now declined in value.

115.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages in connection with their purchases of the Funds.

## COUNT VII

### Rescission
### (Against All Defendants)

116.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

30

117.    As alleged above, Defendants engaged in fraudulent acts and practices in order to induce Plaintiffs to purchase the Funds which have now declined in value.

118.    Defendants made a series of materially false and fraudulent misrepresentations in connection with the sale of the Funds to Plaintiffs during the relevant time period.

119.    As prospective purchasers and customers of Defendants, Plaintiffs had a right to rely, and in fact did rely, on these materially false and fraudulent misrepresentations by the Defendants in connection with their purchases of the Funds

120.    If Defendants had not engaged in their fraudulent scheme or had not made materially false misrepresentations, Plaintiffs would not have purchased the Funds.

121.    Plaintiffs seek rescission of the purchase of the Funds from Defendants during the relevant time period.

## COUNT VIII

### Breach of Implied Duty to Act in Good Faith

### (Against All Defendants)

122.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

123.    Article 1258 of the Civil Code provides that contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law. The Supreme Court of the Commonwealth of Puerto Rico has stated and reiterated that any contract and agreement must have as its foundation principles of good faith and fair dealing in the trade. Requiring good faith in the conduct and actions of all parties is a governing principle in all legal activity and consist in

acting in a loyal, honest and fair manner. It assumes faithful compliance with the representations and agreements reached and that a party will not defraud or abuse the trust given by the other. Good faith is a source of duties and conduct that can be demanded in each case in accordance to the nature of the legal relationship and the purpose or objective pursued by the parties through it.

124.    The actions and conduct of the Defendants throughout the Class Period clearly and expressly demonstrate a lack and complete absence of any basic good faith principles or compliance with fair dealing standards in fulfilling their contractual obligations to Plaintiff and the Class. To the contrary, the conduct, actions and dealings of Defendants clearly show complete and absolute bad faith and disregard, not only of the applicable laws and regulations, but of basic principles of fair and honest dealings. This conduct in bad faith has caused damages to Plaintiffs. Total damages incurred are at least tens of millions of dollars, and likely substantially higher. Defendants are jointly and severally liable for all damages, losses and injuries caused thereby.

125.    Defendants acted in bad faith in making materially false and fraudulent misrepresentations in connection with the sale of the Funds to Plaintiffs.

126.    As a direct result of Defendants' actions, Plaintiffs have suffered irreparable harm, and have, and will continue to suffer monetary damages in an undetermined amount to be in excess of ten million dollars ($10,000,000).

127.    The facts set forth in this Complaint constitute violations to Federal as well as Commonwealth of Puerto Rico statutes. The claims arising from said violations arise from the same nucleus of operative facts. Supplemental jurisdiction to adjudicate all claims under Commonwealth law is appropriate under 28 USC § 1367. Defendants are liable jointly and severally to Plaintiffs for said violations.

128.    The Defendants are jointly and severally liable to Plaintiffs for all sums requested in this Complaint, as well as for all prejudgment and post judgment interest, cost and attorneys' fees as prescribed by Commonwealth law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court award the following:

1.    An award of damages, including compensatory and punitive damages to Plaintiffs as a result of Defendants' wrongdoing;

2.    Rescission of all the monies paid by Plaintiffs to Defendants;

3.    Statutory and common law interest thereon;

4.    Plaintiffs' attorneys fees and costs; and

5.    Such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:  August 13th, 2012

*/S/ Luis E. Miñana    USDC-PR # 225,608*
LUIS E. MINAÑA, ESQ.
122 Calle Manuel Dómenech Altos
Urb. Baldrich
San Juan, PR  00918
787-758-1999 FAX 787-773-0500
minanalaw@prtc.net / minanalaw@yahoo.com

Héctor Eduardo Pedrosa-Luna, Esq.
USDC-PR No. 223202
P.O. Box 9023963
San Juan, PR 00902-3963
787-920-7983 Fax  787-764-7511
hectorpedrosa@gmail.com

ESPADA, MIÑANA & PEDROSA LAW OFFICES, PSC

*Counsel for Plaintiffs*

SCOTT+SCOTT LLP
David R. Scott
Amanda Lawrence
SCOTT+SCOTT LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  (860) 537-5537
Facsimile:   (860) 537-4432
drscott@scott-scott.com
alawrence@scott-scott.com

Joseph P. Guglielmo
SCOTT+SCOTT LLP
500 Fifth Avenue
40th Floor
New York, NY  10110
Telephone:  (212) 223-6444
Facsimile:   (212) 223-6334
jguglielmo@scott-scott.com

*Counsel for Plaintiffs*