# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: UBS FINANCIAL SERVICES, INC. OF PUERTO RICO SECURITIES LITIGATION | Civil Case No.3:12-cv-01663-CCC <br><br><br><br> JURY TRIAL DEMANDED |

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs Ricardo Roman Rivera, Carmelo Roman, Julio Tormes-Rodriguez, Onnasis Corporation, and SDM Holdings Inc. ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of UBS Financial Services, Inc.'s press releases, Securities and Exchange Commission ("SEC") filings and cease and desist proceedings, analyst reports, media reports, and other publicly disclosed reports and information.

## INTRODUCTION

1.     This action arises out of a scheme perpetrated by UBS Financial Services, Inc. of Puerto Rico ("UBS PR" or the "Company"), UBS Financial Services, Inc. ("UBSFS"), Miguel

A. Ferrer ("Ferrer"), and Carlos J. Ortiz ("Ortiz") (collectively "Defendants") relating to the marketing and sale of hundreds of millions of dollars of non-exchange-traded closed-end funds ("CEFs" or "securities") to Plaintiffs and other similarly situated class members.

2.      The CEFs at issue are underwritten, marketed, and sold at the behest of UBSFS by UBS PR to Puerto Rico residents.  Since 1995, Defendant UBS PR has been the primary underwriter of fourteen separately organized, closed-end fund companies' CEFs with a total market capitalization of approximately $4 billion and nine co-managed, closed-end fund companies' CEFs with more than $1 billion in total market capitalization.  The majority of these CEFs' holdings of Puerto Rico securities are Puerto Rico municipal bonds.  The CEFs were marketed mainly to retail customers in Puerto Rico, including individuals and retirees who depended on dividend income from those CEFs for retirement expenses.

3.      The CEFs represented the single largest source of revenue for UBS PR.  For example, between 2004 and 2008, the CEF business generated 50% of annual total revenues for UBS PR.  During 2008, UBS PR's CEF business produced approximately $94.5 million for the firm.  Defendants, through their marketing and sale of their securities, touted safety and security of these investments and represented that the sales price took into account the value of the underlying investments as well as the demand by the market.

4.      However, during the class period, Defendants knew, but did not disclose to Plaintiffs, material facts about the truth behind this lucrative CEF business.  Specifically, Defendants misrepresented and/or did not disclose in the offering documents and related communications:  (a) that the CEF market and its prices were rigged and set solely at the discretion of Defendant Ortiz and not based on market forces such as supply and demand; (b) that as the dominant CEF broker-dealer, UBS PR controlled the secondary market for CEFs and

that any sales that investors wanted to make depended on UBS PR's ability to solicit additional customers or its own willingness to purchase shares into its inventory; (c) that UBS PR was, unbeknownst to Plaintiffs and the Class, purchasing millions of dollars of CEF shares into its own inventory while promoting the appearance of a liquid market, and thereby artificially propping up prices and creating the appearance of liquidity; and (d) that UBSFS knew UBS PR had to reduce its exposure to ECF shares and assisted UBS PR in a covert sell-off of the CEF shares it held in inventory.

5.     Specifically, as discussed below, Defendants promoted the CEFs' "extraordinary 'market returns'" and low risk and volatility, while simultaneously not disclosing that CEF share prices and liquidity were dependent on UBS PR's continued manipulation and support of the market.  When Defendants determined that the market for CEF shares became too risky and the potential millions of dollars of losses for UBS PR was imminent, Defendants continued to tout the safety and extraordinary returns of the CEF shares.  Defendants' actions artificially inflated the value of these securities, and their manipulation of the market for these securities directly harmed Plaintiffs and the Class.

6.     As described in detail below, internal e-mails and other documents show that, particularly during 2008 and 2009, Defendants made uniform misrepresentations and omissions of material facts to Plaintiffs and other retail customers in Puerto Rico regarding CEFs, and all the while were aware that investor demand was significantly declining and/or insufficient to support the volume of inventory.  UBSFS, meanwhile, knew that UBS PR had been purchasing CEFs to maintain the appearance of a marketplace, was over-saturated with CEFs, and needed to unload these CEFs to avoid substantial losses on its own books.

7.     To offset any potential losses UBS PR could face with these CEFs, in the spring of 2009, UBSFS, the parent firm of UBS PR with ultimate control over it, ordered UBS PR, Ferrer, and Ortiz to engage in a concerted effort to substantially reduce its inventory of CEF shares.  To satisfy this directive, Defendants launched a plan they termed "Objective: Soft Landing," whereby UBS PR routinely offered and sold its CEF shares at prices that undercut pending customer sell orders.  Specifically, unbeknownst to Plaintiffs and other class members, between March and September 2009, UBS PR sold *75% of its inventory to investors at the expense of its supposed efforts to sell its clients' holdings* at the request of UBSFS.  Defendants concealed how they were setting secondary market prices and artificially manipulating demand to create the appearance of liquidity of the market, all the while preparing for its withdrawal of market support and sale of its holdings to the detriment of its clients who were likewise attempting to sell.  Therefore, by September 2009, when UBS PR completed its CEF inventory reduction, the market prices of certain funds had declined from 10-15%.

8.     Individual Defendants Miguel Ferrer, UBS PR's Chairman and CEO from 2003 through 2009 and later its Vice Chairman, and Carlos Ortiz, UBS PR's Managing Director in charge of Capital Markets and supervisor of the trading desk for CEFs, touted the CEFs as safe, liquid investments with high, stable prices, and which yielded consistently higher returns than similar funds.  They specifically promoted the liquidity of the CEFs in a supposedly robust and liquid secondary market in which investors could freely sell their shares, if necessary.  However, Ferrer and Ortiz knew, but did not disclose, that prices were set under Ortiz's direction solely as a means of keeping the investment attractive, and that UBS PR controlled the secondary market, making any sales sought by investors largely dependent on UBS PR's desire and ability to solicit additional customers to purchase such shares, or on its willingness to purchase CEF shares into

4

its inventory.  Defendants likewise did not disclose that in order to prevent a collapse of the CEF market, Ferrer and Ortiz directed UBS PR, for much of 2008 and into 2009, to purchase millions of dollars of CEF shares into its own inventory to create the appearance of liquidity, prop up prices, and maintain yields.  In other words, they created an illusion of a safe and secure market. Once UBS PR reduced its own inventory, it ceased its artificial support of the market for these securities and the value of CEFs plummeted.

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "Exchange Act").  The claims asserted herein arise under §§10(b) and 20(a) of the Act and Rule 10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.  This Court also has subject matter jurisdiction over the Commonwealth and common law claims as this action is brought as class action pursuant to 28 U.S.C. §1332 as amended by the Class Action Fairness Act of 2005, there are over 100 Class members, the matter in controversy exceeds $5 million, exclusive of interest and costs, and the action is a class action in which some members of the Class are citizens of states different than Defendants.

10.     This Court has supplemental jurisdiction over all the other claims and Defendants pursuant to 28 USCS §1367 because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  UBS PR is headquartered in San Juan, Puerto Rico and the Company conducts business in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein,

occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

12.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

Plaintiffs

13.     Plaintiffs Ricardo Roman Rivera and Carmelo Roman, as set forth in the certification previously filed and incorporated by reference herein, purchased UBS Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; and Puerto Rico Investors Bond Fund I, Inc. securities at artificially inflated prices during the Class Period and have been damaged thereby.

14.     Plaintiff SDM Holdings Inc., as set forth in the certification previously filed and incorporated by reference herein, purchased UBS Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; and Puerto Rico AAA Portfolio Bond Fund II, Inc. securities at artificially inflated prices during the Class Period and have been damaged thereby.

15.     Plaintiff Onnasis Corporation, as set forth in the certification previously filed and incorporated by reference herein, purchased Puerto Rico Fixed Income Fund, Inc. I, Puerto Rico Fixed Income Fund, Inc. II, Puerto Rico Fixed Income Fund, Inc. III, Puerto Rico Fixed Income Fund, Inc. IV, Puerto Rico Fixed Income Fund, Inc. V, Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund, Inc. I, Puerto Rico AAA Portfolio Target Maturity

Fund, Inc., and Tax Free Puerto Rico Target Maturity Fund, Inc. securities at artificially inflated prices during the Class Period and has been damaged thereby.

