## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re: UBS FINANCIAL SERVICES, INC. OF   :   Civil No.: 12-cv-1663-CCC
PUERTO RICO SECURITIES LITIGATION    :
:
:
:
:   **ECF Case**
:   **Electronically Filed**
:
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT

Roberto C. Quiñones-Rivera
MCCONNELL VALDÉS LLC
270 Muñoz Rivera Ave.
Hato Rey, Puerto Rico  00918
Tel.:  (787) 759-9292

*Attorney for Defendants Puerto Rico Fixed
Income Fund III, Inc. and Puerto Rico Fixed
Income Fund V, Inc.*

Salvador J. Antonetti-Stutts
Mauricio O. Muñiz-Luciano
Ubaldo M. Fernández-Barrera
O'NEILL & BORGES LLC
American International Plaza
250 Muñoz Rivera Ave., Suite 800
Hato Rey, Puerto Rico  00918-1813
Tel.:  (787) 764-8181

OF COUNSEL

Paul J. Lockwood
Nicole A. DiSalvo
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
Tel.:  (302) 651-3000

*Attorneys for Defendants UBS Financial
Services Incorporated of Puerto Rico, UBS
Trust Company of Puerto Rico, UBS Financial
Services Inc., Miguel A. Ferrer and Carlos J.
Ortiz*

## TABLE OF CONTENTS

Page

TABLE OF CASES & AUTHORITIES....................................................................... iii

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND .....................................................................................5

    A.    The Funds Were Sold As Long-Term Investments For Residents Of Puerto Rico. ...........................................................................................................5

    B.    The Limited Market For The Funds Was Disclosed To Investors...........................5

    C.    The Global Financial Crisis Stresses UBS-PR's Maintenance of the Market. ...............................................................................................................8

ARGUMENT .............................................................................................................9

THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE ...........................9

I.    STANDARD OF REVIEW. ...............................................................................9

II.    PLAINTIFFS HAVE NOT ALLEGED A CLAIM UNDER SECTION 10(B) AGAINST UBS-PR OR THE INDIVIDUAL DEFENDANTS....................................10

    A.    Plaintiffs Have Failed To State A Claim For Misrepresentation Under Section 10(b) And Rule 10b-5. ...........................................................................10

        1.    Plaintiffs have not alleged that UBS-PR or the Individual Defendants made any false or misleading statements................................11

        2.    Plaintiffs have failed to plead reliance.......................................................15

            (a)    Plaintiffs have not alleged individual reliance..............................15

            (b)    Plaintiffs cannot invoke any presumption of reliance...................15

        3.    Plaintiffs have not pled economic loss or loss causation. ..........................19

        4.    Plaintiffs have not pled scienter. ...............................................................22

    B.    Plaintiffs Have Failed To State A Claim For Market Manipulation.....................24

III.    PLAINTIFFS HAVE NOT PLED A CLAIM UNDER SECTION 10(B) AGAINST THE DEFENDANT FUNDS. ...........................................................................26

IV.    PLAINTIFFS HAVE NOT ALLEGED A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(A)........................................................27

V.    PLAINTIFFS' PUERTO RICO LAW CLAIMS MUST BE DISMISSED. ....................28

    A.    Plaintiffs' Puerto Rico Law Claims Are Barred By SLUSA. ................................28

B.     Plaintiffs Have Failed To State A Claim Under Puerto Rico Statutory Or Common Law..........................................................................................................29

CONCLUSION...................................................................................................................29

## TABLE OF CASES & AUTHORITIES

**CASES**                                                 **PAGE(S)**

*Abarca Health, LLC v. PharmPix Corp.*,
  806 F. Supp. 2d 483 (D.P.R. 2011)................................................................6

*Abbott v. United States*,
  144 F.3d 1 (1st Cir. 1998) ...........................................................................5

*Abelson v. Strong*,
  644 F. Supp. 524 (D. Mass. 1986) ...........................................................3, 17

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008)...............................................9, 10, 11, 12, 22, 27

*In re Acterna Corp. Sec. Litig.*,
  378 F. Supp. 2d 561 (D. Md. 2005) ...............................................................20

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972)...............................................................................3, 15, 16

*In re AIG Advisor Grp. Sec. Litig.*,
  309 F. App'x 495 (2d Cir. 2009) ....................................................................11

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002)............................................................................27

*In re Alkermes Sec. Litig.*,
  No. 03-12091-RCL, 2005 WL 2848341 (D. Mass. Oct. 6, 2005) ....................20

*Alteram S.A. v. Beacon Hill Asset Mgmt. LLC*,
  No. 03 Civ. 2387 (LAK), 2004 WL 367709 (S.D.N.Y. Feb. 27, 2004) ............14

*Ashland Inc. v. Morgan Stanley & Co.*,
  652 F.3d 333 (2d Cir. 2011)...........................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)........................................................................24, 26

*Bacon v. Stiefel Labs., Inc.*,
  275 F.R.D. 681 (S.D. Fla. 2011) ....................................................................17

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...................................................................18

*In re Canandaigua Sec. Litig.*,
  944 F. Supp. 1202 (S.D.N.Y. 1996).................................................................13

*Cavalier Carpets, Inc. v. Caylor*,
  746 F.2d 749 (11th Cir. 1984) .......................................................................16

*In re Citigroup Auction Rate Sec. Litig.*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009) .............................................................12, 23, 25, 26

*Cox v. Collins*,
    7 F.3d 394 (4th Cir. 1993) ....................................................................................................16

*In re Cytyc Corp. Sec. Litig.*,
    No. 02-12399-NMG, 2005 WL 3801468 (D. Mass. Mar. 2, 2005) ..................................23

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) ................................................................................................26

*In re Doral Fin. Corp. Sec. Litig.*,
    563 F. Supp. 2d 461 (S.D.N.Y. 2008), *aff'd sub nom.*
    *W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717 (2d Cir. 2009) ................23

*Dura Pharm., Inc. v Broudo*,
    544 U.S. 336 (2005) ......................................................................................................19, 21

*Edes v. Verizon Commc'ns, Inc.*,
    417 F.3d 133 (1st Cir. 2005) ...................................................................................................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011) ..........................................................................................................15

*Finkel v. Docutel/Olivetti Corp.*,
    817 F.2d 356 (5th Cir. 1987) .................................................................................................16

*Finkel v. Stratton Corp.*,
    754 F. Supp. 318 (S.D.N.Y. 1990), *aff'd in part & rev'd in part on other grounds*,
    962 F.2d 169 (2d Cir. 1992) ..................................................................................................21

*FirstBank Puerto Rico, Inc. v. La Vida Merger Sub, Inc.*,
    638 F.3d 37 (1st Cir. 2011), *cert. denied*,
    132 S. Ct. 248 (2011) .............................................................................................................20

*In re First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ..............................................................................20, 22

*In re Gap Sec. Litig.*,
    No. 89-16098, 1991 WL 17091 (9th Cir. Feb. 8, 1991) ....................................................13

*Garvey v. Arkoosh*,
    354 F. Supp. 2d 73 (D. Mass. 2005) ..............................................................................4, 22, 23

*Geman v. SEC*,
    334 F.3d 1183 (10th Cir. 2003) ...............................................................................................7

*Generadora de Electricidad del Caribe, Inc. v. Foster Wheeler Corp.*,
    92 F. Supp. 2d 8 (D.P.R. 2000)..............................................................................................20

*In re GenesisIntermedia, Inc. Sec. Litig.*,
    No. 01-9024-SVW, 2007 WL 1953475 (C.D. Cal. June 28, 2007), *aff'd sub nom.*
    *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009) ........................................3

*Greenberg v. Howtek, Inc.*,
    790 F. Supp. 1181 (D.N.H. 1992) ........................................................................................13

*Hidalgo-Velez v. San Juan Asset Mgmt., Inc.*,
    No. 11-2175, 2012 WL 4427077 (D.P.R. Sept. 24, 2012) (Cerezo, J.) ............................28

*Hill v. Gozani*,
    638 F.3d 40 (1st Cir.), *reh'g denied*, 651 F.3d 151 (1st Cir. 2011) ...................................13

*In re Immersion Corp. Sec. Litig.*,
    No. C 09-4073 MMC, 2011 WL 871650 (N.D. Cal. Mar. 16, 2011) ...............................23

*In re Initial Pub. Offering Sec. Litig.*,
    383 F. Supp. 2d 566 (S.D.N.Y. 2005)..............................................................................25

*In re Interbank Funding Corp. Sec. Litig.*,
    668 F. Supp. 2d 44 (D.D.C. 2009), *aff'd*, 629 F.3d 213 (D.C. Cir. 2010) ..................15, 16

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011).......................................................................................4, 7, 27

*Johnston v. HBO Film Mgmt., Inc.*,
    265 F.3d 178 (3d Cir. 2001).............................................................................................16

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000) ......................................................................................26

*In re J.P. Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005).............................................................................23

*Kenney v. State St. Corp.*,
    754 F. Supp. 2d 288 (D. Mass. 2010) ..............................................................16, 17, 19

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)........................................................................................21, 24

*Lewis v. Casey*,
    518 U.S. 343 (1996).........................................................................................................19

*In re Lupron Mktg. & Sales Practices Litig.*,
    No. MDL 1430, 2004 WL 2070883 (D. Mass. Sept. 16, 2004) ...................................3, 15

*Maldonado v. Fontanes*,
    568 F.3d 263 (1st Cir. 2009)..............................................................................................9

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)...........................................................................................................10

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd sub nom.*
    *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011)..............................12, 25, 26

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003)...................................................................................23

*Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*,
    No. 02 Civ. 1230 (LMM), 2003 WL 21088506 (S.D.N.Y. May 14, 2003)................23, 24

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008).......................................................................................10, 22

*In re PolyMedica Corp. Sec. Litig.*,
    453 F. Supp. 2d 260 (D. Mass. 2006) .........................................................................3, 18

*In re PolyMedica Corp. Sec. Litig.*,
    432 F.3d 1 (1st Cir. 2005)..........................................................................................17, 18