16.     Plaintiff Julio Tormes-Rodriguez, as set forth in the certification previously filed and incorporated by reference herein, purchased Puerto Rico Investors Tax-Free Fund, Inc., and Puerto Rico Investors Tax Free Fund, Inc. III securities at artificially inflated prices during the Class Period and has been damaged thereby

Defendants

17.     Defendant UBS Services Inc. of Puerto Rico ("UBS PR") is a Puerto Rico corporation with its principal place of business in Hato Rey, Puerto Rico.  It is a broker-dealer, registered since 1982, and a subsidiary of UBS Financial Services, Inc. ("UBSFS").  It is the largest broker-dealer in Puerto Rico, with approximately 49% of total retail brokerage assets.  It employs roughly 230 financial advisors and has nineteen branch offices throughout Puerto Rico.

18.     Defendant UBS Trust Company of Puerto Rico is an affiliate of UBS Financial Services Incorporated of Puerto Rico.  UBS Asset Managers of Puerto Rico is a division of UBS Trust Company of Puerto Rico and provides advisory services for the CEFs.  According to Company sales documents, UBS Asset Managers of Puerto Rico is a leading asset manager in Puerto Rico, and, as of September 30, 2011, managed, or co-managed, approximately $9.7 billion in fund assets.

19.     Defendant UBS Financial Services, Inc. ("UBSFS") is a Delaware corporation with its principal place of business in New York, New York and Weehawken, New Jersey. UBSFS is a wholly-owned subsidiary of UBS AG, a foreign private issuer based in Switzerland. The Company's business activities include securities and commodities brokerage, investment advisory and asset management services serving the investment, cash management, financial

planning and borrowing needs of individual and institutional clients.  UBSFS is the parent company of UBS PR and, upon information and belief, UBS PR reported directly and regularly to UBSFS.

20.     Defendant Puerto Rico Investors Tax-Free Fund IV, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

21.     Defendant Puerto Rico Fixed Income Fund III, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

22.     Puerto Rico Fixed Income Fund II, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

23.     Defendant Puerto Rico Fixed Income Fund V, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

24.     Defendant Puerto Rico Investors Bond Fund I, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

25.     Defendant Puerto Rico AAA Portfolio Bond Fund, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

26.     Defendant Puerto Rico AAA Portfolio Bond Fund II, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

27.     Puerto Rico Fixed Income Fund I, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

28.     Puerto Rico Fixed Income Fund IV, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

29.     Puerto Rico Investors Tax-Free Fund, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

30.     Puerto Rico Investors Tax-Free Fund III, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the

Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

31.     Puerto Rico AAA Portfolio Bond Fund I, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

32.     Puerto Rico AAA Portfolio Target Maturity Fund, Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

33.     Tax Free Puerto Rico Target Maturity Fund Inc. is a non-diversified, closed-end management investment company.  This CEF is a corporation organized under the laws of the Commonwealth of Puerto Rico and is registered as an investment company under the Puerto Rico Investment Companies Act.

34.     The Defendant CEFs named in ¶¶20-33 are referred to herein, collectively, as the "Funds."

35.     Defendant Miguel A. Ferrer ("Ferrer") is a citizen of Puerto Rico.  From 2003 until October 2009, Ferrer served as UBS PR's Chairman and Chief Executive Officer ("CEO"). Although he was temporarily terminated in October 2009, he was then re-hired as the Vice Chairman three months later.  Mr. Ferrer made specific oral and written representations to Plaintiffs and to broker dealers and failed to disclose material facts concerning CEFs that were contrary to the then-existing facts which were known to Defendants.  Ferrer had a direct financial interest in the CEFs performing well as his compensation was based on UBS PR's revenue,

which was closely tied to the CEFs' success or failure.  Ferrer also controlled all important aspects of UBS PR's CEF business during 2008 and 2009.

36.    Defendant Carlos J. Ortiz ("Ortiz") is a citizen of Puerto Rico.  Since 2004, he has been UBS PR's Managing Director of Capital Markets with the duty of supervising the firm's CEF trading desk.  Mr. Ortiz solicited, offered, and sold the CEFs at issue to Plaintiffs.  Mr. Ortiz made specific oral and written representations to Plaintiffs concerning CEFs that were contrary to the then-existing facts which were known to Defendants.  Ortiz's compensation was based, in part, on the performance of UBS PR, which derived much of its revenue from CEFs.

37.    Defendants Ferrer and Ortiz are referred to herein, collectively, as the "Individual Defendants."

## DEFENDANTS' UNDISCLOSED SCHEME

38.    Since 1995, UBS PR has been the primary underwriter and sole manager of fourteen separately organized closed-end fund companies' CEFs with a total market capitalization of $4 billion, and co-manager of nine closed-end fund companies' CEFs with more than $1 billion in total market capitalization. The majority of the CEFs' holdings are Puerto Rico municipal bonds, a substantial amount of which UBS PR underwrote. UBS PR has been the only secondary market dealer or liquidity provider for the sole-managed Funds and the dominant dealer for several co-managed CEFs, and has effectively controlled the secondary market for all CEFs.

39.    UBS PR also offered an undocumented "dividend reinvestment program", whereby investors could elect to receive dividend reinvestment shares – issued by the CEFs at the Net Asset Value of Funds ("NAV") – and then immediately sell them back to UBS PR at the

then-existing market price to earn a premium of up to 45%. According to Ferrer and other UBS PR principals, this was the CEFs' primary selling point.

40.     UBS PR marketed CEFs primarily to individual retail customers. Many CEF investors were seniors and retirees, and a number of them depended on monthly dividend income from the CEFs to supplement their payments from Social Security. UBS PR's network of financial advisors aggressively solicited customers to buy CEF shares, particularly as demand for the shares plummeted during 2008 and 2009. Ferrer aggressively pushed the financial advisors to solicit buyers. Indeed, during UBS PR's planned inventory reduction, 95% of the firm's CEF sales came from buyers expressly solicited by UBS PR during its aggressive and deceitful campaign.

41.     Unknown to Plaintiffs and the Class, though, in 2008 and 2009, the pricing of CEFs was left to the discretion of the Defendants – namely Ortiz. Defendants priced the CEFs to reduce volatility and maintain high premiums to NAV, and not at market value. The pricing was driven in part by the need to keep the "dividend reinvestment program" an attractive feature and not based on market forces (i.e. supply and demand). Under the guidance of the Individual Defendants, Defendants used the CEF inventory account to purchase any excess supply of shares for which UBS PR could not find customers, thus creating the false illusion of a viable market.

42.     UBS Financial Services, Inc. (UBSFS) directly controlled UBS PR's purchases of the excess supply of CEF shares by setting and increasing the limits to the number of shares that UBS PR was allowed to purchase and by monitoring the size of its inventory. UBSFS thereby, knowingly, directly or indirectly, controlled UBS PR's fraudulent sales of the CEF shares at artificially inflated prices that were maintained by the false appearance of a market demand for the shares that was created by the increase of the inventory limits that UBSFS had allowed.

43. At the direction of Ortiz, and with Ferrer's and UBSFS's knowledge, UBS PR priced CEFs to create the illusion of a market driven by liquidity and stability. The goal of pricing was not to find an objective market price, but to maintain high and stable CEF prices and "appropriate" yields for each Fund class. UBS PR also used its CEF inventory account to purchase shares for which it could not find customers to keep prices at consistently high premiums. Thus pricing was dictated by UBS PR's own interests irrespective of market realities.

### A. Misrepresentations Regarding The Pricing of CEFs.

44. Consistent and stable share prices above the Funds' respective NAVs were crucial to the success of CEF sales for several reasons. The Defendants marketed CEFs to elderly investors who were looking for stable, consistently-priced investments to protect their retirement savings and income. In addition, the success of the undocumented dividend reinvestment program was dependent on UBS PR maintaining high share prices relative to the Funds' NAVs so when investors received additional shares each month at NAV prices, they could immediately sell the shares at the higher "market prices" to UBS.