*Powers v. Boston Cooper Corp.*,
    926 F.2d 109 (1st Cir. 1991) .....................................................................................10, 14

*In re Sadia, S.A. Sec. Litig.*,
    269 F.R.D. 298 (S.D.N.Y. 2010) ......................................................................................22

*Salgado v. Piedmont Capital Corp.*,
    452 F. Supp. 853 (D.P.R. 1978).......................................................................................29

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)..........................................................................................................24

*SEC v. First Jersey Sec. Inc.*,
    101 F.3d 1450 (2d Cir. 1996)...........................................................................................27

*SEC v. Tambone*,
    597 F.3d 436 (1st Cir. 2010) ..............................................................................................9

*Specialty Graphite Servs., Inc. v. Chiodo*,
    No. 2:11–cv–1438, 2012 WL 162936 (W.D. Pa. Jan. 12, 2012).....................................19

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005)......................................................................................15, 17

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005) ............................................................................................27

*Suna v. Bailey Corp.*,
    107 F.3d 64 (1st Cir. 1997) ........................................................................................4, 9, 22

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)..............................................................................................18

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    No. 05 Civ. 1898 (SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), *aff'd*,
    546 F.3d 196 (2d Cir. 2008) ....................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................................................5, 22

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
    No. 02-MD-1335-PB, 2008 WL 489257 (D.N.H. Feb. 20, 2008)....................................28

*Urman v. Novelos Therapeutics, Inc.*,
    867 F. Supp. 2d 190 (D. Mass. 2012) .........................................................................4, 20

*Vervaecke v. Chiles, Heider & Co.*,
    578 F.2d 713 (8th Cir. 1978) ....................................................................................16

*Vogel v. Sands Bros.*,
    126 F. Supp. 2d 730 (S.D.N.Y. 2001)..........................................................................24

*Westernbank Puerto Rico v. Kachkar*,
    No. 07-1606 ADC/BJM, 2009 WL 6337949 (D.P.R. Dec. 10, 2009)...............................29

*White v. H & R Block, Inc.*,
    No. 02 Civ. 8965 (MBM), 2004 WL 1698628 (S.D.N.Y. July 28, 2004) ........................19

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011)..................................................................2, 7, 12, 13, 24, 25

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche, LLP*,
    549 F.3d 100 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 2011 (2009) ..................................15

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005)......................................................................................18

## STATUTES

Federal Rule of Civil Procedure 9(b) .............................................................................1, 2, 9, 29

Federal Rule of Civil Procedure 12(b)(6) ........................................................................1, 2, 9, 29

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)............................................10, 22

Puerto Rico Uniform Securities Act, 10 L.P.R.A. § 890................................................20, 27, 28, 29

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b)...................................................10

Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb....................................................28

S.E.C. Rule 10b-5 ...................................................................................................... *passim*

TO THE HONORABLE COURT:

Defendants UBS Financial Services Incorporated of Puerto Rico; UBS Trust Company of Puerto Rico; UBS Financial Services Inc.; Miguel A. Ferrer; Carlos J. Ortiz; Puerto Rico Fixed Income Fund III, Inc.; and Puerto Rico Fixed Income Fund V, Inc. (collectively, "Defendants"), through their undersigned counsel, respectfully move this Honorable Court under Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss with prejudice the Second Consolidated Amended Complaint (the "SAC" or "Complaint") filed by plaintiffs Ricardo Roman-Rivera, Carmelo Román, Onnasis Corporation, Julio Tormes-Rodríguez and Lead Plaintiff SDM Holdings, Inc. (collectively, "Plaintiffs"), for failure to state a claim upon which relief can be granted and failure to plead fraud with particularity.[1]

## PRELIMINARY STATEMENT

Plaintiffs, purported purchasers of shares issued by thirteen closed-end mutual funds (the "Funds" or the "CEFs") marketed to investors in Puerto Rico, allege that UBS Financial Services Incorporated of Puerto Rico ("UBS-PR") and two of its executives, Miguel A. Ferrer and Carlos J. Ortiz ("Individual Defendants"), committed fraud by misleading Plaintiffs about the liquidity of the market for shares of the Funds.  The SAC is the *fourth* complaint filed in this action.[2]

Plaintiffs' latest pleading contains only superficial and inconsequential modifications and additions from the prior Consolidated Amended Complaint.[3]  Glaringly absent from the SAC is

---

[1]    Defendants Puerto Rico Fixed Income Fund III, Inc. and Puerto Rico Fixed Income Fund V, Inc. are similarly situated to Defendants Puerto Rico Investors Tax-Free Fund IV, Inc. and Puerto Rico Investors Bond Fund I and therefore refer to and incorporate the arguments made by those Funds in support of their motion to dismiss.

[2]    Plaintiffs Román, Román-Rivera and Lead Plaintiff SDM Holdings, Inc. filed a class action complaint on August 13, 2012.  (D.I. 1)  Plaintiffs Onnasis Corporation and Tormes-Rodríguez subsequently filed their substantially similar class action complaint on October 9, 2012.  (No. 3:12-cv-01849-CCC, D.I. 1)  On October 16, 2012, the Court consolidated the actions, appointed SDM Holdings, Inc. as Lead Plaintiff and also appointed lead and co-liaison counsel.  (D.I. 34)  Pursuant to the court-ordered schedule, Plaintiffs filed the Consolidated Amended Complaint on November 5, 2012.  (D.I. 45)  Defendants moved to dismiss the Consolidated Amended Complaint on December 5, 2012.  (D.I. 50)  Plaintiffs responded by seeking leave to file the SAC (D.I. 59) and filed the SAC on January 17, 2013.  (D.I. 60)

[3]    A blackline comparison provided by Plaintiffs of the SAC to the Consolidated Amended Complaint is attached hereto as Ex. P.  We note, however, that there are a few discrepancies in paragraph numbering between the blackline and the SAC.

any description of the information provided *to Plaintiffs* when they purchased their shares in the Funds or any losses that *they* purportedly suffered from their investments.

Plaintiffs plead claims on behalf of a putative class of purchasers of securities issued by the Funds. Plaintiffs bring claims under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 against UBS-PR, its parent company, UBS Financial Services Inc. ("UBSFS"), Ferrer and Ortiz, and the Funds. Plaintiffs also plead claims under Puerto Rico law against those same defendants plus UBS Trust Company of Puerto Rico ("UBS Trust"). As explained below, all of these claims should be dismissed with prejudice pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

*First*, Plaintiffs have not identified any statements made by UBS-PR, Ferrer or Ortiz, or the Funds that were materially misleading. The Funds were marketed as long-term investments that provided income through dividends, not as readily tradeable securities. (*See, e.g.*, Ex. A, Puerto Rico AAA Portfolio Bond Fund, Inc. Prospectus at 7 ("[T]he Shares may not be suitable to all investors as they are designed primarily for long-term investors, and investors in the Shares should not view the Fund as a vehicle for trading purposes.")) And investors were specifically warned that liquidity depended on UBS-PR's willingness to maintain a market in the Funds' shares: "No assurance can be given as to the liquidity of, or the trading market for, the Shares as a result of any activities undertaken by UBS Puerto Rico. *Such purchases and sales, if commenced, may be discontinued at any time*. If at any time UBS Puerto Rico (and other dealers, if any) ceases to maintain a market*, the Shares will become illiquid* until a market is reestablished." (Ex. B, Puerto Rico Fixed Income Fund III, Inc. Prospectus at 8) (emphasis added) Despite these express warnings, Plaintiffs contend that they were allegedly misled into believing that there was "a supposedly robust and liquid" market for shares of the Funds "in which investors could freely sell their shares," when the market actually depended on UBS-PR's willingness to provide such liquidity through its own purchases. (SAC ¶ 9) Those assertions are refuted by the prospectuses and related offering documents cited in the Complaint. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) (holding broker did not engaged in deceitful conduct by purchasing securities to support market because broker disclosed that it may routinely place bids and warned that if it stopped bidding, the securities could become illiquid).

*Second*, Plaintiffs have not pleaded facts that could show that *they* actually relied upon any purportedly false and misleading statements made by UBS-PR, Ferrer or Ortiz.  Plaintiffs do not allege any personal interactions with Ferrer, Ortiz or anyone else working for UBS-PR (or any other corporate defendant).  Instead, Plaintiffs allege that Ferrer or Ortiz made false statements to UBS-PR's "network of financial advisors" and "sales force."  (SAC ¶¶ 40, 62, 63, 66, 68, 70, 72, 84, 87, 91, 93, 94, 99)  Notably, the Complaint contains no specific allegation that any financial advisor or member of the sales force passed on any supposedly false information to Plaintiffs or any other investors.  Because Plaintiffs have not alleged any facts regarding how they purportedly came to rely on the alleged misstatements, they have failed to plead reliance. *See In re Lupron Mktg. & Sales Practices Litig.*, No. MDL 1430, 2004 WL 2070883, at *4 & n.9 (D. Mass. Sept. 16, 2004).

In addition, Plaintiffs cannot rely on a presumption of reliance arising from the fraud-on-the-market theory.  That presumption requires an efficient market.  *See In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 278 & n.23 (D. Mass. 2006).  Here, Plaintiffs contend that the market was inefficient and did not respond to market conditions.

In their latest pleading, Plaintiffs have recast their allegations as "omissions" in an attempt to invoke the presumption of reliance developed in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  This repackaging of their allegations as "omissions" fails, however, because, at most, Plaintiffs contend that certain statements by Defendants were incomplete or misleading without the disclosure of additional facts.  The *Affiliated Ute* exception does not apply in these circumstances because "positive statements exist" upon which Plaintiffs may have relied.  *See Abelson v. Strong*, 644 F. Supp. 524, 528 (D. Mass. 1986).  *See also In re GenesisIntermedia, Inc. Sec. Litig.*, No. 01-9024-SVW, 2007 WL 1953475, at *6-7 (C.D. Cal. June 28, 2007) (holding *Affiliated Ute* does not apply where "[a]t best, Plaintiffs' complaint alleges a mix of affirmative misrepresentations and omissions"), *aff'd sub nom. Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009).