45. As a result, Defendants ensured that throughout 2008 and 2009, CEF prices remained both high and unwavering. UBS PR had no substantive written or formal CEF pricing procedures or guidelines during this time. The process was left to the discretion of Ortiz, as the head of the CEF trading desk, and the CEF Head Trader. At the direction of Ortiz, and with Ferrer's and UBSFS's knowledge, UBS PR priced CEFs to achieve stability and reduce volatility. For example, from May to October 2008, the Head Trader, at Ortiz's direction, re-priced the CEFs only one or two times a month.

46.     At the same time, however, Defendants, including Ferrer and Ortiz, misled customers and UBS PR financial advisors by representing that market forces such as supply and demand determined CEF prices.

47.     For example, UBS PR paid the Puerto Rico daily newspaper *El Vocero* to publish CEF prices in the paper's business section.   Each week, beginning in October 2008 and continuing through September 2009, the trading desk transmitted the share prices Ortiz had set to the newspaper for publication.   The newspaper simply listed CEF share "prices."   This was misleading because UBS PR failed to disclose in the listings that the prices were not actual "market" prices based on supply and demand but rather only what UBS PR and Ortiz termed "indicative" prices.   Indicative prices were simply what UBS PR and Ortiz thought the prices should be, but did not represent any commitment by UBS PR to buy or sell at that price.

48.     Similarly, UBS PR sent Plaintiffs and other Class Members monthly account statements that described "market values" of customers' CEFs.   These were misleading in that the true price of UBS PR CEFs actually had nothing to do with market value, but were simply the "indicative" prices, as in the case of newspaper "prices", that Defendants falsely determined and published.

**B.        Misrepresentations Regarding Liquidity, Stability and Returns of CEFs**

49.     Defendants also misrepresented the liquidity of the CEFs in the secondary market in 2008 and 2009.  As 2008 progressed, Ortiz became increasingly aware that the supply of CEF shares far outstripped demand, leading to an illiquid market.   Nonetheless, as Ferrer knew, Ortiz petitioned UBSFS to increase the firm's inventory limits so UBS PR could purchase additional CEF shares into inventory and maintain the illusion of a liquid market.   UBSFS granted these requests, thus permitting UBS PR's to continue to misrepresent and omit the liquidity of the

CEFs in the secondary market and allow Defendants to continue to sell CEFs to the Plaintiffs and other Class Members at artificial inflated prices.  UBSFS knew or should have known that it was assisting UBS PR's creation of a false illusion of demand and a fake "liquid" market to induce the Plaintiffs to purchase CEF shares at inflated prices.

50.     In 2008, Defendants knew UBS PR had $37 million of CEF shares in its inventory, $7 million above its inventory limit.   In addition, there were $16 million in unexecuted customer orders to sell shares at prices lower than the "indicative" price set by UBS PR for the funds.  Ortiz acknowledged in an email to senior executives that the trading desk either had to execute these customer orders or lower the bid price of the Funds.

51.     Rather than lower CEF prices to reflect the supply/demand imbalance and volatile market,  UBSFS instead provided UBS PR with an increase  in  the  inventory  limits to $50 million in December 2008

52.     UBSFS had absolute control over any increases in the inventory of USB PR's CEF limits, and it granted the authorization to UBS PR, thus knowingly and artificially inflating demand.  UBSFS controlled UBS PR' sales of additional CEF shares by knowingly allowing it to sell them at artificially inflated prices.  UBS PR increased its own inventory without lowering prices to hide the reality of a failing market from investors.  In fact, Ortiz would not agree to price the CEF shares in line with actual supply and demand.  He told UBSFS' Chief Risk Officer that he did not want to decrease Fund prices.  Therefore, UBSFS was well aware UBS PR was continuing to sell the CEF's shares at artificially inflated prices.

53.     Furthermore, Ortiz made only small changes to CEF share prices during this period, approximately once or twice a month.  As UBS PR's CEF inventory grew from May through August 2008, Ortiz did not change prices for nine CEFs on any trading day.  For other

CEFs, he changed the price at most on five trading days over four months.  For example, UBS PR's trading desk quoted the same $9.65 per-share price for the $460 million PR Fixed Income Fund I from May to August, even with $5.7 million shares of that Fund in inventory, a declining NAV, and changing dividend rates.  From May to December 2008, Ortiz changed the price of that Fund only once.

54.     Ortiz ensured other CEFs saw similarly unchanging prices during 2008. On every trading day from May to August 2008, UBS PR's desk quoted the same $9.90 per-share price for the PR Investors Tax-Free Fund I (a fund with a purported $120 million market value) and only changed the price of that fund on three trading days through December 2008, even with UBS PR's share inventory rising to $3 million.  For another $460 million fund – the PR Fixed Income Fund IV – Ortiz kept the share prices between $9.60 and $9.70 every day from May through December.

55.     Ferrer knew UBS PR set CEF share prices to maintain a consistent yield. He also knew prices were both at a premium to NAV and atypically high compared with comparable closed-end funds. These unchanging and consistently high prices in the face of declining NAVs, reduced customer demand, and other unfavorable market conditions were in marked contrast to the representations by Ferrer and others at UBS PR that market forces determined CEF share prices.

56.     UBS PR attempted to generate customer demand by promoting the CEFs at a UBS PR Investor Conference in June 2008.  Ferrer hosted the conference, at which a UBS PR managing director touted the CEFs' extraordinary market returns and low risk and volatility, but failed to disclose that  share prices and liquidity depended largely on UBS PR's undisclosed scheme and continued willingness to purchase CEF shares into inventory.

57.     After the Investor Conference, Ortiz directed the CEF Head Trader to develop sales stories for brokers, focusing on promoting and selling CEFs with the greatest inventory levels.  Ortiz told the trader to inform the sales force that the CEF desk was willing to help push sales of Funds with the highest inventory levels by reducing the typical five-cent-per-share markup the desk received on sales.  But he cautioned the trader not to put this information in an email so as not to unduly alarm the entire sales force.  The trader, in fact, held a meeting with the financial advisors to explain why they should promote certain funds to customers – not to the advisors that the funds being promoted were those with the highest inventory levels.

58.     By August 2008, Defendants knew customer demand for CEF shares was continuing to decline.  On August 12, 2008, UBS PR's Group Management Board, including Ferrer and Ortiz, met.  Among other things, the board discussed the "market drag," "product fatigue," and "weak secondary market" for CEF shares.  Ferrer expressed his uneasiness to the Group Management Board that financial advisors were concerned about the concentration of customers' investments in CEFs and about not being able to sell new CEF offerings.

59.     After the Board meeting, Ferrer directed his subordinates to boost investor demand for CEF shares.  On August 29, he told UBS PR executives "[i]t is clear to me that we have to 'fix' this."  He ordered them to "generate a story for each Fund" that the financial advisors could use to: increase sales; facilitate large cross trades between customers; and work with the traders to coordinate bids and offers.

60.     Ferrer also directed Ortiz's Capital Markets group to create a CEF "Wholesaler" and "Facilitator" to move excess CEF inventory.  Ferrer emphasized the need to immediately solve the liquidity issues in the CEF markets because he feared "apathy in the Funds." He also

made a thinly veiled threat to Ortiz: if there were not sufficient sales of CEFs, there would not be any need for a CEF desk.

61.     Notwithstanding his knowledge of the weak demand for CEF shares in the secondary market and UBS PR's increasing use of inventory to support and stabilize the CEF market, Ferrer and Ortiz repeatedly misled UBS PR's financial advisors throughout the fall of 2008 into continuing to promote CEF sales.  In email after email, Ferrer repeatedly misstated the strength, stability, and liquidity of the CEF market.  Ferrer also directed Ortiz to create investor demand for the CEFs.