*Third*, Plaintiffs have no valid claims because they did not suffer a loss.  The Complaint alleges, in a wholly conclusory manner, that some unnamed investor lost $12,000 (SAC ¶ 5), but Plaintiffs must allege that they *personally* suffered an economic loss in order to survive a motion

to dismiss.  Moreover, Plaintiffs must plead not only an economic loss, but "loss causation," *i.e.*, "a plausible theory of stock price inflation" caused by the alleged fraud and a "corresponding stock price deflation . . . caused by a 'corrective disclosure.'"  *Urman v. Novelos Therapeutics, Inc.*, 867 F. Supp. 2d 190, 198 (D. Mass. 2012).  Here, the Complaint states that share prices declined between March 2009 and September 2009, but those prices recovered entirely before the "truth was revealed" in May 2012.  Furthermore, when the purported "corrective disclosure" occurred, the prices of the Funds did not drop.  Thus, the Complaint offers no plausible loss causation theory at all.

*Fourth*, Plaintiffs have failed to plead particularized facts giving rise to a "'strong inference of fraudulent intent.'"  *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997) (citation omitted).  Plaintiffs point to the purported desire of UBS-PR, Ferrer and Ortiz to earn fees or commissions in connection with sales of shares of the Funds as demonstrating their fraudulent intent, but courts have consistently found such assertions to be insufficient to plead scienter.  *See, e.g.*, *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 81 (D. Mass. 2005).  Moreover, there are absolutely no scienter allegations against the Funds, which were added to the Section 10(b) claims in the SAC.

*Fifth*, Plaintiffs have failed to plead a Section 10(b) claim against the defendant Funds, including Puerto Rico Fixed Income Fund III, Inc. and Puerto Rico Fixed Income Fund V, Inc. The only basis for asserting this claim in the SAC against the Funds is Plaintiffs' unsupported allegation that Ferrer's actions are "attributable to the Funds because Ferrer was a director of the Funds during the Class Period."  (SAC ¶ 129)  However, nowhere in the SAC do Plaintiffs allege that any of Ferrer's actions were undertaken in his capacity as a director of the Funds.  As such, Plaintiffs' Section 10(b) claim against the Funds must be dismissed.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2303 (2011) (refusing to "expand [Section 10(b)] liability beyond the person or entity that ultimately has authority over a false statement" because "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it").

*Sixth*, Plaintiffs have failed to plead a Section 20(a) claim against Ferrer, Ortiz and UBSFS because they have failed to plead a Section 10(b) claim.  *See* p. 27, *infra*.

*Finally*, Plaintiffs' claims under Puerto Rico law are precluded by the Securities Litigation Uniform Standards Act ("SLUSA"), which requires that class action claims for securities fraud be brought exclusively under federal law.  *See* p. 28, *infra*.

For all of these reasons and the reasons set forth more fully below, the Complaint should be dismissed in its entirety with prejudice.

## FACTUAL BACKGROUND[4]

### A.     The Funds Were Sold As Long-Term Investments For Residents Of Puerto Rico.

Plaintiffs are alleged purchasers of securities issued by the Funds.  (SAC ¶¶ 14-17, 21-33)  They purport to bring this lawsuit on behalf of a class of purchasers of shares of the Funds who acquired shares during the period from January 1, 2008 to May 1, 2012 (the "Class Period").  The Funds were marketed to investors in Puerto Rico who sought to receive current income from their investment (in the form of dividends) that is exempt from federal and Puerto Rico income taxes.  (*See, e.g.*, Ex. B, Puerto Rico Fixed Income Fund III, Inc. Prospectus at Cover)  According to the Complaint, the investors in these securities are mostly "seniors and retirees" "who were looking for stable, consistently-priced investments" and who "depended on the monthly dividend stream from the CEFs."  (SAC ¶¶ 40, 44)

UBS-PR was the underwriter for each Fund's offering of securities.  UBS-PR also provides brokerage services that support the purchase or sale of each Fund's securities in the secondary market.  (SAC ¶¶ 18, 38)  A different entity, UBS Trust, provides advisory services to the Funds regarding the investments made by the Funds themselves.  (SAC ¶ 19)

### B.     The Limited Market For The Funds Was Disclosed To Investors.

The limited market for the securities of the Funds and the potential for illiquidity should UBS-PR reduce its purchases of such securities were disclosed in the prospectuses for the Funds and on the UBS website.[5]

---

[4]     Solely for purposes of this motion, Defendants assume the truth of the factual allegations made in the Complaint, but not conclusory allegations or legal conclusions offered as pleadings. *See Abbott v. United States*, 144 F.3d 1, 2 (1st Cir. 1998).  The Court also may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

5

For example, the Funds' prospectuses disclose:

- UBS Puerto Rico currently intends to maintain a market in the Shares commencing after the final closing of the initial public offering of the Shares, *although it is not obligated to do so*.  No assurance can be given as to the liquidity of, or the trading market for, the Shares as a result of any activities undertaken by UBS Puerto Rico. *Such purchases and sales, if commenced, may be discontinued at any time*.  If at any time UBS Puerto Rico (and other dealers, if any) ceases to maintain a market, *the Shares will become illiquid* until a market is reestablished.  (Ex. B, Puerto Rico Fixed Income Fund III, Inc. Prospectus at 8) (emphasis added)[6]

- The Fund cannot predict whether the Shares will trade at, below, or above net asset value or their respective offering price.  That conclusion is further affected by the fact that there may be few or no market-makers in the Shares.  [UBS-PR] may be the only firm maintaining a market in the Shares, and from time to time, due to regulatory constraints or otherwise, *[UBS-PR] may cease to maintain a market in the Shares, which could result in illiquidity of the Shares*. . . .  [T]he Shares may not be suitable to all investors as they are designed primarily for long-term investors, and investors in the Shares should not view the Fund as a vehicle for trading purposes.  (Ex. A, Puerto Rico AAA Portfolio Bond Fund, Inc. Prospectus at 7) (emphasis added)[7]

In addition, an electronic brochure available on the UBS website throughout the Class

Period also explained UBS-PR's role in maintaining a secondary market for the Funds:

- While UBS Financial Services Incorporated of Puerto Rico currently intends to maintain a market in the shares, and has since 1995, it is under no obligation to do so. Therefore, there may be occasions when you may be unable to sell your fund shares or may be able to sell them only at a loss or, at times, at a significant loss.  (Ex. E, 2009 UBS Puerto Rico Family of Funds Brochure at 3)

- Investors may purchase or sell closed-end fund shares in the secondary market. Transactions in the secondary market may be made directly with UBS Financial Services Incorporated of Puerto Rico to or from its inventory.  (*Id.*)

- After the initial trading, however, the fund shares of the UBS Puerto Rico closed-end funds are traded through the trading desk of UBS Financial Services Incorporated of Puerto Rico.  UBS Financial Services Incorporated of Puerto Rico is the principal

---

*(cont'd from previous page)*

[5]      The Court can take judicial notice of the prospectuses and the online brochure because these documents are referenced in the Complaint (*see, e.g.*, SAC ¶¶ 4, 69, 108, 115, 124, 164, 170) and were also publicly available on the UBS website.  *See Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 137 n.4 (1st Cir. 2005); *Abarca Health, LLC v. PharmPix Corp.*, 806 F. Supp. 2d 483, 492 n.9 (D.P.R. 2011) ("'It is not uncommon for courts to take judicial notice of factual information found on Internet websites.'") (citations omitted).

[6]      Similar disclosures by other Funds are collected in Exhibit C, attached hereto.

[7]      Similar disclosures by other Funds are collected in Exhibit D, attached hereto.

secondary market dealer for the UBS Puerto Rico closed-end funds, but is not required to purchase shares of a closed-end fund from clients seeking to sell their shares. Shares of the UBS Puerto Rico funds do not trade on any exchanges. The funds are not obligated to redeem or repurchase any shares. (*Id.* at 2)

- Your Financial Advisor and the trading desk may earn compensation in connection with secondary market transactions you make through UBS Financial Services Incorporated of Puerto Rico. We may charge up to 3.5% on your purchase (a "mark up"), and up to 1.5% on a sale (a "mark down"). A portion of the mark up or mark down may be paid to the UBS Financial Services Trading Desk or all or a portion may be paid to your Financial Advisor. (*Id.* at 3)[8]

Despite these extensive disclosures in the very offering documents and published materials cited in the Complaint, Plaintiffs allege that they purchased their shares in the Funds based on false and misleading information that purportedly caused them to believe that the shares of the Funds traded in a liquid market. (*See* SAC ¶ 4) Specifically, Plaintiffs allege that UBS-PR touted the market for CEF shares as "a supposedly robust and liquid secondary market in which investors could freely sell their shares," purportedly failed to disclose that investors' ability to sell was "largely dependent on UBS PR's desire and ability to solicit additional customers to purchase such shares, or on its willingness to purchase CEF shares into its inventory," and did so while misleading investors about the compensation it was receiving on the transactions. (SAC ¶¶ 3, 9)[9] These allegations are refuted by the disclosures listed above.

---

[8] Similar warnings are found in the 2008 UBS Puerto Rico Family of Funds Brochure, attached hereto as Exhibit F.

[9] Plaintiffs largely copy their allegations from a proceeding brought by the Securities and Exchange Commission (the "SEC") in connection with its investigation into sales of shares of the Funds. (SAC ¶ 104) The SEC's allegations are not entitled to any deference in this private action brought under Section 10(b). *See, e.g.*, *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2303, 2304 n.8 (2011) (affording no deference to SEC's position in amicus brief regarding the "maker" of a statement in a private action under Section 10(b) and stating: "We have previously expressed skepticism over the degree to which the SEC should receive deference regarding the private right of action"); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) (affirming dismissal of securities class action despite SEC's amicus brief asserting that defendants' disclosures were inadequate). Moreover, a regulatory proceeding brought by the SEC differs in important respects from this private lawsuit in that Plaintiffs here have to plead and prove reliance and damages. *See Geman v. SEC*, 334 F.3d 1183, 1191 (10th Cir. 2003) (recognizing that the "SEC is not required to prove reliance or injury in enforcement actions").