62.     For example, on September 18, 2008, Ferrer told financial advisors "[i]n the midst of all the turmoil [of the then-ongoing financial crisis], I note the superior performance of our local funds. . . . [Y]ou should look at these for clients searching for low volatility and respectable returns."  On September 30, 2008, Ferrer sent another email to "note our Funds did not budge in the midst of all the bad news yesterday?  Their low volatility . . . [is] a 'great reason to consider them as a timely investment.  Plus their returns are superior!'"  On October 9, 2008, Ferrer emailed financial advisors to "keep in mind that local investors have side stepped the wrath of the marketplace and have been enjoying superior returns from our Funds."

63.     Ferrer did not disclose to the financial advisors the liquidity problems the CEFs were having because of weakening demand, or that the high, stable CEF prices were being maintained only because UBS PR was buying millions worth of CEF shares into its inventory.

64.     One way to "fix" the liquidity problem was new offerings. The two new primary CEF offerings would total $66 million.  The two funds were Puerto Rico Fixed Income Fund VI, Inc. and Puerto Rico AAA Portfolio Bond Fund II, Inc., both of which were underwritten by UBS PR.   These new offerings meant additional broker-dealer commissions and asset

management fees, as well as a direct benefit to Ferrer, as his compensation was based on revenue performance of the CEF companies in part.   The increased inventory levels, authorized by UBSFS, directly permitted the new offerings which gave the false impression that there was a demand for those shares at artificially inflated prices.

65.     Even though he knew about the CEF market's illiquidity, Ferrer sent an e-mail to UBS PR's financial advisors on September 10, 2008 in an effort to dispel their concerns about the potential impact of the two planned CEF issues on share prices and the liquidity of the secondary market:

> "Not to worry!!! No one should feel discomfort for our opening new Fund opportunities; because the local marketplace [is] in a very rapid consolidation… We have put in place a growth strategy in a consolidating market! It is bold, but it is right. This move should have little direct effect on secondary market activity, and if any, a positive one."

66.     Just a few days earlier, Ferrer privately told other UBS PR executives he was directing UBS PR's Investment Banking department to move forward with the primary offerings regardless of UBS PR's high CEF inventory holdings, stating: "I want these [two primary offerings] to happen right away.  I do not want to keep postponing new availability for reasons of inventory, no way!"

67.     In furtherance of this push, UBS PR prepared a presentation to the sales force in connection with the new CEF offerings ordered by Ferrer.   That presentation contained a myriad of illusory reasons why customers should invest in the new fund, including that "[f]und inventory levels are lower, trading volumes are at all-time high (annualized), and prices/yields are aligned with current market conditions."

68.     The prospectuses for the new CEF offerings likewise failed to disclose to investors that there was a serious market supply and demand imbalance, that UBS PR was using

its inventory account to support CEF market prices and liquidity to prevent price declines and maintain stable yields, and that CEF prices and liquidity were utterly dependent on the efforts of UBS PR's sales force to maintain customer demand for CEFs.

69.    In the two weeks before the primary offerings, which began on September 30, 2008, Ferrer sent several e-mails to UBS PR's sales force urging financial advisors to recommend the new issues for their customers' accounts, including the following:

- Financial Advisors: There is a certain comfort in owning our Funds; low volatility, attractive returns (in fact very attractive). Conclusion: Worth Considering!!! Look at Fund VI…; it will presently provide good yields.

- Financial Advisors: It is our expectation that due to particular and favorable circumstances, Fund VI will promptly show attractive returns. I urge you to focus your efforts in what we expect will have stellar performance.

70.    Ferrer failed to disclose to financial advisors that: (1) secondary markets for CEFs were illiquid; and (2) UBS PR routinely acquired CEFs for its inventory and supported CEF market prices and liquidity to prevent price declines and maintain yields.

71.    Ortiz likewise misrepresented material information to the financial advisors during this same time.  For the entire month leading up to the new offerings, Ortiz concealed UBS PR's ballooning inventory from the financial advisors.  He directed the Head Trader to alter the daily CEF inventory sheets sent to financial advisors to reflect a maximum of 50,000 shares per Fund, rather than the actual number of shares the firm owned.  By understating UBS PR's inventory of CEFs by approximately $30 million during the primary offerings, Ortiz and UBS PR misled the financial advisors and investors about the health of the secondary market for CEFs and the availability of CEF shares trading at lower prices with higher yields.  Ultimately more than 600 investors purchased shares in the primary offerings.

72.     UBS PR sales in the primary offerings did not fix its secondary market illiquidity problem, however.  UBS PR continued, under the direct control of UBSFS, to purchase shares into inventory throughout the fall of 2008 and into early 2009, often to buttress the undocumented dividend reinvestment program.  Ferrer and Ortiz worried that if UBS PR denied CEF investors their monthly dividend reinvestment check, they would complain and hurt demand for the shares.  Therefore, the CEF trading desk gave preference to executing reinvestment share orders over the backlog of other customers' sell orders.

73.     In December 2008, UBS PR exceeded its already extended $50 million CEF inventory limit. Ortiz thus directed his traders to "price to sell" all aged inventory holdings by pricing each class of CEF to achieve certain yields.  After financial advisors complained about the desk manipulating CEF prices, Ferrer instructed Ortiz to meet with the sales force to reassure them and promote additional CEF sales by providing "appropriate justifications" for the price changes and make them "believe" in the Funds.

### C.     Defendants Undertake a "SOFT LANDING" Plan To Unload UBS PR's CEF Holdings

74.     In February and March 2009, UBS PR's persistently high CEF inventory levels and the CEF shares' significant price premiums over NAV finally began to raise concerns at the highest levels of UBSFS.

75.     In March, Ortiz emailed a number of UBSFS executives seeking a temporary increase of inventory levels from $50 to $55 million to buy customers' reinvestment shares. Ferrer was copied on the email. The email explained the reason for the request was because of the supply and demand imbalance in the CEF market.

76.     On March 19, UBSFS's Chief Risk Officer rejected the request and told Ortiz to begin reducing inventory levels from about $50 million to the historical limit of $30 million.

UBS PR executives told UBSFS's Head, Wealth Management Advisor Group ("Head of WMAG") that UBS PR would correct the market imbalance by increasing demand using its sales force.  UBS PR's president added if that strategy failed, UBS PR would use "***the ultimate weapon [of] aggressive use of pricing to bring balance back to the market*** . . . ."
[Emphasis added.]

77.     Shortly thereafter, UBSFS' Chief Risk Officer noted that, although a supply and demand imbalance existed in the CEF secondary market, CEF prices remained high with a significant "difference between NAV and the price quoted by the trading desk . . . in some cases over 40%."  He further noted to UBSFS executives that due to the fact that UBS PR's internal CEF trading limits were already exceeded because UBS PR had not yet reduced its inventory to its permanent limit, "there is a significant likelihood that clients wishing to sell the shares received through the dividend reinvestment program will be unable to do so."  UBSFS was thus very aware of the situation in Puerto Rico with CEFs and the consequences it would have on investors, such as Plaintiffs and the Class.

78.     Over the next several weeks, UBSFS senior executives continued to follow the supply and demand imbalance in the CEF secondary market that they had created by the inventory limit increase.  A review by UBSFSs' Risk Control Group and Compliance Department of UBS PR's CEF pricing methods for both NAV and market value concluded:

- UBS PR was the sole CEF liquidity provider;

- UBS PR had to reduce its CEF inventory to limit its risk exposure and "promote more rational pricing and more clarity to clients . . .[so] prices transparently develop based on supply and demand;" and

- UBS PR ran a significant concentration risk that was inherent to the CEF business, which could not "effectively be reduced."

79.     UBSFS's Risk Control Committee therefore ordered further reductions to inventory limits.  On May 29, 2009, UBSFS's Chief Risk Officer sent Ortiz an email directing UBS PR to further reduce its CEF inventory to $12 million.  The risk officer's email was forwarded to Ferrer that same day.  Therefore, UBSFS ordered UBS PR to drastically reduce its inventory, thus launching the ensuing spree of sales of CEF shares held in inventory by UBS PR to meet corporate demands.