In any event, the Complaint contains no allegations that Plaintiffs even spoke to any UBS financial advisor about the Funds, much less Ferrer or Ortiz.  The Complaint has no description whatsoever of the specific information considered by Plaintiffs before making their investment.

## C.    The Global Financial Crisis Stresses UBS-PR's Maintenance of the Market.

Despite a global recession that hit Puerto Rico with particular force,[10] UBS-PR continued to maintain a market for the Funds' shares throughout the Class Period.  UBS-PR's willingness to continue to purchase shares of the Funds during a time of particular turbulence – 2008 – resulted in an increase in UBS-PR's inventory.  (SAC ¶¶ 51-53)

During this period in which UBS-PR increased its inventory of shares of the Funds, Plaintiffs contend that a senior executive of UBS-PR, Miguel Ferrer, made false statements to UBS-PR's financial advisors (not to investors).  The statements, however, merely point out the relative stability of the Funds during a period of almost unprecedented stock market turmoil.  (*See* SAC ¶ 63 (attributing to Ferrer: "[i]n the midst of all the turmoil [of the then-ongoing financial crisis], I note the superior performance of our local funds. . . .  [Y]ou should look at these for clients searching for low volatility and respectable returns"; "note our Funds did not budge in the midst of all the bad news yesterday?  Their low volatility . . . [is] a 'great reason to consider them as a timely investment.  Plus their returns are superior!'"))  Plaintiffs have not identified what was false about these statements.  At the time that Ferrer was observing the relatively stable performance of the Funds, Lehman Brothers was filing for bankruptcy, Merrill Lynch was being quickly sold to Bank of America, and the federal government was bailing out American International Group.  Investors were fleeing the stock market, and share values plunged.[11]  The Funds, in contrast, continued to regularly declare and pay dividends, consistent with their long-term, income-oriented investment objectives.  (SAC ¶¶ 40-41, 73; Ex. A, Puerto Rico AAA Portfolio Bond Fund, Inc. Prospectus at 7 ("Shares may not be suitable for all

---

[10]     *See* Andrew Ross Sorkin, "Puerto Rico Lenders Face Their Own Crisis,"  NY TIMES, Apr. 29, 2010 *available at* http://dealbook.nytimes.com/2010/04/29/puerto-rican-lenders-face-their-own-crisis/

[11]     *See* Bajaj, Vikas, "Stocks Drop Sharply and Credit Markets Seize Up," NY TIMES, Nov. 19, 2008, *available at* http://www.nytimes.com/2008/11/21/business/21markets.html.

investors as they are designed primarily for long-term investors, and investors in the Shares

should not view the Fund as a vehicle for trading purposes."))

By March 2009, UBS-PR decided that it could no longer continue to hold so many shares

of the Funds.  (SAC ¶¶ 78-79)  UBS-PR decided to reduce its inventory to its historical limits by

gradually selling shares into the secondary market.  (*Id.*)  Plaintiffs complain that UBS-PR

undercut its customers' efforts to sell their shares by selling its own shares at lower prices.  (SAC

¶¶ 85-89)  While Plaintiffs allege that unnamed "investors" and "customers" were unable to sell

or had their sales delayed, Plaintiffs do not allege that they personally submitted unsuccessful

sell orders to UBS-PR.  (SAC ¶ 103)

## ARGUMENT

### THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

### I.   STANDARD OF REVIEW.

On a motion to dismiss pursuant to Rule 12(b)(6), the Court draws reasonable inferences

in favor of the non-moving party, but the complaint "must nonetheless 'contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *SEC v. Tambone*,

597 F.3d 436, 442 (1st Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

"'Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice.'"  *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (quoting

*Iqbal*, 556 U.S. at 677).  Thus, dismissal will be granted if the court finds that "the factual

allegations . . . are too meager, vague, or conclusory to remove the possibility of relief from the

realm of mere conjecture."  *Tambone*, 597 F.3d at 442 (citing *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555 (2007)).

In addition, all of Plaintiffs' claims are based on allegations of fraud, which are subject to

the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  To plead fraud

with particularity, a plaintiff must "'(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent.'"  *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir.

1997) (citations omitted).  *See also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st

Cir. 2008) ("Of course, plaintiffs alleging securities fraud must also meet the Rule 9(b) standard for pleading fraud with particularity.").

Plaintiffs' claims under the Exchange Act (Counts I-III) are also subject to the special pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) (the "PSLRA"), which mandates that "'securities fraud complaints "specify" each misleading statement; set forth the facts "on which [a] belief" that a statement is misleading was "formed"; and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006) (alteration in original) (quoting *Dura Pharm., Inc. v Broudo*, 544 U.S. 336, 345 (2005)). In the First Circuit, a plaintiff pleading securities fraud must "specify[] in the . . . complaint the time, place, and content of the alleged false or fraudulent representations." *Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991) (affirming dismissal of action for failure to plead fraud with specificity).

## II.    PLAINTIFFS HAVE NOT ALLEGED A CLAIM UNDER SECTION 10(B) AGAINST UBS-PR OR THE INDIVIDUAL DEFENDANTS.

### A.    Plaintiffs Have Failed To State A Claim For Misrepresentation Under Section 10(b) And Rule 10b-5.

In Count I of the Complaint, Plaintiffs purport to assert a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, against UBS-PR and the Individual Defendants. To establish a claim under Section 10(b), a plaintiff's complaint "must plead adequately (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 44 (1st Cir. 2008). For the reasons set forth below, Plaintiffs have not adequately alleged a claim for misrepresentation under Section 10(b) against UBS-PR or the Individual Defendants because they have not alleged that: (1) UBS-PR or the Individual Defendants made any misleading statements; (2) Plaintiffs relied on any purportedly misleading statements; (3) Plaintiffs suffered any losses as a result of any purportedly misleading statements; or (4) UBS-PR or the Individual Defendants acted with the requisite scienter.

10

### 1.   Plaintiffs have not alleged that UBS-PR or the Individual Defendants made any false or misleading statements.

Plaintiffs' allegations that they were defrauded turn on their contentions that:  (i) Defendants misrepresented the market for the shares of the Funds as "a supposedly robust and liquid secondary market in which investors could freely sell their shares" when, supposedly, the investors' ability to sell was "largely dependent on UBS PR's desire and ability to solicit additional customers to purchase such shares, or on its willingness to purchase CEF shares into its inventory" (SAC ¶ 9; *see also* SAC ¶¶ 66, 68, 90-93); and (ii) Defendants purportedly led Plaintiffs to believe that prices for the Fund shares were "based on market forces such as supply and demand or the underlying value of the Funds' assets" when they were actually set by UBS-PR's purchases that maintained the market.  (SAC ¶ 4; *see also* SAC ¶¶ 41, 43)

Plaintiffs' assertions that they were misled about the liquidity in the secondary market and UBS-PR's role in maintaining that market are refuted by numerous publicly available statements regarding the Funds.  *See* pp. 6-7, *supra*.  For example, the Funds' prospectuses, which were publicly available on UBS-PR's website throughout the Class Period, disclosed that:

> [UBS-PR] currently intends to maintain a market in the Shares commencing after the final closing of the initial public offering of the Shares, although it is not obligated to do so.  No assurance can be given as to the liquidity of, or the trading market for, the Shares as a result of any activities undertaken by [UBS-PR].  Such purchases and sales, if commenced, may be discontinued at any time.  If at any time [UBS-PR] ceases to maintain a market, the Shares will become illiquid until a market is reestablished.

*See* p. 6 & n.6, *supra*.  In addition, a brochure published on UBS-PR's website disclosed that:

> UBS Financial Services Incorporated of Puerto Rico is the principal secondary market dealer for the UBS Puerto Rico closed-end funds, but is not required to purchase shares of a closed-end fund from clients seeking to sell their shares.  Shares of the UBS Puerto Rico funds do not trade on any exchanges.

*See* pp. 6-7 & n.8, *supra*.[12]

---

[12]    It does not matter that individual investors might not have received these disclosures because they were available online and Plaintiffs "could have easily discovered [them] through minimal diligence."  *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 n.4 (2d Cir. 2011).  Where, as here, a website and other public documents divulge the purportedly undisclosed information, they "render[] inactionable the alleged misrepresentations."  *See In re AIG Advisor Grp. Sec. Litig.*, 309 F. App'x 495, 498 (2d Cir. 2009); *see also ACA*, 512 F.3d at 60

*(cont'd)*

Further, the published prices of shares of the Funds that Plaintiffs contend were misleading were accompanied by the weekly net asset value ("NAV") of each Fund, so investors could make their own judgments as to the relationship between the prices and "the underlying value of the Funds' assets."  (*Compare* Exs. H & I *with* SAC ¶ 4)

Where it is "disclosed 'that Defendants could engage in the very conduct of which Plaintiff[s] complain[ ],'" no claim of fraud has been pleaded.  *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 391-92 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) (alteration in original) (citation omitted).  *See also In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294 (S.D.N.Y. 2009) (dismissing Rule 10b-5 claims based on broker's allegedly misleading support of auctions where broker disclosed its auction practices on its website).  In *Wilson v. Merrill Lynch*, the Second Circuit dismissed a securities fraud suit that was factually analogous to the claims asserted here.  *See* 671 F.3d 120 (2d Cir. 2011).  Wilson asserted that Merrill Lynch misled purchasers of auction rate securities ("ARS") into believing that there was a liquid market for the ARS when Merrill Lynch was allegedly supporting an illiquid market with its own purchases.  *Id.* at 132-33.  In affirming dismissal, the Second Circuit noted that Merrill Lynch's support of the auctions was not misleading because Merrill Lynch had disclosed that it "'is permitted, but not obligated, to submit orders in auction for its own account,'" that it "'may routinely place'" bids, and that "'in the absence of Merrill . . . bidding in the auction for its own account or encouraging others to bid,' there might not be sufficient demand to prevent auction failure."  *Id.* at 132 (citation omitted).  The court also rejected Wilson's assertions that Merrill Lynch should have disclosed its purported motive "to meet certain limits on its own inventory" and "its internal assessments that the ARS market was collapsing" because it was sufficient that Merrill Lynch disclosed its bidding and the "possible consequences of this activity on the price and liquidity of the ARS."  *Id.* at 135.