80.     In response, Ortiz made a presentation to UBSFS' Executive Committee in June 2009 in which he described a proposed strategy to reduce CEF inventory and bring prices in-line with NAVs as "Objective: Soft Landing."   In a subsequent email to members of UBSFS's Executive Committee and Ferrer, Ortiz described the firm's strategy as: "1. [p]urchasing from clients the minimum amount of shares possible," and "2.  [l]owering our price to keep ahead of any client open orders in terms of lowest offer price in the market," effectively undercutting UBS PR customer orders to allow UBS PR to sell its own inventory first.  UBSFS thus signed off on "Objective: Soft Landing," which would have direct and substantial negative impacts on Plaintiffs and the Class.

81.     Over the course of the next few months, Defendants pursued this fraudulent Soft Landing strategy to execute UBSFS' directive, with UBSFS's knowledge and approval, and to reduce CEF inventory by:

- Lowering CEF prices to undercut the pending customer sell orders in the firm's Good-Til-Cancelled ("GTC") order book;

- Soliciting new and existing customers to buy CEF shares without disclosing UBS PR's decision to reduce its inventory by lowering CEF share prices below customer orders;

- Limiting UBS PR's inventory purchases to dividend reinvestment share sellers; and,

- Arranging transactions in conjunction with offers by the affiliated CEF companies to repurchase newly issued shares from customers so UBS PR could sell to those customers' shares from the firm's aged inventory.

82.     Defendants capitalized on the firm's control of the secondary market and inside access to order information to execute a scheme to dump UBS PR's CEF inventory ahead of a growing wave of customers attempting to exit the CEF market.   UBSFS signed off on this scheme.   UBS PR's trading desk reduced its inventory by selling CEF shares at prices slightly below pending customer limit orders. Ortiz discouraged financial advisors from placing market orders by telling them customers might not receive the best execution price. In reality, UBS PR and Ortiz were strongly discouraging market orders because UBS PR had to execute those orders before it could reduce its own positions.

83.     UBS PR's trading policy directed the firm to treat "marketable" limit orders, i.e., orders at or better than UBS PR's bid prices, like market orders. However, commencing in March 2009, Ortiz directed the Head Trader to regularly wipe pending marketable limit orders off the GTC book by reducing CEF prices to pennies below the customers' pending sales orders. This allowed UBS PR to sell its inventory first.

84.     For example, on March 3, 2009, UBS PR sent its GTC book to the sales force showing $16 million in marketable, unexecuted customer sell orders. That day, Ortiz instructed the Head Trader to "prepare a pricing where we eliminate the marketable GTC [customer] orders . . . This is top priority."

85.     A few hours later, the Head Trader lowered market prices of 15 of the funds to a penny below the best customer orders, rendering $14 million of customer orders "non-marketable."   The GTC book that the CEF trading desk sent to financial advisors on March 4 reflected a much smaller number, only $2 million, of pending marketable sales orders.

86.     Defendants did not disclose to UBS PR's customers or financial advisors that UBS PR was no longer supporting the CEF market or the firm's new CEF pricing strategy to undercut customers' limit orders and sell UBS PR's shares first.

87.     Defendants also failed to disclose the conflict of interest created by recommending CEFs to investors while dumping the firm's own shares.  UBS PR continued to accept sell limit orders from customers without disclosing the direct conflict of interest created by UBS PR's new practice of purchasing few, if any, CEF shares, or undercutting customer orders to liquidate UBS PR's own inventory position.

88.     On March 31, 2009, UBS PR and Ortiz made misrepresentations and omissions to thousands of customers at a UBS PR Investor Conference about the CEFs' superior returns and consistent liquidity levels.

89.     Before the conference, Ferrer urged UBS PR's sales force to "call your clients, [because] the information presented will offer comfort to holders of Puerto Rico bonds and Funds".  UBS PR also purchased full-page newspaper advertisements in the Puerto Rican daily newspaper *El Vocero* as well as television spots promoting the conference.  On the morning of the conference, Ortiz told Ferrer and other executives his view that UBS PR should present the message to investors that the secondary market had "shown resiliency (high liquidity, stable price) during these times."  This directly contradicted Ortiz's statements just two weeks earlier to UBS PR executives that the market was illiquid because sellers far outnumbered buyers.

90.     At the conference, which Ferrer hosted, Ortiz made a presentation about the CEFs' secondary trading market.  He misrepresented that CEF liquidity was increasing, and CEF prices were the result of supply and demand in an open market.  These statements were false because the CEFs were experiencing a severe supply and demand imbalance, and UBS PR had

been using its own inventory to support CEF prices and disguise the lack of liquidity in the market.  Furthermore, Ortiz omitted disclosing UBSFS had recently ordered UBS PR to reduce inventory, and that to comply with this directive UBS PR had begun lowering share prices and buying fewer customer shares.

91.     The day after the investor conference, Ferrer sent an e-mail to UBS PR's sales force stating:

> "Wow!  What a show.  Our clients received a huge dose of comfort on their investments, the right consideration in view of what we believe the local market for bonds (and funds) is headed.  This will offer you another opportunity to do right for your own client base by showing each client how he or she can benefit from the opportunities at hand.  The ball is now in your court."

92.     During the ensuing months, Defendants stepped up their campaign to create CEF demand while also concealing the liquidity crisis and inventory dump.  Ferrer directed UBS PR's sales force to push their customers to buy CEFs while dismissing UBS PR customers and financial advisors' concerns about CEF prices and liquidity.

93.     Ferrer further misled investors about the state of the CEF market in a newspaper interview published in *El Vocero* on April 24, 2009.  Specifically addressing the CEF market, Ferrer stated in the newspaper article:

> "The local mutual funds have had an excellent return during all this process,' explained Ferrer.  But through all of this, many investors call [UBS PR] scared about the news of the drop in financial markets, 'when the reality is that news doesn't have any relevance for the investor.'  In general, 'the Puerto Rican investor that has their money invested in bonds and mutual funds has obtained fantastic results . . . The result of an investor in local mutual funds, that has been able to reinvest dividends, has been superior and in some cases comparable with the stock market Indices,' said Ferrer, and he assured that this type of investment offers much less volatility and relative positive results."

94.     From April to August 2009, Ortiz and other UBS PR executives conducted multiple sales meetings with financial advisors focusing exclusively on promoting CEF solicitations.  They did not disclose the inventory dump ordered by UBSFS and misleadingly blamed falling CEF prices on global economic conditions.  As a result of this sales push, the percentage of investors' CEF purchases that financial advisors solicited grew from approximately 65 percent to 95 percent by mid-2009.

95.     In August 2009, despite having recently expressed concerns to UBSFS executives that UBS PR's inventory reduction had caused "huge losses" to investors, Ferrer sent an e-mail to UBS PR's sales force urging them to "consider the present prices of our Funds" and increasing dividends as a buying opportunity for UBS PR customers.  Ferrer omitted any mention of UBS PR's inventory or share price reductions, or his belief the ongoing inventory dump had drastically reduced market prices.

96.     By September 30, 2009, UBS PR had reduced its CEF inventory to about $12 million, the level UBSFS mandated.  However, UBS PR's GTC order book on the same day detailed $72 million in pending, unexecuted customer sell orders.

97.     By selling 75% of its inventory (as directed by UBSFS) and ceasing to use its inventory to support the CEF secondary market, UBS PR caused prices to decline.  Therefore, investors were induced to purchase CEFs that had significantly declined in value.  In fact, the difference in value of the funds from the height of their prices on March 1, 2009 to the prices at the end of September, 2009 was more than $500 million.

98.     Plaintiffs' injuries are the direct and proximate cause of Defendants' fraudulent activities.  Such injuries were reasonably foreseeable by Defendants.  In fact, Defendants were actively and secretly trying to minimize UBS PR's CEF inventory for the very same reasons.