---

*(cont'd from previous page)*
(statements not misleading where public disclosures contained warnings about risks of investments).

Here, both Plaintiffs' allegations and UBS-PR's disclosures closely resemble the facts in *Wilson*.  As described above, UBS-PR and the Funds made disclosures regarding the liquidity of the shares and UBS-PR's effect on the pricing of the shares that refute Plaintiffs' allegations that they were misled.  Furthermore, as in *Wilson*, UBS-PR had no obligation to disclose its motivation for purchasing or selling shares or its internal inventory limits as UBS-PR disclosed its activities and the negative consequences that would result if UBS-PR withdrew from its maintenance of the market.  *See id.* at 135.  Indeed, as UBS-PR made no statements about its inventory levels one way or the other, there was nothing misleading about its silence on that issue.  *See In re Gap Sec. Litig.*, No. 89-16098, 1991 WL 17091, at *3-4 (9th Cir. Feb. 8, 1991) (holding no duty to disclose increasing or "excessive" inventory levels where company made no affirmative statements that were misleading without additional disclosure).[13]

Plaintiffs also point to purportedly false statements made by Ferrer to UBS-PR's financial advisors (*not to Plaintiffs*), such as:  "[i]n the midst of all the turmoil [of the then-ongoing financial crisis], I note the superior performance of our local funds . . . .  [Y]ou should look at these for clients searching for low volatility and respectable returns."  (SAC ¶ 63; *see also* ¶ 70 ("Financial Advisors:  There is a certain comfort in owning our Funds; low volatility, attractive returns (in fact very attractive)"))  Plaintiffs have not alleged specific facts that could demonstrate that any of these statements were false.  The Funds were relatively stable investments during that period of unprecedented volatility and negative returns.  And the Funds have proven to be exactly what they were marketed to be:  "long-term" investments, not "vehicle[s] for trading purposes" (*see* p. 6 & n.7, *supra*), that have provided dividends for investors who "depended on the monthly dividend stream."  (SAC ¶¶ 40, 44)

---

[13]     *See also Hill v. Gozani*, 638 F.3d 40, 56-70 (1st Cir.) (affirming dismissal of 10(b) claim because multitude of alleged omissions did not render any affirmative statements misleading), *reh'g denied*, 651 F.3d 151 (1st Cir. 2011); *Greenberg v. Howtek, Inc.*, 790 F. Supp. 1181, 1187 (D.N.H. 1992) (dismissing 10(b) claim because fact that corporation failed to disclose unavailability of product for sale did not render any affirmative statements misleading); *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209 (S.D.N.Y. 1996) ("Plaintiffs merely sound the familiar refrain that any comment by a corporation imposes an affirmative duty to disclose all marginally-related material information.  There is no such obligation or duty.").

The SAC contains an unsourced new allegation that Ferrer purportedly instructed financial advisors to give an "OK" hand signal to customers who asked about commissions so that customers might mistake a three for a zero.  (SAC ¶ 50)  UBS-PR did not hide its commissions from investors.  Its online brochure about the Funds states:  "*We may charge up to 3.5% on your purchase* (a 'mark up'), and up to 1.5% on a sale (a 'mark down')."  (Ex. E at 3)

Furthermore, the so-called false and misleading "statements" do not come close to satisfying the heightened pleading standard to which the Complaint must submit.  Plaintiffs make sweeping claims that Ferrer and Ortiz made "specific oral and written representations" (SAC ¶¶ 35, 36), and "never told customers" (SAC ¶ 46), but the Complaint fails to describe the "who, what, where and when" of any of these statements.  The Complaint's assertions that Ferrer and Ortiz purportedly spoke to unnamed "financial advisors" (*see, e.g.*, SAC ¶ 40) are insufficient. *See Alteram S.A. v. Beacon Hill Asset Mgmt, LLC*, No. 03 Civ. 2387 (LAK), 2004 WL 367709, at *1 (S.D.N.Y. Feb. 27, 2004) (dismissing under Rule 9(b) because plaintiffs failed to allege "who attended" meetings or "which plaintiffs received" alleged misstatements).  In sum, a "'fraud count [that] is almost wholly conclusory, and . . . lacking in specifics . . . is too vague to meet the Rule 9(b) benchmark.'"  *Powers*, 926 F.2d at 111 (quoting *Lopez v. Bulova Watch Co.*, 582 F. Supp. 755, 766 (D.R.I. 1984)).[14]

Plaintiffs also now claim in the SAC that Ferrer's statements in *El Vocero* on April 24, 2009 describing the dividends and low volatility achieved by Puerto Rican investors in the Funds were misleading because he did not also disclose that there was an "extreme market imbalance" in the market for the Funds, that UBS-PR had increased its inventory of the Funds, and that it was planning to sell this inventory at prices set by UBS-PR.  (SAC ¶¶ 96-97)  The additional information that Plaintiffs claim was required does not contradict Ferrer's statements.  Thus, no

---

[14]     Plaintiffs also contend that UBS-PR purportedly misled investors by not disclosing its alleged plan to sell more Fund shares than it purchased in 2009 in order to reduce its inventory. (*See* SAC ¶¶ 88, 94)  This conduct was not misleading as it was consistent with UBS-PR's warnings that its "purchases and sales" of CEF securities "may be discontinued at any time." *See* p. 6, n.6, *supra*.

obligation to make additional disclosures about these (at best) tangentially related issues exists. *See* p. 13, n.13, *supra*.

### 2.   Plaintiffs have failed to plead reliance.

Plaintiffs have also failed to plead that they individually relied on any misrepresentations or that any presumption of reliance applies here.

#### (a)   Plaintiffs have not alleged individual reliance.

Plaintiffs have not alleged that they personally had communications of any kind with any of the Defendants.[15]   Nor have Plaintiffs alleged that they were personally aware of any of the purportedly misleading statements when they purchased their CEF shares.  "A plaintiff unaware of the relevant statement . . . could not establish reliance on that basis."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011).[16]   Wholly conclusory allegations of reliance are no substitute for factual allegations of actual reliance.  *See In re Lupron Mktg. & Sales Practices Litig.*, No. MDL 1430, 2004 WL 2070883, at *4 & n.9 (D. Mass. Sept. 16, 2004) ("It is not enough to simply aver that plaintiffs 'reasonably relied upon the veracity of'" defendants' statements) (citation omitted).

#### (b)   Plaintiffs cannot invoke any presumption of reliance.

Neither can Plaintiffs invoke a presumption of reliance to overcome their failure to plead individual reliance.

*First*, Plaintiffs cannot base their claim of reliance on the presumption articulated in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because that presumption only applies in cases where plaintiffs base their claims *primarily* on omissions.  *See Starr ex rel.*

---

[15]   Plaintiffs allege that Ferrer or Ortiz made purported misstatements to UBS-PR's "network of financial advisors" or  "sales force" (SAC ¶¶ 3, 40, 50 62, 63, 66, 68, 70, 72, 84, 87, 91, 93, 94, 99), but not to Plaintiffs.  For example, Plaintiffs allege that Ortiz changed CEF inventory sheets used internally at UBS-PR.  (SAC ¶ 72)  Plaintiffs do not contend that these internal inventory sheets were ever shown to investors, much less to any Plaintiff.  (*See id.*)

[16]   Here, Plaintiffs' own reliance is critical because they must establish their individual claims in order to assert claims on behalf of a putative class.  *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche, LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 2011 (2009).

*Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005); *In re Interbank Funding Corp. Sec. Litig.*, 668 F. Supp. 2d 44, 49 (D.D.C. 2009) (noting that this is the approach adopted by most courts), *aff'd*, 629 F.3d 213 (D.C. Cir. 2010).[17]  The *Affiliated Ute* rule was created for fraud claims based primarily on omissions because of the difficulty of showing reliance on information that was never made available to the plaintiff.  *See Interbank*, 668 F. Supp. 2d at 49 ("*Affiliated Ute* presumption reflects the idea that where the defendant's fraud consists largely of omissions, 'requiring a plaintiff to show a speculative state of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff.'") (quoting *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000)).  This concern is not present where a plaintiff  alleges omissions in the form of incomplete misleading statements.  *Id.* (*Affiliated Ute* "'does not require the burden of persuasion to shift in cases where the plaintiffs allege either that the defendant has made false statements or has distorted the truth by making true but misleading incomplete statements'") (quoting *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988)).  As such, courts have declined to apply the *Affiliated Ute* presumption in situations where a plaintiff bases its claim primarily on affirmative misstatements.  *See Kenney v. State St. Corp.*, 754 F. Supp. 2d 288, 293 (D. Mass. 2010) (plaintiff required to prove individual reliance where claim was based on affirmative misrepresentation).  *See also Interbank*, 668 F. Supp. 2d at 49, 51 (no *Affiliated Ute* presumption because defendants did offer positive statements and reliance was not impossible to prove); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898 (SAS), 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006) (no *Affiliated Ute* presumption because it was "certainly not a case 'in which no positive statements exist [and] reliance as a practical matter is impossible to prove'"), *aff'd*, 546 F.3d 196 (2d Cir. 2008) (citation omitted).