99.   As a result of Defendants' fraudulent activities, Plaintiffs have suffered millions of dollars of damages because the CEFs have declined in value or they possess unexecuted sell orders.   Moreover, as a foreseeable consequence of Defendants' actions Plaintiffs purchased millions of dollars of CEFs that had a value that had dramatically declined far below the value of what Plaintiffs paid for them.   In addition, Plaintiffs have been injured as a result of the illiquidity of tens of millions of dollars invested in CEFs.   Defendants' inventory dump harmed investors who sold, or attempted to sell, shares during that dump in that customers waited weeks or months for UBS PR to execute their sell orders at significant losses, while some customers' sell orders were never even executed

## THE TRUTH IS REVEALED

100.   On May 1, 2012, the SEC announced an Order Instituting Administrative and Cease-and-Desist proceedings against Defendants.   The papers filed by the SEC make similar allegations to those contained herein concerning misrepresentations surrounding the CEF market and finding that Defendants "willfully violated Section 17(a) of the Securities Act, which prohibits fraudulent conduct in the offer and sale of securities, and Sections 10(b) and 15(c) of the Exchange Act and Exchange Act Rule 10b-5, which prohibit fraudulent conduct in connection with the purchase or sale of securities."

101.   The SEC ordered UBS PR to retain an independent third-party consultant to review UBS PR's CEF practices and policies.   It also censured UBS PR and ordered it to pay disgorgement of $11.5 million, prejudgment interest in excess of $1 million, and a $14 million civil penalty.   It also launched an investigation and proceedings against Ferrer and Ortiz.

102.   As a result of Defendants' actions and once the truth was revealed, the value of Plaintiffs' and other Class Members' CEFs have been dramatically reduced and, in certain

instances, the market for CEFs has become illiquid as Plaintiffs have been unable to sell their CEFs at the prices they purchased them.

## LOSS CAUSATION / ECONOMIC LOSS

103.    As detailed herein, Defendants made false and misleading statements and failed to disclose material facts during the Class Period that artificially inflated the price of CEFs and operated as a fraud or deceit on the Class.  As further detailed herein, the price of CEFs declined and individuals' abilities to sell CEFs were dramatically reduced when Defendants' prior false statements, material misrepresentations, and omissions began to reach the market.  As a direct result, Plaintiffs and the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## SCIENTER

104.    Defendants clearly acted with conscious knowledge of their fraud and deception during the Class Period.  Defendants had actual knowledge of the falsity of the statements and the materiality of their omissions and/or acted in reckless disregard of the truth or falsity of such statements.  As alleged herein, Defendants violated the federal securities laws by, *inter alia,* knowingly and/or recklessly making false and misleading statements and omitting to disclose material facts to Plaintiffs and other Class Members, disregarding that the documents and statements issued or disseminated by the Individual Defendants and USB PR were false and materially misleading, and that such statements or documents would be issued or disseminated to the investing public.

105.    Defendants also received information reflecting the true facts regarding CEFs sold by UBS PR, had control over, received and/or modified UBS PR's false and materially misleading statements, or were otherwise privy to confidential proprietary information about

CEFs sold by UBS PR reflecting the true state of CEFs and contradicting public statements made by the Individual Defendants and/or the Company.

## NO SAFE HARBOR

106.    To the extent Defendants made or issued oral or written forward-looking statements accompanied by purported statutory "safe harbor" warnings, such warnings were ineffective to shield those statements from liability.  Defendants are liable for false or materially misleading, forward-looking statements made during the Class Period because the speaker or issuer knew that the forward-looking statement was false or misleading, and/or such forward-looking statements were authorized and/or approved by an executive officer who knew that the forward-looking statement was false.  Defendants also did not make or issue contemporaneous, meaningful, and cautionary "safe harbor" statements identifying important factors that could cause actual results or circumstances to differ materially from those in the forward-looking statements.

## CLASS ACTION ALLEGATIONS

107.    Plaintiffs brings this Action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased or acquired the Funds from UBS PR during the period from January 1, 2008 to May 1, 2012 (the "Class Period") (the "Class").  Excluded from the Class are Defendants, any entity in which a Defendant has, or had, a controlling interest, members of the Individual Defendants' families and legal representatives, agents, affiliates, and heirs and successors-in-interest or assigns of any such excluded party.

108.    Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and all members of the Class sustained damages as a result of Defendants' misconduct alleged herein.

109.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel with significant experience in class action litigation and litigation involving alleged violations of the federal securities laws.  Plaintiffs have no interests that are contrary to, or in conflict with, those of the Class that Plaintiffs seeks to represent in this Action.

110.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, including because joinder of all members of the Class is impracticable and damages suffered by individual Class members may be relatively small whereas the expense and burden of individual litigation make it virtually impossible for the members of the Class to individually redress the wrongs done to them by Defendants.  There will be no difficulty in the management of this Action as a class action.

111.    There is a well-defined community of interest in the questions of law and fact involved in this Action.  The questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members are:

(a)    whether Defendants' acts and omissions complained of herein violated the federal securities laws;

(b)    whether Defendants misrepresented material facts;

(c)    whether documents, including, *inter alia*, the Company's press releases and prospectuses issued, and Defendants' other public statements made during the Class Period contained misstatements of material fact, or omitted to state material facts, necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(d)     whether the price for the Funds was artificially inflated during the Class Period due to the false and materially misleading statements, including non-disclosures, complained of herein;

(e)     whether Defendants represented that the Funds were safe and liquid, or thus had characteristics, benefits, or qualities that they, in reality, did not have;

(f)     whether Defendants' acts and practices in connection with the marketing, advertising, and sale of the Funds violated the Puerto Rico Securities Act;

(g)     with respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, whether Defendants acted with the requisite state of mind in making false and materially misleading statements, including non-disclosures, in press releases and other public statements;

(h)     with respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, whether Defendants named in such claims are controlling persons of UBS PR; and

(i)     whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure of such damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

112.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment.  Defendants, by suppressing information, failing to disclose that the Funds' prices were set solely at the discretion of Defendants and not based on market forces, failing to disclose that UBS PR controlled the secondary market for the Funds, failing to disclose that UBS PR was artificially propping up prices and creating the appearance of liquidity, failing

to disclose that UBS PR was well beyond internal limits, failing to timely disclose known defects of the Funds, and misrepresenting their products as liquid and safe, actively concealed from Plaintiffs and the Class the true risks associated with the Funds.

113.    As a result of Defendants' actions, until May 1, 2012, Plaintiffs and the Class were unaware, and could not have reasonably known or learned through reasonable diligence; (1) that Plaintiffs and the Class were exposed to the risks described above, and/or (2) that those risks were the direct and proximate result of Defendants' acts and omissions.

114.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality, state of the market and nature of the Funds and the risks and volatile nature inherent in them.  The Defendants were under a duty to disclose the true riskiness, liquidity, and nature of the CEF market because (1) this information was non-public and the Defendants had, and continue to have, exclusive control over it, and (2) Defendants knew that the information was not available to the Plaintiffs or the Class.

115.    Plaintiffs and the Class had no knowledge that Defendants were engaged in the wrongdoing described herein.  As a result of the fraudulent concealment by the Defendants, the Plaintiffs and the Class could not have discovered previously that UBS PR manipulated the market for the Funds until the SEC announced its investigation in May 2012.  There is no way that Plaintiffs and the Class, who are unsophisticated investors, could have discovered the fraud prior to this date.

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against UBS PR and the Individual Defendants**

116.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

117.    Plaintiffs brings this Claim pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC on behalf of Plaintiffs and members of the Class who purchased the Funds from UBS PR during the Class Period against UBS PR and the Individual Defendants.

118.    Throughout the Class Period, Defendants, individually and together, directly and indirectly, by the use and means of instrumentalities of interstate commerce: employed devices, schemes and artifices to defraud; made untrue statements of material fact; materially misrepresented facts, including by omitting to state material facts necessary to make statements not misleading; and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class.  Such acts were in violation of Section 10(b) of the Exchange Act and Rule 10-b5 promulgated thereunder by the SEC.