Here, after Defendants' original motion to dismiss pointed out Plaintiffs' lack of reliance, they tried to overcome this fatal defect in their claims by recharacterizing their misrepresentation

---

[17]      *See also Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192 (3d Cir. 2001); *Cox v. Collins*, 7 F.3d 394, 395-96 (4th Cir. 1993); *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987); *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 757 (11th Cir. 1984); *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 717 (8th Cir. 1978).

claims as claims based on omissions.  But merely sprinkling the words  "never disclosed" or "omitted" throughout the Complaint has not changed the nature of this lawsuit.  (*See, e.g.*, SAC ¶¶ 1, 3, 5-6, 41, 46-48; Ex. P, comparing AC and SAC)  *See also Kenney*, 754 F. Supp. 2d at 292 (rejecting plaintiff's "attempts to circumvent the requirement to prove detrimental reliance by recasting his claim as one for non-disclosure").  Plaintiffs' claims are still primarily based on allegations that Defendants made affirmative misstatements.  (*See, e.g.*, SAC ¶ 35 ("Ferrer made specific oral and written representations to investors and to broker dealers"); *id.* ¶ 36 ("Ortiz made specific oral and written representations to investors and financial advisors"); *see also id.* ¶¶ 62, 63, 66, 68, 72, 86, 87, 93, 94, 99)  To the extent there are purported "omissions" in the SAC, they are not pure omissions for which reliance could never be shown, but are allegations that affirmative statements were incomplete without the disclosure of additional facts.  For example:

- Plaintiffs allege that Ferrer and Ortiz "touted the CEFs as safe, liquid investments." (SAC ¶¶ 9, 62, 63, 92)  Plaintiffs contend that these statements were misleading because Defendants did not disclose that (i) UBS-PR's willingness to purchase shares was subject to inventory limits (*id.* ¶¶ 5, 6, 41, 43, 57, 64); and that (ii) UBS-PR would supposedly inhibit liquidity by undercutting customer sale orders.  (*Id.* ¶ 97)

- Plaintiffs allege that published prices for the shares were misleading (*id.* ¶¶ 47, 48) absent disclosure that UBS-PR allegedly set these prices.  (*Id.* ¶¶ 41, 43, 56)

The *Affiliated Ute* presumption does not apply where, as here, a plaintiff's "principal objection to the omissions … is that the omissions exacerbated the misleading nature of the affirmative statements."  *Starr*, 412 F.3d at 109 n.5.  *See also Abelson v. Strong*, 644 F. Supp. 524, 528 (D. Mass. 1986) (holding *Affiliated Ute* presumption does not apply where "information was needed to correct misimpression created by the series of misstatements" because "reliance may [] be proven" "where such positive statements exist"); *Bacon v. Stiefel Labs., Inc.*, 275 F.R.D. 681, 698 (S.D. Fla. 2011) (no *Affiliated Ute* presumption where "omissions are inextricably intertwined with the alleged misrepresentations").

Second, Plaintiffs cannot plead reliance based on the "fraud-on-the-market" presumption. (SAC ¶ 127)  The fraud-on-the-market presumption only applies where the securities "'traded on well-developed markets reflect[ing] *all publicly available information*.'"  *In re PolyMedica Corp.*

*Sec. Litig.*, 432 F.3d 1, 11 (1st Cir. 2005) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 244, 246 (1988)) (emphasis in original).  In other words, the market must be efficient.  *Id.* at 7.

The First Circuit has adopted the test set forth in *Cammer v. Bloom* for determining whether there is an efficient market.  *See In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512-18 (1st Cir. 2005) (citing 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).  The *Cammer* factors are:  "(1) the stock's average trading volume; (2) the number of securities analysts that followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file a Form S-3 Registration Statement; and (5) a cause-and-effect relationship, over time, between unexpected corporate events or financial releases and an immediate response in stock price."  *Id.* at 511.  The fifth factor is the most significant in determining market efficiency.  *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 265-66 (D. Mass. 2006) (citing *Xcelera.com*, 430 F.3d at 511).  As such, Plaintiffs cannot allege the existence of an efficient market unless they allege that the "market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information."  *PolyMedica*, 432 F.3d at 19.

Here, the facts alleged in the Complaint would – if true – indicate just the opposite – that the market prices of shares did not respond quickly to new information, but were set by Ortiz to "reduce volatility and maintain high premiums to NAV" (SAC ¶ 41); and they were not updated daily, but only sporadically and only a couple of times a month.  (SAC ¶¶ 45, 54-55)  Furthermore, the shares were not traded on an exchange, were not registered under the Securities Act of 1933, were sold only in Puerto Rico and depended on UBS-PR to maintain the market.  *See* pp. 5-7, *supra*.  Because Plaintiffs have not alleged facts indicating that the market was efficient – the facts in the Complaint allege the opposite – they cannot invoke the fraud-on-the-market presumption.  *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 210 (2d Cir. 2008); *cf. PolyMedica*, 453 F. Supp. 2d at 278 & n.23 (rejecting "fraud-on-the-market" presumption on motion for class certification where facts indicated an inefficient market).

Moreover, if the market were efficient, then it would have incorporated all publicly available information, including the disclosures regarding UBS-PR's maintenance of the market and the possibility that UBS-PR could cease that activity at any time.  *PolyMedica*, 432 F.3d at

14 ("[W]e conclude that an efficient market is one in which the market price of the stock *fully reflects all* publicly available information.") (emphasis in original).  Thus, if the market were sufficiently efficient to allow for fraud-on the-market reliance, the market would reflect the facts disclosed in the prospectuses and on UBS's website.  *See White v. H & R Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *13 (S.D.N.Y. July 28, 2004) ("Plaintiffs cannot use this presumption to argue that the market price reflected defendants' purported misstatements but not the true statements contained in Block's press releases and SEC filings . . . .").

Because Plaintiffs have failed to adequately allege individual reliance, and because they cannot invoke any presumption of reliance, their 10(b) claim fails.

**3.    Plaintiffs have not pled economic loss or loss causation.**

The most glaring flaw in Plaintiffs' case is that they have not alleged facts that could show that they personally suffered any loss at all.  *See Specialty Graphite Servs., Inc. v. Chiodo*, No. 2:11-cv-1438, 2012 WL 162936, at *4-5 (W.D. Pa. Jan. 19, 2012) (dismissing 10(b) claim "[w]ithout concerning itself in great detail with the question of whether Plaintiff has sufficiently pled a material misrepresentation, scienter, or transactional causation (based upon Plaintiff's alleged reliance upon the misrepresentation), [because] the Court has before it no allegation of economic loss, much less economic loss attributable to the misrepresentation of Defendant") (citing *Dura Pharm.*, 544 U.S. at 343-44).  Here, the Complaint does not describe any loss that Plaintiffs suffered on their investments.  Instead, Plaintiffs assert, without explaining as to how or why, that one investor in the Funds "lost $12,000 in one month alone."  (SAC ¶ 5)  While such conclusory allegations would be inadequate as to that investor's claims, they are utterly meaningless as to whether Plaintiffs *themselves* suffered any loss – and Plaintiffs themselves must have a claim.  *See Lewis v. Casey*, 518 U.S. 343, 344 (1996) ("[N]amed plaintiffs in a class action must show that they personally have been injured . . . ."); *Kenney*, 754 F. Supp. 2d at 292.

Moreover, a plaintiff must allege not only that it suffered an economic loss, but must also allege "a causal connection between the material misrepresentation and the loss."  *Dura Pharm., Inc. v Broudo*, 544 U.S. 336, 342 (2005).  Plaintiffs' conclusory allegations that "the price of CEFs declined and individuals' abilities to sell CEFs were dramatically reduced when Defendants' prior false statements, material misrepresentations, and omissions began to reach the

19

market" (SAC ¶ 107) are insufficient.  "[T]o establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *In re Alkermes Sec. Litig.*, No. 03-12091-RCL, 2005 WL 2848341, at *11 (D. Mass. Oct. 6, 2005) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)) (emphasis in original).  Loss causation cannot be satisfied unless the complaint adequately pleads that "the defendant company's 'share price fell significantly after the truth became known.'"  *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164 (D. Mass. 2009) (quoting *Dura Pharm.*, 544 U.S. at 342).  In other words, Plaintiffs must plead "a plausible theory of stock price inflation [and] a plaintiff must also allege that the corresponding stock price deflation was caused by a 'corrective disclosure.'"  *Urman v. Novelos Therapeutics, Inc.*, 867 F. Supp. 2d 190, 198 (D. Mass. 2012).  For a plaintiff attempting to plead loss causation, "[t]he timing of the disclosure is no small matter."  *Urman*, 867 F. Supp. 2d at 197.

Here, there is no connection between the timing of the price declines and the alleged corrective disclosures.  The Complaint mentions only one decline in price that occurred between March 2009 and September 2009; years before the truth was allegedly revealed in May 2012.  (*Compare* SAC ¶¶ 7, 9, 101 *with id.* ¶¶ 104, 117, 119)  Not only did prices for the Funds (as reported in the newspaper listings and monthly account statements cited in the Complaint) rebound after September 2009, but prices did not fall in response to the alleged corrective disclosure in May 2012.  (*See* Exs. G-M)  This two-and-a-half year gap between the price decline and the corrective disclosure precludes loss causation.  *See In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 588 (D. Md. 2005) (holding loss causation was not pleaded because "Plaintiffs' allegation that '[b]y the time the Company belatedly admitted the truth-*i.e.*, that the value of its goodwill was severely impaired-the price of Acterna's common stock had already fallen' is a clear indicator that Defendants' alleged fraudulent conduct did not cause the precipitous decline in Acterna's share price during the Class Period") (citation omitted).[18]

---

[18]    To the extent Plaintiffs base their theory of loss causation on events that occurred in 2009, they would be barred by the two-year statute of limitations under federal law for their federal claims and under Puerto Rico law for their Puerto Rico law claims.  *See FirstBank Puerto Rico, Inc. v. La Vida Merger Sub, Inc.*, 638 F.3d 37, 38 (1st Cir. 2011) (two-year statute of limitations applies to claims under Section 10(b)), *cert. denied*, 132 S. Ct. 248 (2011).  *See also* 10 L.P.R.A.