119.    Defendants' false and materially misleading statements were made with scienter and were intended to, and did:  deceive the investing public, including Plaintiffs and the Class; artificially create, inflate, and maintain the market for, and market price of, the Funds; and cause Plaintiffs and the Class to purchase the Funds from UBS PR at artificially inflated prices.

120.    Defendants were individually and collectively responsible for making the statements and omissions alleged herein by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material facts, and/or omitted

material facts necessary to make the statements contained therein not misleading.  Defendants also made materially false and misleading oral statements to investors.

121.    During the Class Period, Defendants were executives at UBS PR and had access to, and were provided with, non-public information concerning the Company and the Funds. Each of them knew, or recklessly disregarded, the adverse facts specified herein and omitted to disclose those facts.

122.    As set forth herein, Defendants made false statements and materially misleading statements, including by omitting to state material facts, knowingly and intentionally, or in an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the Class who purchased the Funds from UBS PR during the Class Period.  Throughout the Class Period, Defendants had a duty to disclose new, material information that rendered their prior statements to the market materially false and misleading.  There is a substantial likelihood that disclosure of these omitted facts would have been viewed by Plaintiffs and the Class, as reasonable investors, as significantly altering the 'total mix' of information available about the Company and its CEFs.

123.    As a result of the dissemination of the false and misleading statements and failure to disclose material facts, set forth above, the market price for the Funds was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, and relying directly or indirectly on those statements or upon the integrity of the market in which the Funds were sold, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, Plaintiffs and other members of the Class acquired the Funds from UBS PR at artificially high prices and were damaged thereby.

124.    Defendants made the false and materially misleading statements, including omissions of material facts, complained of herein in connection with the purchase or sale of the Funds from the Company.

125.    Plaintiffs and the Class purchased the Funds from UBS PR at artificially inflated prices during the Class Period in ignorance of the false and materially misleading nature of Defendants' statements and upon the integrity of the market price for CEFs.  Plaintiffs and the Class would not have purchased the Funds from UBS PR but for Defendants' fraud.

126.    As described in detail herein, the market price for the Funds (and the ability to even sell such CEFs) declined materially upon public disclosure of the facts that Defendants had previously misrepresented or omitted to disclose.

127.    Plaintiffs and the Class were damaged as a direct and proximate result of their purchases of the Funds from UBS PR at artificially inflated prices and the subsequent decline of the value of the Funds when the truth about them was disclosed.

128.    Accordingly, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, and are liable to Plaintiffs and the Class.  This claim was brought within two years after discovery of Defendants' fraud and within five years of the making of the statements alleged herein to be false and/or materially misleading.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

129.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

130.    Plaintiffs bring this claim pursuant to Section 20(a) of the Exchange Act against the Individual Defendants on behalf of Plaintiffs and the Class who purchased the Funds from UBS PR during the Class Period.

131.    As set forth herein, UBS PR is liable to Plaintiffs and the Class who purchased the Funds from UBS PR based on the false and materially misleading statements, including omissions, set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

132.    Throughout the Class Period, the Individual Defendants were controlling persons of UBS PR within the meaning of Section of 20(a) of the Exchange Act and culpable participants in the fraud at UBS PR, as set forth above.

133.    Each Individual Defendant exercised control over UBS PR during the Class Period by virtue of, *inter alia*, their executive positions with the Company, the key roles they played in the management of UBS PR, and their direct involvement in the Company's operations, including its marketing and sale of the Funds.

134.    Given, then, the Individual Defendants' personal and collective responsibilities for managing UBS PR during the Class Period, the Individual Defendants were regularly presented to the market as the persons responsible for UBS PR's day-to-day business and operations and the Company's overall strategic direction, and in particular for their CEF operations.  The Individual Defendants were responsible for presenting results, setting guidance for future reporting periods, and assuring the market about the state of the Company and its investment vehicles.  At UBS PR, the Individual Defendants had ultimate responsibility for, and control over, the Company's internal activities and public statements, and no one else at UBS PR exercised similar degrees of responsibility and control.

135.   As set forth herein, the Individual Defendants' false and materially misleading statements, including omissions, artificially inflated the market price of the Funds during the Class Period.  As more fully described above, the presumption of reliance available under the "fraud on the market theory" applies under such circumstances.  Plaintiffs and the Class relied upon either the integrity of the market or upon the statements and reports of the Individual Defendants in purchasing the Funds from UBS PR at artificially inflated prices.

136.   Accordingly, each of the Individual Defendants are liable to Plaintiffs and the Class, each of whom has been damaged by the underlying violations of the federal securities laws.  This claim was brought within two years after discovery of the Individual Defendants' fraud and within five years of the making of the statements alleged herein to have been false and/or materially misleading.

## COUNT III

### For Violations of Section 20(a) of the Exchange Act
### Against Defendant UBSFS

137.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

138.   Plaintiffs bring this claim pursuant to Section 20(a) of the Exchange Act against UBSFS on behalf of Plaintiffs and the Class who purchased the Funds from UBS PR during the Class Period.

139.   As set forth herein, UBSFS is liable to Plaintiffs and the Class who purchased the Funds from UBS PR based on the false and materially misleading statements, including omissions, set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

140.    Throughout the Class Period, UBSFS was a controlling person of UBS PR within the meaning of Section of 20(a) of the Exchange Act and a culpable participant in the fraud at UBS PR, as set forth above.

141.    UBSFS exercised control over UBS PR during the Class Period by virtue of, *inter alia*, being the parent and controlling company of UBS PR, the key roles it played in the management of UBS PR, and its direct involvement in UBS PR's operations, including its inventory limits, its marketing and sale of the Funds.

142.    Given, then, UBSFS's responsibilities for managing UBS PR during the Class Period, it was regularly presented to the market as the corporate person ultimately responsible for UBS PR's business and operations and the Company's overall strategic direction, and in particular for their CEF limits, holdings, sales and operations.   UBSFS was responsible for directing inventories, setting guidance for future reporting periods, and assuring the market about the state of its subsidiary, UBS PR, and its investment vehicles.

143.    As set forth herein, the false and materially misleading statements, including omissions, artificially inflated the market price of the Funds during the Class Period.   As more fully described above, the presumption of reliance available under the "fraud on the market theory" applies under such circumstances.   Plaintiffs and the Class relied upon either the integrity of the market or upon the statements and reports of the Defendants in purchasing the Funds from UBS PR at artificially inflated prices.

144.    Accordingly, UBSFS is liable to Plaintiffs and the Class, each of whom has been damaged by the underlying violations of the federal securities laws.   This claim was brought within two years after discovery of UBSFS's fraud and within five years of the making of the statements alleged herein to have been false and/or materially misleading.

## COUNT IV

### Puerto Rico Securities Act - 10. L.P.R.A. §890
### (Against All Defendants)

145.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

146.     Defendants marketed and sold the Funds to Plaintiffs, making untrue statements of fact, as well as omitting material facts concerning the market demand, liquidity, safety, and returns for the Funds.  Defendants made these untrue statements of fact regarding the Funds in publicly-disseminated materials, and omitted to disclose the true state of the market for the Funds in such materials.  Defendants knew, or recklessly disregarded, that the untrue statements of fact described herein were false and materially misleading when making such statements.

147.     Defendants made untrue statements of fact regarding the Funds for the purpose of inducing Plaintiffs and other class members to purchase the Funds.  Based on Defendants' untrue statements of fact, Plaintiffs and other class members purchased the Funds.

148.     Defendant UBSFS, the parent company of UBS PR, directly or indirectly controlled the sale of the relevant CEF shares by engaging in, *inter alia,* setting and increasing the limits of the number of shares that UBS PR was allowed to purchase; monitoring the size of its inventory; and approving "Objective: Soft Landing."   UBSFS thus, directly or indirectly, knowingly controlled, aided, abetted, and permitted UBS PR's misrepresentation of the liquidity of the CEFs in the secondary market and the fraudulent sale of CEFs to the Plaintiffs and the Class at artificially inflated prices.

149.     All Defendants thus violated 10 L.P.R.A. §890(a)(2), and Plaintiffs and the Class are entitled to damages and interest.  Specifically, that section provides that any person:

shall be liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards as provided by the regulations approved to such effects the Financing Board created by §§2001 et seq. of Title 7, starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security.