*(cont'd)*

Despite the recovery of the prices of the Funds before the "truth" was purportedly revealed, Plaintiffs allege generally that they "have been unable to sell their CEFs at the prices they purchased them."  (SAC ¶ 106)  Not only does that conclusory assertion conflict with the trading prices for the Funds (*see* Ex. G), but even if it were accurate, the mere fact that the price had declined does not plead loss causation.  The Complaint must also untangle the other factors, "which taken separately or together account for some or all of that lower price," such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts."  *Dura Pharm.*, 544 U.S. at 343.  Thus, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (citation omitted).   Here, the Complaint fails to account for intervening market conditions, including the terrible recession in Puerto Rico and the worldwide financial crisis.  *See Lentell*, 396 F.3d at 174; *Finkel v. Stratton Corp.*, 754 F. Supp. 318, 330 (S.D.N.Y. 1990) (conclusory allegations of loss causation insufficient "given other plausible explanations for the investors' ultimate disappointment, such as changes in the tax laws and a downturn in the real estate market"), *aff'd in part & rev'd in part on other grounds*, 962 F.2d 169 (2d Cir. 1992).

Plaintiffs also have not alleged that they were stymied in an attempt to sell their shares due to UBS-PR's purported selling at prices below its clients' sell orders.  There are no specific allegations that Plaintiffs themselves ever attempted to sell their shares and were unable to do so.  (*See, e.g.*, SAC ¶ 103, alleging generally that "investors" attempted to sell and "customer" sell orders were not executed)  Indeed, Plaintiffs' account statements show that at least two of the

---

*(cont'd from previous page)*
§ 890(e) ("No person may bring a civil suit pursuant to the provisions of this section more than two (2) years after the sale contract has been executed."); *Generadora de Electricidad del Caribe, Inc. v. Foster Wheeler Corp.*, 92 F. Supp. 2d 8, 24 (D.P.R. 2000).

named Plaintiffs sold all of their shares in 2010, when the prices of the shares were purportedly inflated by the then-unrevealed fraud.[19]

### 4.   Plaintiffs have not pled scienter.

Plaintiffs' 10(b) claim also fails because they have not pled particularized facts giving rise to a "'strong inference of fraudulent intent.'"  *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997) (citation omitted).  For claims under Section 10(b) and Rule 10b-5, "[s]cienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). To establish scienter, Plaintiffs must allege that Defendants either had a "conscious intent to defraud or 'a high degree of recklessness.'"  *Id.* (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)); *see also N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 44 (1st Cir. 2008).

The PSLRA mandates that "the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts* giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added). "Allegations of opportunity and motive, without more, are insufficient at the pleading stage to satisfy the requirements of the PSLRA; a plaintiff must allege conduct from which a jury could infer intentional (or reckless) deception."  *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 81 (D. Mass. 2005) (citing *Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir. 2001)).  In addition, allegations must be "more than merely plausible or reasonable" to constitute a "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  "[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," and "[a] complaint will survive . . . only if a reasonable person would deem the

---

[19]     *See* Exs. N, C. Román Apr. 2010 Account Statement at 1, 5; Ex. O, Onnasis Corp. Apr. 2010 Account Statement at 5, 6.  They could not have suffered losses as a result of the alleged fraud.  *See Dura Pharm.*, 554 U.S. at 342 ("[I]f, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."); *see also In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 317-18 (S.D.N.Y. 2010) ("[A] claim of loss causation is unsustainable for those who sold their shares prior to the corrective disclosure . . . .").

inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 310, 324; *see also ACA Fin.*, 512 F.3d at 59.

Here, Plaintiffs cannot establish a strong inference of scienter because UBS-PR and the Funds disclosed the information that Plaintiffs allege was concealed.  *See* pp. 11-14, *supra*. These disclosures refute a strong inference of scienter.  *See First Marblehead*, 639 F. Supp. 2d at 163 ("Lead Plaintiffs have failed to plead sufficient facts giving rise to a strong inference of scienter because First Marblehead disclosed that which the Complaint alleges it concealed."); *In re Cytyc Corp. Sec. Litig.*, No. 02-12399-NMG, 2005 WL 3801468, at *27 (D. Mass. Mar. 2, 2005) (concluding that plaintiffs had failed to allege scienter in light of the fact that the company disclosed the alleged fraudulent activity).

In the SAC, Plaintiffs have attempted to beef up their weak scienter allegations by claiming that Ferrer and Ortiz "controlled the content of documents and presentations that failed to disclose material information."  (SAC ¶¶ 35, 36)  But these new allegations fail because they are conclusory and do not allege specific facts as to what "documents" and "presentations" Ferrer and Ortiz actually controlled, let alone what statements within them are false and misleading. *See In re Immersion Corp. Sec. Litig.*, No. C 09-4073 MMC, 2011 WL 871650, at *3 (N.D. Cal. Mar. 16, 2011) (while "a statement made by the named defendant himself is not necessary to a finding of liability under § 10(b)," a plaintiff must show such defendant's "'substantial participation or intricate involvement in the preparation'") (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n. 5 (9th Cir. 2009)).

In any event, Plaintiffs' vague allegations that UBS-PR, Ferrer and Ortiz had a motive to commit fraud because of the revenue UBS-PR earned from their management of the Funds (SAC ¶¶ 3, 35, 36, 65) are insufficient as a matter of law.  *See Garvey*, 354 F. Supp. 2d at 81.  *See also In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009) (motive to obtain fees insufficient to plead scienter); *In re J.P. Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 620-21 (S.D.N.Y. 2005) ("The incentive to increase profit . . . is not the type of concrete and personal benefit that suffices to plead a strong inference of scienter.").  That purported motive is even weaker for Ferrer and Ortiz, who are not alleged to have benefitted directly from

the success of the Funds, only tangentially because their "compensation was based, in part, on the performance of UBS PR, which derived much of its revenue from CEFs."  (SAC ¶ 36)[20]

## B.    Plaintiffs Have Failed To State A Claim For Market Manipulation.

As explained above, Plaintiffs have based their 10(b) claim primarily on the assertion that UBS-PR and the Individual Defendants misrepresented the market for CEF shares by making affirmative statements.  The Complaint, however, appears to also characterize their claim as one for market manipulation by asserting that Defendants "employed devices, schemes and artifices to defraud."  (SAC ¶ 122; *see also id.* ¶ 5)  As this claim is primarily based on alleged misrepresentations, even if Plaintiffs try to recast it as one for market manipulation, the claim should still be dismissed for failure to plead the elements of a misrepresentation claim.  *See Lentell v. Merrill Lynch*, 396 F.3d at 177 (holding where market manipulation is based on alleged misrepresentations or omissions, no market manipulation claims is stated and plaintiffs must instead plead misstatements or omissions claims consistent with the PSLRA).

Nevertheless, even if the Court were to independently assess Plaintiffs' Rule 10b-5 claims as market manipulation claims, then such claims would also be dismissed for failure to allege market manipulation with particularity.  To establish a market manipulation claim, Plaintiffs must allege:  "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  Here, Plaintiffs fail to plead deception, reliance or scienter.

---

[20]    *See also In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465 n.1 (S.D.N.Y. 2008) (allegations that defendant earned fees were insufficient to plead motive); *aff'd sub nom. W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.,* 344 F. App'x 717 (2d Cir. 2009); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003) (alleged motive to receive fees insufficient); *Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*, No. 02 Civ. 1230 (LMM), 2003 WL 21088506, at *6 (S.D.N.Y. May 14, 2003) ("[C]ourts in this district have consistently held that a defendant's desire to artificially inflate stock in order to realize greater transaction fees alone cannot show an improper motive."); *Vogel v. Sands Bros.*, 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) ("[The] alleged desire to realize greater transaction fees . . . [is] insufficient to show an improper motive.").

As an initial matter, Plaintiffs cannot allege that UBS-PR or the Individual Defendants engaged in any deceptive conduct.  Market manipulation claims must be based on "deception, misrepresentation, or nondisclosure."  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).  "Indeed, nondisclosure is usually essential to the success of a 'manipulative' scheme."  *Id.  See also Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 134 n.7 (2d Cir. 2011) ("[T]he determination of whether certain market activities are manipulative within the meaning of the securities laws requires us to consider whether these activities were fully disclosed to the market.").[21]

Here, Plaintiffs' core contention is that UBS-PR created a false signal to the market by purchasing CEF shares and thereby creating the appearance of a liquid market.  (SAC ¶¶ 4, 52, 53, 62, 64, 69, 71, 73)  These allegations cannot establish a claim for market manipulation because the Funds and UBS-PR disclosed the role that UBS-PR would serve for maintaining a market in shares of the Funds.  *See* pp. 6-7 & nn.6-8, *supra*.

Plaintiffs also contend that UBS-PR engaged in market manipulation because it decided to reduce its inventory in Fund shares without alerting the market of its plan.  (*See* SAC ¶¶ 88, 94)  The Second Circuit recently rejected very similar allegations as insufficient to plead market manipulation.  *See Wilson*, 671 F.3d at 134-35 (where broker-dealer discloses that it may withdraw support for ARS auctions, such withdrawal did "not render the disclosed practices manipulative").  For the same reasons, UBS-PR's "failure" to advise investors of its intent to reduce its inventory in CEF shares does not state a market manipulation claim.  Like the broker-dealer in *Wilson*, UBS-PR disclosed that it could discontinue its support of the market at any time and warned investors that, if it did, "there may be occasions when you may be unable to sell your fund shares or may be able to sell them only at a loss or, at times, at a significant loss."  *See* p. 6 & n.6, *supra*.

---

[21]     *See also In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 390-91 (S.D.N.Y. 2010) (dismissing plaintiffs' market manipulation claim and explaining that the "market is not misled when a transaction's terms are fully disclosed"), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011); *In re Citigroup*, 700 F. Supp. 2d at 306 (dismissing market manipulation claims where the disclosures warned investors that defendants could engage in market-making activities).