150.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchase of the Funds.

## COUNT V

**Fraudulent Inducement**
**(Against UBS PR and Individual Defendants)**

151.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

152.    In marketing the Funds to Plaintiffs, Defendants made untrue statements of fact specified above.  Defendants also made untrue statements of fact regarding the Funds in publicly-disseminated materials, as specified above.  Defendants knew that the untrue statements of fact described herein were false and materially misleading when making such statements.

153.    Defendants made untrue statements of fact regarding the Funds investments for the purpose of inducing Plaintiffs to purchase the Funds.   Based on Defendants' untrue statements of fact, Plaintiffs purchased the Funds.

154.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their purchase of the Funds.

## COUNT VI

### Negligent Misrepresentation
### (Against UBS PR and Individual Defendants)

155.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

156.     As alleged above, Defendants made a series of misrepresentations contained in oral presentations, written presentation materials, sales pitches, and published documents during the relevant time period concerning the state of the CEF market, and specifically touting the liquidity of the Funds.

157.     The information Defendants provided to the Plaintiffs was false and misleading because, at that same time, in reality, Defendants were aware that there was a serious imbalance in the CEF market and that Defendants were artificially manipulating the CEF market.

158.     Defendants failed to exercise reasonable care in obtaining and communicating to Plaintiffs this information concerning CEFs, but instead, provided the faulty and false information in order to induce Plaintiffs to purchase the Funds.

159.     In response thereto, Plaintiffs justifiably relied on the information provided to them by the Defendants concerning CEFs and bought, collectively, millions of dollars of the Funds that have now declined in value.

160.     As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages in connection with their purchases of the Funds.

## COUNT VII

### Fraudulent Misrepresentation
### (Against UBS PR and Individual Defendants)

161.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

162.    As alleged above, Defendants engaged in fraudulent acts and practices by conveying false and misleading information to Plaintiffs in oral presentations, written presentation materials, sales pitches, and published materials during the relevant time period concerning the state of the CEF market, and specifically touting the liquidity of the Funds.

163.    Defendants conveyed the information concerning the state of the CEF market and the liquidity of the investments as statements of fact.

164.    However, as alleged above, evidenced by oral statements, internal e-mails, and reports at UBS PR, Defendants knew that their statements to Plaintiffs concerning the viability and liquidity of the Funds were untrue or, at a minimum, made the statements with reckless disregard for the truth of the matter.

165.    Defendants made these fraudulent statements concerning CEFs in order to induce Plaintiffs to purchase the Funds.

166.    In response thereto, Plaintiffs bought, collectively, millions of dollars of the Funds that have now declined in value.

167.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages in connection with their purchases of the Funds.

## COUNT VIII

### Rescission
### (Against All Defendants)

168.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

169.    As alleged above, Defendants engaged in fraudulent acts and practices in order to induce Plaintiffs to purchase the Funds which have now declined in value.

170.    Defendants made a series of materially false and fraudulent misrepresentations in connection with the sale of the Funds to Plaintiffs during the relevant time period.

171.    As prospective purchasers and customers of Defendants, Plaintiffs had a right to rely, and in fact did rely, on these materially false and fraudulent misrepresentations by the Defendants in connection with their purchases of the Funds.

172.    If Defendants had not engaged in their fraudulent scheme or had not made materially false misrepresentations, Plaintiffs would not have purchased the Funds.

173.     Plaintiffs seek rescission of the purchase of the Funds from Defendants during the relevant time period.

## COUNT IX

### Breach of Implied Duty of Good Faith
### (Against UBS PR and Individual Defendants)

174.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

175.    Article 1258 of the Civil Code provides that contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their

character, are in accordance with good faith, use, and law. The Supreme Court of the Commonwealth of Puerto Rico has stated and reiterated that any contract and agreement must have as its foundation principles of good faith and fair dealing in the trade. Requiring good faith in the conduct and actions of all parties is a governing principle in all legal activity and consist in acting in a loyal, honest and fair manner. It assumes faithful compliance with the representations and agreements reached and that a party will not defraud or abuse the trust given by the other. Good faith is a source of duties and conduct that can be demanded in each case in accordance to the nature of the legal relationship and the purpose or objective pursued by the parties through it.

176. The actions and conduct of the Defendants throughout the Class Period clearly and expressly demonstrate a lack and complete absence of any basic good faith principles or compliance with fair dealing standards in fulfilling their contractual obligations to Plaintiff and the Class. To the contrary, the conduct, actions and dealings of Defendants clearly show complete and absolute bad faith and disregard, not only of the applicable laws and regulations, but of basic principles of fair and honest dealings. This conduct in bad faith has caused damages to Plaintiffs. Total damages incurred are at least tens of millions of dollars, and likely substantially higher. Defendants are jointly and severally liable for all damages, losses and injuries caused thereby.

177. Defendants acted in bad faith in making materially false and fraudulent misrepresentations in connection with the sale of the Funds to Plaintiffs.

178. As a direct result of Defendants' actions, Plaintiffs have suffered irreparable harm, and have, and will continue to suffer monetary damages in an undetermined amount to be in excess of ten million dollars ($10,000,000).

179.    The facts set forth in this Complaint constitute violations to Federal as well as Commonwealth of Puerto Rico statutes.  The claims arising from said violations arise from the same nucleus of operative facts.   Supplemental jurisdiction to adjudicate all claims under Commonwealth law is appropriate under 28 USC §1367.  Defendants are liable jointly and severally to Plaintiffs for said violations.

180.    The Defendants are jointly and severally liable to Plaintiffs for all sums requested in this Complaint, as well as for all prejudgment and post judgment interest, cost and attorneys' fees as prescribed by Commonwealth law.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court award the following:

1.    An award of damages, including compensatory and punitive damages to Plaintiffs as a result of Defendants' wrongdoing;

2.    Rescission of all the monies paid by Plaintiffs to Defendants;

3.    Statutory and common law interest thereon;

4.    Plaintiffs' attorneys fees and costs; and

5.    Such other relief as the Court may deem just and proper.


**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:  November 5, 2012    ESPADA MIÑANA & PEDROSA LAW OFFICES PSC

*/S/ Luis E. Miñana USDC-PR # 225,608*
LUIS E. MIÑANA, ESQ.
122 Calle Manuel Dómenech Altos
Urb. Baldrich
San Juan, PR 00918
Telephone: (787) 758-1999
Facsimile: (787) 773-0500
minanalaw@prtc.net / minanalaw@yahoo.com

- and -

Héctor Eduardo Pedrosa-Luna, Esq.
USDC-PR No. 223202
P.O. Box 9023963
San Juan, PR 00902-3963
Telephone: (787) 920-7983
Facsimile: (787) 764-7511
hectorpedrosa@gmail.com

*Co-Liaison Counsel*

Eric Quetglas-Jordan
QUETGLAS LAW OFFICES
USDC-PR No. 202514
PO Box 16606
San Juan PR 00908-6606
Tel: (787) 722-0635/(787) 722-7745
Fax: (787) 725-3970
Quetglaslaw@gmail.com;
Eric@Quetglaslaw.com

*Co-Liaison Counsel*

David R. Scott (admitted *pro hac vice*)
Amanda Lawrence (admitted *pro hac vice*)
SCOTT+SCOTT LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
drscott@scott-scott.com
alawrence@scott-scott.com

- and -

Joseph P. Guglielmo (admitted *pro hac vice*)

SCOTT+SCOTT LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY  10174
Telephone:     (212) 223-6444
Facsimile:      (212) 223-6334
jguglielmo@scott-scott.com

*Lead Counsel for Lead Plaintiff*

Richard P. Rouco
QUINN, CONNOR, WEAVER, DAVIES &
ROUCO, LLP
2700 Highway 280
Mountain Brook Center Ste. 380
Birmingham, Alabama 35223
Tel. (205) 870-9989
rrouco@qcwdr.com

*Counsel for Plaintiffs*