In addition, any market manipulation claim would fail because Plaintiffs have not alleged that they relied on the belief that the market for the CEF shares was efficient and free from manipulation. *See In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 579 (S.D.N.Y. 2005). To meet this standard, plaintiffs must plead facts that, if true, would show that defendants' conduct "sen[t] a false pricing signal to the market" while plaintiffs believed that the market "'reflect[ed] undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded.'" *ATSI*, 493 F.3d at 100 (quoting *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995)). Here, in light of the disclosures discussed above, no reasonable market participant could have believed that the market for the CEF shares was a robust and liquid market free from the influence of UBS-PR's activities. *See Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d at 400-02 (holding that plaintiffs had failed to plead justifiable reliance where the alleged manipulative conduct was disclosed); *In re Citigroup*, 700 F. Supp. 2d at 306 (holding that public disclosures revealing the alleged manipulative conduct "negate[d] any inference that reliance by the class on such a view of the ARS pricing mechanism was reasonable").[22]

## III.   PLAINTIFFS HAVE NOT PLED A CLAIM UNDER SECTION 10(B) AGAINST THE DEFENDANT FUNDS.

In the SAC, Plaintiffs now purport to bring a Section 10(b) claim against the defendant Funds, including Puerto Rico Fixed Income Fund III, Inc. and Puerto Rico Fixed Income Fund V, Inc. (SAC ¶¶ 120-33) Seemingly, the only basis for asserting this claim against the Funds is Plaintiffs' unsupported allegation that Ferrer's actions are "attributable to the Funds because Ferrer was a director of the Funds during the Class Period." (*Id.* ¶ 129) However, nowhere in the SAC do Plaintiffs allege that any of Ferrer's actions were undertaken in his capacity as a

---

[22]   In addition, Plaintiffs cannot rely on the *Affiliated Ute* presumption of reliance because it does not apply to market manipulation claims. A plaintiff cannot turn a market manipulation case into an omissions case by alleging that the defendants failed to disclose their manipulative conduct. *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940-41 (9th Cir. 2009); *Joseph v. Wiles*, 223 F.3d 1155, 1162-63 (10th Cir. 2000). *See also In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d at 398 (*Affiliated Ute* presumption did not apply because alleged omissions only "'exacerbated the misleading nature of the' alleged conduct") (citing *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005)).

director of the Funds.  Rather, Plaintiffs based their claims on allegations that Ferrer "touted the CEFs as safe, liquid investments" as *UBS-PR*'s Chairman and Vice-Chairman (*id.* ¶ 9), that he had a motive to make alleged false statements because the commissions from sales would increase his salary as an employee of *UBS-PR* (*id.* ¶¶ 50, 65), that he hosted investor conferences on behalf of *UBS-PR* (*id.* ¶¶ 57, 90, 92), that he made statements to *UBS-PR*'s financial advisors and sales force (*id.* ¶¶ 62-63, 66, 70, 99), and that he held meetings with *UBS -PR*'s Group Management Board and *UBS-PR*'s Investment Banking department (*id.* ¶¶ 59, 67).  Moreover, Plaintiffs allege that it was UBS-PR – and not the Funds – that had authority over the content of the allegedly misleading statements.  (*See, e.g.*, SAC ¶ 40 ("UBS PR marketed CEFs"); ¶¶ 47, 91 (UBS-PR published prices and statements about the CEFs in *El Vocero*); ¶ 48 ("UBS PR sent Plaintiffs … monthly and quarterly account statements"); ¶ 68 ("UBS PR prepared a presentation to the sales force"))  As such, Plaintiffs' Section 10(b) claim against the Funds must be dismissed.[23]  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2303 (2011) (refusing to "expand [Section 10(b)] liability beyond the person or entity that ultimately has authority over a false statement" because "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it").

## IV.   PLAINTIFFS HAVE NOT ALLEGED A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(A).

In Counts II and III, Plaintiffs bring claims alleging "control person" liability against Ferrer, Ortiz and UBSFS.  These claims should be dismissed because Plaintiffs have failed to plead a primary violation under Section 10(b).  *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 67 (1st Cir. 2008).  In addition, Plaintiffs must plead that these three defendants knowingly participated in any of the alleged activities that purportedly violated Section 10(b).  *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).[24]

---

[23]   To the extent Plaintiffs rely on Ferrer's actions and statements to support their claims against the Funds for fraudulent inducement, negligent and fraudulent misrepresentation, and breach of the implied duty of good faith (SAC ¶¶ 161, 168, 175, 187), those claims should be dismissed for the same reasons as their Section 10(b) claim.

[24]   Although the First Circuit has recognized a split among the circuit courts as to whether an element of section 20(a) liability is "culpable participation," it has not decided the issue.  *In re*

*(cont'd)*

### V.     PLAINTIFFS' PUERTO RICO LAW CLAIMS MUST BE DISMISSED.

Plaintiffs have brought four counts against UBS-PR, the Individual Defendants and the Funds under Puerto Rico common law for fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and breach of the implied duty of good faith and two counts against all Defendants for violations of the Puerto Rico Securities Act (10 L.P.R.A. § 890) and rescission. (SAC ¶¶ 150-190)  For the reasons set forth below, these Puerto Rico law claims should also be dismissed with prejudice.

### A.     Plaintiffs' Puerto Rico Law Claims Are Barred By SLUSA.

 As an initial matter, Plaintiffs are barred from asserting any of their claims under Puerto Rico law because such claims are precluded by SLUSA.  SLUSA provides that "[n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging – (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb.  Counts IV through IX are all based on allegations that Defendants made misrepresentations of material fact. (SAC ¶¶ 152, 159, 164, 170, 179, 186)

Further, Plaintiffs allege that these purported misrepresentations were made in connection with the purchase of covered securities.  (SAC ¶¶ 153, 160, 167, 174, 178, 186)  The shares of the Funds are "covered securities" under SLUSA because the Funds themselves invest in securities that meet the definition of "covered securities;" *i.e.*, they invest in securities that are traded on the NYSE or the Nasdaq exchange.  *See Hidalgo-Velez v. San Juan Asset Mgmt., Inc.*, No. 11-2175, 2012 WL 4427077, at *2 (D.P.R. Sept. 24, 2012) (Cerezo, J.) ("A vast majority of courts have held that SLUSA applies to cases brought by investors of a fund that invests, or represents that it will invest, in a covered security, even when the shares of the fund in which the class invested are not covered securities."); 15 U.S.C. § 78bb (citing 15 U.S.C. § 77r(b)).  Thus,

_____
*(cont'd from previous page)*
*Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 194 n.4, 196 n.6 (1st Cir. 2005); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002).

Plaintiffs are precluded from asserting any of their Puerto Rico law claims.  *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-MD-1335-PB, 2008 WL 489257, at *2 (D.N.H. Feb. 20, 2008).

**B.  Plaintiffs Have Failed To State A Claim Under Puerto Rico Statutory Or Common Law.**

Even if Plaintiffs' Puerto Rico law claims were not preempted by SLUSA, they would still have to state a claim upon which relief could be granted.  These claims fail as a matter of law for the same reasons that Plaintiffs' federal claims fail as a matter of law.  Count IV (SAC ¶¶ 150-157), a claim under the Puerto Rico Uniform Securities Act, 10 L.P.R.A. § 890 ("PRUSA"), fails for the reasons set forth above because this claim is "for all practical purposes a verbatim repetition of . . . Rule 10b-5(2) of the 1934 Act."  *Salgado v. Piedmont Capital Corp.*, 452 F. Supp. 853, 860 (D.P.R. 1978).  In addition, to the extent Plaintiffs base Count IV on purchases of CEF securities that occurred before August 13, 2010, it is barred by the two-year statute of repose that applies to claims brought under PRUSA.  10 L.P.R.A. § 890(e) ("No person may bring a civil suit pursuant to the provisions of this section more than two (2) years after the sale contract has been executed.").  Counts V, VI and VII (SAC ¶¶ 158-176), which assert claims against UBS-PR and the Individual Defendants for fraudulent inducement, fraudulent misrepresentation and negligent misrepresentation, also fail for the same reasons described above. *See Westernbank Puerto Rico v. Kachkar*, No. 07-1606 ADC/BJM, 2009 WL 6337949, at *21 (D.P.R. Dec. 10, 2009) (citing 31 L.P.R.A. § 3408).  Counts VIII and IX, which plead claims for rescission and breach of contract, fail because Plaintiffs do not allege any direct dealings with any of the Defendants, much less a contract.  *Id.*

## CONCLUSION

WHEREFORE, Defendants respectfully request that all claims filed by Plaintiffs Ricardo Román-Rivera, Carmelo Román, Onnasis Corporation, SDM Holdings, Inc. and Julio Tormes-Rodríguez be dismissed with prejudice under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for failure to state a claim upon which relief can be granted and failure to plead fraud with particularity.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 28th day of February, 2013.

IT IS HEREBY CERTIFIED that the foregoing was filed electronically with the Clerk of the Court using CM/ECF on this same date and that, as such, the foregoing was served electronically upon all counsel of record.

Roberto C. Quiñones-Rivera
MCCONNELL VALDÉS LLC
270 Muñoz Rivera Ave.
Hato Rey, Puerto Rico  00918
Tel.:  (787) 759-9292
Fax:  (787) 759-9225

By:   /s/ Roberto C. Quiñones-Rivera
        Roberto C. Quiñones-Rivera
        USDC-PR No. 211512

*Attorney for Defendants Puerto Rico Fixed*
*Income Fund III, Inc. and Puerto Rico Fixed*
*Income Fund V, Inc.*

Salvador J. Antonetti-Stutts
Mauricio O. Muñiz-Luciano
Ubaldo M. Fernández-Barrera
O'NEILL & BORGES LLC
American International Plaza
250 Muñoz Rivera Ave., Suite 800
Hato Rey, Puerto Rico  00918-1813
Tel.:  (787) 764-8181
Fax:  (787) 753-8944

By:   /s/ Mauricio O. Muñiz-Luciano
        Mauricio O. Muñiz-Luciano
        USDC-PR No. 220914

OF COUNSEL:
Paul J. Lockwood
Nicole A. DiSalvo
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
Tel.:  (302) 651-3000
Fax:  (302) 651-3001

*Attorneys for Defendants UBS Financial*
*Services Incorporated of Puerto Rico, UBS*
*Trust Company of Puerto Rico, UBS*
*Financial Services Inc., Miguel A. Ferrer and*
*Carlos J. Ortiz*