**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: UBS FINANCIAL SERVICES, INC. OF PUERTO RICO SECURITIES LITIGATION | Civil Case No.3:12-cv-01663-CCC<br><br>SECURITIES CLASS ACTION<br><br><u>JURY TRIAL DEMANDED</u> |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**</u>
<u>**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**</u>

**TABLE OF CONTENTS**

PROLOGUE ............................................................................................................. 1

INTRODUCTION ................................................................................................... 1

BRIEF FACTUAL BACKGROUND...................................................................... 3

ARGUMENT ........................................................................................................... 6

    I.    Legal Standard.......................................................................................... 6

    II.   Plaintiffs Have Alleged a Claim Under Section 10(b) Against UBS PR and the Individual Defendants .................................................................. 7

        A.   UBS PR and the Individual Defendants Made Misleading Statements and Omissions... 8

        B.   A Demonstration of Reliance Is Not Required ............................ 12

        C.   Plaintiffs Have Adequately Pled Loss Causation......................... 15

        D.   Plaintiffs Have Adequately Pled Scienter .................................. 18

    III.  Plaintiffs Have Stated a Claim Against the Defendant Funds............................ 20

    IV.  Plaintiffs Have Adequately Plead Violations of Puerto Rico Law ................... 23

        A.   SLUSA Does Not Bar Plaintiffs' Puerto Rico Law Claims........................... 23

        B.   The PRUSA Claim Is Not Time Barred Because of Defendants' Fraudulent Concealment. .................................................................... 26

    V.   Control Person Liability Is Adequately Pled.................................................... 27

CONCLUSION........................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008) .......................................................................18

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128, 92 S. Ct. 1456 (1972) ........................................................12

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) .......................................................................18

*Ambert v. Caribe Equity Group, Inc.*,
   Civil No. 11-1254 (JAF), 2011 WL 4626012 (D.P.R. Sept. 30, 2011) ....................................19

*Anschutz Corp. v. Merrill Lynch & Co.*,
   785 F. Supp. 2d 799 (N.D. Cal. 2011) .................................................9, 10

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010).................................................24, 25

*Asher v. Baxter Int'l, Inc.*,
   No. 02 CV 5608, 2006 WL 299068 (N.D. Ill. Feb. 7, 2006) ....................16

*Backus v. Conn. Cmty. Bank, N.A.*,
   Civ. No. 3:09-CV-1256, 2009 WL 5184360 (D. Conn. Dec. 23, 2009).................................25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1995 (2007)..........................................................6

*Belmont v. MB Investment Partners*,
   708 F.3d 470 (3d Cir. 2013)......................................................................21

*Black v. Finantra Capital, Inc.*,
   418 F.3d 203 (2d Cir. 2005).......................................................................12

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) .......................................................16

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002).......................................................................12

*Caterpillar, Inc. v. Williams*,
   482 U.S. 386 (1987)......................................................................................2

*City of St. Clair Shores General Employees' Retirement Sys. v. Lender Processing Services, Inc.*,
No. 3:10-cv-1073-J-32, 2012 WL 1080953 (M.D. Fla. Mar. 30, 2012)............................22, 23

*Concilio Evangelico de Puerto Rico v. Negron*,
178 F. Supp. 2d 49 (D.P.R. 2001) (Garcia-Gregory, J.) .........................................................7

*Cook v. Avien, Inc.*,
573 F.2d 685 (1st Cir. 1978)...............................................................................................27

*Cooperativa de Ahorro y Crédito Aguada v. Kidder, Peabody & Co.*,
799 F. Supp. 261 (D.P.R. 1992) (Fuste, J.)...........................................................................26

*COSSEC v. Gonzalez Lopez*,
179 D.P.R. 793 (P.R. 2010) ................................................................................................26

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ...............................................................................20, 27

*Defer LP v. Raymond James Fin., Inc.*,
No. 08 Civ. 3449, 2010 WL 3452387 (S.D.N.Y. Sept. 2, 2010).............................................10

*Dura Pharmaceuticals Inc. v. Broudo*,
544 U.S. 336, 125 S. Ct. 1627 (2005)...........................................................................15, 17

*Fogarazzo v. Lehman Bros., Inc.*,
263 F.R.D. 90 (S.D.N.Y. 2009) ............................................................................................13

*Gebhardt v. ConAgra Foods, Inc.*,
335 F.3d 824 (8th Cir. 2003) ..............................................................................................16

*Greenspan v. Ramdom House, Inc.*,
No. 12-1594, 2012 WL 5188792 (1st Cir. Oct. 16, 2012)........................................................7

*Hidalgo-Velez v. San Juan Asset Management, Inc.*,
Civil No. 11-2175-CCC, 2012 WL 4427077 (D.P.R. Sept. 24, 2012) .....................................25

*Hoff v. Popular, Inc.*,
727 F. Supp. 2d 77 (D.P.R. 2010) (Gelpí, J.)...................................................................16, 27

*In re Access Cardio Systems, Inc.*,
404 B.R. 593 (Bankr. D. Mass. 2009) ..................................................................................12

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002)...................................................................................................6

*In re Centennial Technologies Litig.*,
52 F. Supp. 2d. 178 (D. Mass. 1999) ..............................................................................21, 22

*In re CMS Energy Sec. Litig.*,
   403 F. Supp. 2d 625 (E.D. Mich. 2005)................................................................16

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) .................................................................................11

*In re Credit Suisse First Boston Corp. Sec. Litig.*,
   No. 97 CIV. 4760, 1998 WL 734365 (S.D.N.Y. Oct. 20, 1998) ............................10

*In re Credit Suisse-AOL Sec. Litig.*,
   465 F. Supp. 2d 34 (D. Mass. 2006) ..........................................................12, 16, 17

*In re Dynex Capital, Inc. Sec. Litig.*,
   No. 05 Civ. 1897, 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ........................14, 15

*In re ICG Comm. Inc. Sec. Litig.*,
   No. 1:00CV01864, 2006 WL 416622 (D. Colo. Feb. 7, 2006) ..............................16

*In re IPO Sec. Litig*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)....................................................................16

*In re Merck & Co., Inc. Securities, Derivative and "ERISA" Litigation*,
   Civil Action Nos. 05–1151, 05–2367, 2011 WL 3444199 (D.N.J. Aug. 8, 2011) .................22

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   704 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011) (Defs' Br. at 12) ........................................................9

*In re Number Nine Visual Technology Corp. Sec. Litig.*,
   51 F. Supp. 2d 1 (D. Mass. 1999) ..........................................................................11

*In re Parmalat Sec. Litig.*
   No. 04 MD 1653, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)...........................13

*In re Smith Barney Transfer Agent Litig.*,
   No. 05 Civ. 7583, 2013 WL 1150737 (S.D.N.Y. Mar. 21, 2013) ..........................13

*Janus Capital Grp., Inc.v. First Derivative Traders*,
   131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011) ......................................................22, 23

*Joseph v. Wiles*,
   223 F.3d 1155 (10th Cir. 2000) ..............................................................................12

*Katz v. MRT Holdings, Inc.*,
   No. 07-61438-CIV, 2008 WL 4725284 (S.D. Fla. Oct. 24, 2008) .........................14

*Kircher v. Putnam Funds Trust*,
   547 U.S. 633 (2006)................................................................................................23

*Lalor v. Omtool, Ltd.*,
   No. CIV. 99-469M, 2000 WL 1843247 (D.N.H. Dec. 14, 2000)...........................................16

*Lander v. Hartford Life & Annuity Ins. Co.*,
   251 F.3d 101 (2d Cir. 2001)............................................................................................23

*Maldonado v. Dominguez*,
   137 F.3d 1 (1st Cir. 1998)................................................................................................7

*Moss v. Camp Pemigewassett, Inc.*,
   312 F.3d 503 (1st Cir. 2002)............................................................................................6

*Negrón-Fuentes v. UPS Supply Chain Solutions*,
   532 F.3d 1 (1st Cir. 2008)................................................................................................8

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...........................................................................................18

*Pension Comm. of U. of Montreal Pension Plan v. Banc of Am. Securities, LLC*,
   750 F. Supp. 2d 450 (S.D.N.Y. 2010)...............................................................................25

*Puerto Rico Tel. Co., Inc. v. Telecomm. Reg. Bd. of Puerto Rico*,
   Civil No. 12-1683 GAG, 2012 WL 4794381 (D.P.R. Oct. 9, 2012) ........................................7

*Quaak v. Dexia, S.A.*,
   445 F. Supp. 2d 130 (D. Mass. 2006) ..............................................................................21

*Resolution Trust Corp. v. Gold*,
   30 F.3d 251 (1st Cir. 1994).............................................................................................28

*Rodriguez-Robledo v. Puerto Rico Elec. Power Authority*,
   90 F. Supp. 2d 175 (D.P.R. 2000)......................................................................................7

*Roeder v. Alpha Indus., Inc.*,
   814 F.2d 22 (1st Cir. 1987)...............................................................................................6

*Rosselló-González v. Calderón-Serra*,
   398 F.3d 1 (1st Cir. 2004)................................................................................................8

*Serabian v. Amoskeag Bank Shares, Inc.*,
   24 F.3d 357 (1st Cir. 1994).............................................................................................18

*Sharp v. Coopers & Lybrand*,
   649 F.2d 175 (3d Cir. 1981), *cert denied,* 455 U.S. 398, 102 S. Ct. 1427 (1982).................13

*Swack v. Credit Suisse First Boston*,
   383 F. Supp. 2d 223 (D. Mass. 2004) ..............................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499 (2007) ......................................................................18

*Tracinda Corp. v. DaimlerChrysler AG*,
   197 F. Supp. 2d 42 (D. Del. 2002) ..........................................................................16

*Trans-Spec Truck Service, Inc. v. Caterpillar, Inc.*,
   524 F.3d 315 (1st Cir. 2008) ....................................................................................7

*U.S. SEC v. Brown*,
   878 F. Supp. 2d 109 (D.D.C. 2012) ........................................................................23

*United States v. Cannistraro*,
   800 F. Supp. 30 (D.N.J. 1992) ................................................................................10

*Winters v. Steinberg*,
   529 F. Supp. 2d 237 (D. Mass. 2008) ....................................................................27

**STATUTES, RULES & REGULATIONS**

**United States Code**

   15 U.S.C. § 77r(b) ....................................................................................................24
   15 U.S.C. § 78bb(f)(5)(E)) ......................................................................................23

Federal Rules of Civil Procedure

   Rule 8 ........................................................................................................................3
   Rule 8(a)(2) ..............................................................................................................15
   Rule 10b-5 ................................................................................................................28
   Rule 15(a) ................................................................................................................28
   Rule 56 ......................................................................................................................7

Laws of Puerto Rico Annotated

   31 L.P.R.A. § 5142 ..................................................................................................21

## PROLOGUE

On May 1, 2012, we issued an Order Instituting Administrative and Cease-and-Desist Proceedings against Miguel A. Ferrer, formerly the Chairman and Chief Executive Officer of UBS Financial Services Inc. of Puerto Rico ("UBS PR"), a subsidiary of UBS Financial Services, Inc. ("UBS Financial"), a Delaware corporation, and Carlos J. Ortiz, currently the Managing Director of Capital Markets at UBS PR. The OIP alleges that Ferrer and Ortiz played significant roles in a fraudulent "pump-and-dump" scheme that misled thousands of UBS PR customers into buying and holding substantial amounts of shares in UBS PR-affiliated, non-exchange-traded closed-end funds ("CEFs") in 2008 and 2009. The OIP alleged that Ortiz, who was in charge of UBS PR's CEF trading desk, and Ferrer, who controlled all important aspects of UBS PR's CEF business, touted, or "pumped," the CEFs as safe, high-yield investments and promoted the liquidity of the CEF shares in a supposedly robust secondary market in which investors could sell their shares.

Securities and Exchange Commission Order Granting Extension, Admin. Proc. File No. 3-14862 (February 25, 2013) (Exhibit 1, hereto).

## INTRODUCTION

Lead Plaintiff SDM Holdings Inc. and Plaintiffs Carmelo Roman, Ricardo Roman-Rivera, Onnasis Corporation, and Julio Tormes-Rodriguez (collectively "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Second Amended Complaint, ECF No. 66 ("Defs' Br."). The Second Consolidated Amended Complaint (the "Complaint") pleads classic and pervasive violations of the anti-fraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and of the Puerto Rico Uniform Securities Act ("PRUSA") by the Defendants, UBS Puerto Rico ("UBS PR"), UBS Financial Services, Inc. ("UBSFS"), Miguel A. Ferrer ("Ferrer"), and Carlos J. Ortiz ("Ortiz")[1] (together with the Individual Funds, "Defendants"). Beginning in early 2008, Defendants began their scheme to pump up the "market" for closed-end funds ("CEFs"), to create the illusion of liquidity, and to manipulate the price of CEFs, while all the while knowing that there was a

---

[1] Ferrer and Ortiz are referred to herein as the "Individual Defendants."

serious supply and demand imbalance and that UBS PR itself was *heavily* over-invested in CEFs.

Specifically, during the Class Period, Defendants created the illusion of liquidity in the CEF market through a series of omissions, manipulations, half-truths, and lies.  For example, Defendants published "prices" for the CEFs, but ***never once disclosed*** that those prices were not, in fact, set by market forces such as supply and demand, but instead were wholly and arbitrarily set by Defendant Ortiz based on the needs and whims of UBS PR.  During those same years, UBS PR became so heavily invested in CEFs in order to create this false market that it had to petition UBSFS for repeated and seemingly constant permission for inventory limit extensions.  Rather than disclose this reality to investors and suffer the consequences, Defendants instead ramped up their scheme by introducing two new CEF offerings.  Not surprisingly, Defendants Ortiz and Ferrer stood to benefit financially from generous salaries and bonuses based upon the fees charged on new offerings.  Ultimately, though, UBSFS demanded that UBS PR decrease its inventory of CEFs drastically.  To do so, Defendants continued their fraudulent scheme by launching "Operation: Soft Landing," which effectively sold UBS PR's own CEF holdings before any pending customer sell orders.  In other words, they began "screwing over the client."  Investors, meanwhile, lost out and were left holding illiquid assets of diminished value.

In the face of their fraudulent conduct, Defendants have re-written the claims pled in the Complaint in a desperate attempt to support their motion to dismiss.  As Defendants would have it, this case involves little but "true" statements that somehow caused Plaintiffs no loss.  This is simply nonsense.  Plaintiffs, and not Defendants, are masters of their complaint.  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 398-99 (1987).  This Court should look to the Complaint and not Defendants' characterization of the allegations to hold that the Complaint ***in its totality*** adequately identifies material omissions.  Moreover, the Complaint is replete with facts and

internal emails putting Ferrer and Ortiz at meetings where the true state of the CEF "market" was discussed.  This is direct evidence of Defendants' knowledge (*i.e.*, scienter).  Furthermore, the fact that CEFs were the largest source of revenue for UBS PR, and thus the alleged false statements went to the core of the Company's operations, makes it utterly implausible that the false and misleading statements were made innocently.  The lucrative fees and ties to the Individual Defendants' salaries add further weight to Plaintiffs' already compelling showing of scienter.  Loss causation has also been properly alleged in accordance with Fed. R. Civ. P. 8, and the Complaint properly pleads claims of control person liability pursuant to §20(a) of the Exchange Act.  Finally, Plaintiffs' PRUSA claims are not time barred by either the Securities Litigation Uniform Standards Act ("SLUSA") or a statute of limitations defense.  Plaintiffs have, therefore, fully satisfied their pleading obligations under both of the federal rules, the PSLRA, and Puerto Rico law.  The Complaint should be sustained and Defendants' motion to dismiss denied.

## BRIEF FACTUAL BACKGROUND

UBS is the primary underwriter and sole manager or co-manager of CEFs with a market capitalization of over $5 billion.  ¶38.[2]  Because the CEFs contained a "dividend reinvestment program," they generated a strong degree of interest from seniors and retirees who depended on that monthly dividend income to supplement Social Security.  ¶40.  To continue to draw such persons into investing in CEFs, Defendants made sure that the CEF prices remained high and unwavering by failing to disclose material facts related to the pricing of the CEFs.  Indeed, the prices told to investors and published in newspapers and on investor statements were not true market prices, but instead prices artificially determined by Defendant Ortiz himself.  ¶45.

---

[2]  "¶_" and "¶¶_" refer to corresponding paragraphs in the Complaint.

In addition to making omissions about the pricing for CEFs, Defendants also never disclosed to the investing public that there was a severe supply and demand imbalance for CEFs. Defendants long knew there was an "out of balance market" and so petitioned UBSFS, who controlled UBS PR's inventory limits, for an increase so that UBS PR could purchase more and more CEF shares into its inventory in 2008 and 2009 to maintain the *illusion* of liquidity.  ¶49. Indeed, in December, 2008, Defendant Ortiz petitioned UBS PR to increase the inventory limits to $50 million from $30 million to address the fact that there were *$16 million in unexecuted customer sell orders outstanding at that time*.  ¶¶51-52.  Rather than disclose this fact, though, Defendants instead hosted an "investor conference" in June 2008 to tout the "extraordinary market returns" and "low risk" of CEFs.  ¶57.  Furthermore, Ortiz and Ferrer met in August 2008 to discuss "market drag" (¶59) but, again, rather than disclose the truth, opted instead to introduce *two new offerings of CEFs* in September 2008.  ¶65.  Those new offerings meant a far higher commission for Defendants and also gave a false impression of continuing demand for CEFs which, of course, did not exist.  *Id.*  Defendants also went to great lengths to hide the commissions from Plaintiffs.  For example, Defendant Ferrer instructed financial advisors, when asked about commission, to hold up an "okay" sign (with two fingers forming a "zero" and three outstretched) so that a customer would *think* this hand gesture meant zero commission, when, in reality, it meant three percent!  ¶3.

Defendants' scheme did not end with the two new offerings.  UBS PR, under the control of UBSFS, continued to purchase CEFs into its inventory into early 2009 and to maintain the illusion of a well-functioning CEF market.  In March 2009, however, Defendant Ortiz again asked for an inventory limit extension from $50 million to $55 million from UBSFS.  ¶77.  This time, though, UBSFS denied the request and instead instructed UBS PR to begin reducing the

inventory back to its historical limit of $30 million.  ¶78.  After a series of internal discussions at UBSFS concerning liquidity issues for CEFs, UBSFS told UBS PR to lower its inventory to $12 million.  ¶81.  In response to UBSFS' request, Ortiz and Ferrer made a presentation to UBSFS that outlined their plan to achieve such inventory reduction: "Operation Soft Landing."  ¶82. Ferrer has since described "Operation: Soft Landing" as "reduc[ing] the price for reasons that have nothing to do with the real marketplace."  ¶84.  What it entailed, though, was wiping pending marketable orders off of the books by reducing the sale price for UBS PR's CEFs to pennies below investors' pending sell orders.  In effect, it ensured that UBS PR could sell its own CEFs before customers – even if only by a penny less.  ¶85.  Or, as stated by one financial advisor at UBS PR, it was ***"turning around and screwing the client." Id.***  Of course, Defendants never once disclosed this process and reality to investors.  Instead, in March 2009, Defendants hosted another investor conference where Ferrer touted the "superior returns" and "consistent liquidity levels" for CEFs.  ¶90.  Ferrer also gave a newspaper interview in April 2009 where he reiterated those misstatements.  ¶96.  Meanwhile, Ortiz attempted to sell his personal CEF investments before those of his customers!  ¶95.

Once UBS PR had sold off 75% of its inventory, as dictated by UBSFS, Defendants let the prices for CEFs decline and the CEFs became illiquid.  The reasons for such declines were only revealed in May 2012 when the Securities and Exchange Commission (the "SEC") announced its investigation into UBS PR, Ferrer, and Ortiz.  The SEC has subsequently held numerous hearing on Defendants' "pump-and-dump" scheme, is in the process of reviewing over 3,000 pages of transcribed testimony, and a decision is due by September 4, 2013.  See Exhibit 1 hereto.

## ARGUMENT

### I.  <u>Legal Standard</u>

"In ruling on a motion to dismiss, a court must 'accept all well-pleaded facts of the complaint as true and draw all reasonable inferences in favor of the plaintiff.'"  *Moss v. Camp Pemigewassett, Inc.,* 312 F.3d 503, 506 (1st Cir. 2002) (quoting *Aybar v. Crispin-Reyes,* 118 F.3d 10, 13 (1st Cir. 1997)).  The Court may grant dismissal "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25 (1st Cir. 1987).[3]  To survive a motion to dismiss, the facts alleged need only "be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1995 (2007).  Additionally, a court may not decide questions of fact when ruling on a motion to dismiss.  *Roeder,* 814 F.2d  at 25.  Although the Private Securities Litigation Reform Act ("PSLRA") imposes heightened pleading requirements on claims of securities fraud, the First Circuit "has said repeatedly that the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence."  *In re Cabletron Sys., Inc.,* 311 F.3d 11, 33 (1st Cir. 2002) (citing *Cooperman v. Individual, Inc.,* 171 F.3d 43, 48-49 (1st Cir. 1999); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1225 (1st Cir. 1996)).

Defendants inappropriately attempt to introduce evidence at this stage of the pleadings. Defendants improperly seek to have the court consider: (1) the prospectuses (Defs' Br. at 6); (2) news articles (Defs' Br. at 8); and (3) an electronic brochure (Defs' Br. at 6-7) to support the motion to dismiss and counter the particularized allegations of the Complaint.  While the prospectuses cited by Defendants may be permissible, the electronic brochure and various New

---

[3]  Unless otherwise noted, all internal citations are omitted and emphasis is added.

York Times articles discussing the Puerto Rican securities market cited by Defendants cannot be considered at all because they are not referenced or quoted in the Complaint.[4]  However, even if the Court were to consider such documents, it is still clear that Plaintiffs have sufficiently plead violations of federal securities laws and PRUSA.  As such, Defendants' motion should be denied in its entirety.

## II.    Plaintiffs Have Alleged a Claim Under Section 10(b) Against UBS PR and the Individual Defendants

Plaintiffs have alleged that Defendants made material misrepresentations and omissions and acted with the requisite state of mind.  Plaintiffs have also put forth allegations in the Complaint sufficient to demonstrate that their losses were caused by Defendants' actions.  As discussed below, a showing of reliance is not required in this case.  Thus, Plaintiffs have stated a classic case for securities fraud under Rule 10b-5 and Section 10(b).  Although Defendants repeatedly attempt to reclassify this case as a "market manipulation" case, that, in fact, is not what is alleged.  Instead, "in accordance with the well-pleaded Complaint rule, the plaintiff is the master of his Complaint . . ." (*Concilio Evangelico de Puerto Rico v. Negron,* 178 F. Supp. 2d 49, 52 n.3 (D.P.R. 2001) (Garcia-Gregory, J.)), and Defendants may not attempt to re-write it. *See Puerto Rico Tel. Co., Inc. v. Telecomm. Reg. Bd. of Puerto Rico,* Civil No. 12-1683 GAG,

---

[4]   The law is clear that a district court may not consider matters extraneous to the pleadings without converting the motion to dismiss into a motion for summary judgment.  *See, e.g., Trans-Spec Truck Service, Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (holding that if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment); *Maldonado v. Dominguez,* 137 F.3d 1, 6 (1st Cir. 1998); *Rodriguez-Robledo v. Puerto Rico Elec. Power Authority*, 90 F. Supp. 2d 175 (D.P.R. 2000) (same).  Defendants submit two newspaper articles which purport to demonstrate "the relative stability of the Funds" and hand-picked disclosures available from an electronic brochure available on the UBS website to rebut allegations that Plaintiffs' purchases were based on false and misleading information.  Both are issues of fact that are disputed in the Complaint and are thus wholly inappropriate for judicial notice.  *See, e.g. Greenspan v. Ramdom House, Inc.*, No. 12-1594, 2012 WL 5188792, at *1 (1st Cir. Oct. 16, 2012) (refusing to take judicial notice of a newspaper article).

2012 WL 4794381 (D.P.R. Oct. 9, 2012); *Negrón-Fuentes v. UPS Supply Chain Solutions*, 532 F.3d 1, 6 (1st Cir. 2008)*; Rosselló-González v. Calderón-Serra*, 398 F.3d 1, 11 (1st Cir. 2004). Plaintiffs have not set forth a market manipulation case, but rather a classic case of securities fraud based on glaring omissions of material facts.

A.    **UBS PR and the Individual Defendants Made Misleading Statements and Omissions.**

Defendants' contentions that the Complaint fails to allege false or misleading statements or omissions concerning CEFs are patently disingenuous.  In the Complaint, Plaintiffs succinctly allege that Defendants created a CEF market whose prices were rigged and set solely at the discretion of Defendants themselves; that UBS PR completely controlled the secondary market for CEFs; that UBS PR was artificially propping up the prices of CEFs; and that UBS PR was given strict orders to reduce its CEF inventory and did so by selling its holdings at the expense of its clients who were likewise attempting to sell.  ¶¶4, 7, 8.  While the case centers around the omissions made by Defendants, it also, contrary to Defendants' arguments, sets forth certain statements that are rendered false by the omission of pertinent information.  Such misstatements include, *inter alia*:

- The CEF prices were published in *El Vocero* and did not reveal that prices were actually arbitrarily set by Ortiz (¶47);
- Monthly/Quarterly statements were sent to Plaintiffs and the Class with "market values" but not disclosing the arbitrary pricing practice (¶48);
- Newspaper and Television ads promoting investor conferences about CEFs "superior returns and liquidity" (¶91);
- Public presentation by Ortiz (attended by Ferrer) touting increasing liquidity and supply and demand in an open market (¶92); and
- An interview with Ferrer in the newspaper wherein he discussed fantastic results and "low volatility" (¶96).

Again, the Complaint repeatedly alleges that *at no time* did any Defendant ever disclose to Plaintiffs or the investing public that: (1) the prices were not "market price" but randomly created by Ortiz, (2) the magnitude of UBS PR's control of the secondary market, (3) the market was completely illiquid, and (4) UBS PR was selling off its own holdings at prices slightly below pending customer sales at the direction of UBSFS.

Defendants' primary response to these allegations is to claim that they did, in fact, reveal this information to the public in the prospectuses for each Fund and in an online brochure.  In support thereof, Defendants rely entirely on *In re Merrill Lynch Auction Rate Sec. Litig.,* 704 F. Supp. 2d 378, 391-92 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch & Co.,* 671 F.3d 120 (2d Cir. 2011) (Defs' Br. at 12).  In *In re Merrill Lynch,* the Court held that language informing investors that Merrill Lynch routinely bid on auction rate securities ("ARS") was sufficient to apprise the public of Merrill Lynch's activities.  *In re Merrill Lynch,* however, is unimportant here for two reasons: (1) Defendants utterly overlook cases that have rejected *In re Merrill Lynch* for exactly the same reasons as presented here; and (2) UBS PR's blanket "disclosures" cannot exculpate Defendants from making glaring and material omissions concerning the price of, and market for, CEFs.

To begin with, several cases have distinguished *In re Merrill Lynch*.  Defendants here conveniently ignore those.  For example, in *Anschutz Corp. v. Merrill Lynch & Co.,* 785 F. Supp. 2d 799 (N.D. Cal. 2011), the Court specifically held that the actual actions of Merrill Lynch – bidding in every auction and effectively keeping the market alive – were never disclosed in prospectuses.  The prospectus stated that Merrill Lynch "may" participate, but not that it *would* always participate.  In short, the court held:

> Fundamentally, the allegations in this case are that DBSI created a false market for these securities; that the seeming liquidity of the securities existed only

because of DBSI's extensive intervention in the market.  The disclosure that DBSI "may" participate in the market is simply not sufficient to disclose that – as alleged – DBSI created a false market.

*Id.* at 812-813.  Likewise, in *Defer LP v. Raymond James Fin., Inc.,* No. 08 Civ. 3449, 2010 WL 3452387, at *11-12 (S.D.N.Y. Sept. 2, 2010), the Court found that a disclosure in a prospectus that a defendant "may routinely" place ARS orders for its own account could not and did not "disclose the risk that is at the core – that the ARS were liquid only because of extensive and sustained auction broker intervention."  Similarly, in *In re Credit Suisse First Boston Corp. Sec. Litig.,* No. 97 CIV. 4760, 1998 WL 734365, at *7 (S.D.N.Y. Oct. 20, 1998), that Court found that a blanket disclosure warning that defendants "may from time to time have long or short positions" did not adequately inform the public of what was really going on – that defendants were planning to drive down the price of stocks.  *See also United States v. Cannistraro,* 800 F. Supp. 30, 80-81 (D.N.J. 1992) (defendant, who had issued positive research reports to artificially inflate the price of securities it held, could not escape liability for securities fraud by pointing to vague disclaimers that it "*may from time to time have a position in the securities mentioned*") (italics in original).[5]

Indeed, although Defendants attempt to rely upon the language from the various prospectuses, the reality is that the majority of the prospectuses contain the very same "disclosures" that analogous cases have found inadequate:  that UBS PR ***may*** cease to maintain a market, which ***could*** result in illiquidity of the shares.  *See, e.g.* July 29, 2003 Fixed Income

---

[5]  These cases also reject Defendants' argument that Plaintiffs were aware of the commissions being charged by UBS PR on the CEFs.  The Complaint sets forth how UBS PR undertook a system of hiding the commission (misrepresenting it as "zero" when in reality it was "three" percent).  Defendants now argue that the online brochure says "We ***may*** charge up to 3.5% on your purchase . . ." (Defs' Br. at 14, emphasis added) and that this means the public was on notice.  As discussed in the cases cited herein, the use of the word "may" when something is ***routinely*** occurring is not satisfactory to defeat a claim for misrepresentation/omission.

Fund, Inc. I. prospectus, p. 8; March 29, 2005 Puerto Rico Fixed Income Fund, Inc. IV prospectus p. 11; May 29, 2007 Puerto Rico Fixed Income Fund, Inc. V., p. 11; and July 29, 2002 Puerto Rico AAA Portfolio Target Maturity Fund, Inc., p. 19 (attached hereto as Exhibits 2-5). No prospectus ever discloses what UBS PR was actually doing: maintaining an illusory and artificial market and subsequently cashing out before the requests and orders of customers.

Indeed, **none** of the offering materials for the CEFs (much less any other source) state that UBS PR priced the CEFs based solely on what was "convenient" or "apparent" to Ortiz. Nor do the prospectuses indicate that there was insufficient legitimate market demand for CEFs to create liquidity absent UBS PR's participation and manipulation. The prospectuses state only that "[n]o assurance can be given as to the liquidity of, or the trading market for, the Shares as a result of any activities undertaken by [UBS PR]." Defs' Br. at 11. Nor is it stated **anywhere** that UBS PR was attempting to eliminate its own exposure to the market by beating customer sell orders by as little as a penny. Rather, the cited provisions state only that UBS PR "is not required to purchase shares of a closed-end fund from clients seeking to sell their shares." Defs' Br. at 11. As in the above cases, the use of such cautionary language concerning events or risks that "may" occur in the face of "a potentiality that it is currently aware exists" is materially misleading as a matter of law: "'[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'" *In re Number Nine Visual Technology Corp. Sec. Litig.,* 51 F. Supp. 2d 1, 24 (D. Mass. 1999); *In re Convergent Techs. Sec. Litig.,* 948 F.2d 507, 515 (9th Cir. 1991). Because UBS PR knew that there was insufficient legitimate demand for the CEFs, knew there was no real market for the shares, and knew that customers would be

absolutely unable to sell their CEFs while UBS PR was under its forced inventory reduction ("Operation:  Soft Landing"), its statements were actionable under established case law.[6]

### B.    A Demonstration of Reliance Is Not Required

As stated above, Plaintiffs are "masters of their own complaint."  Once again, however, Defendants have attempted to re-write Plaintiffs' pleading by suggesting that this is a case about misrepresentations rather than omissions.  While the Complaint describes statements made by Defendants, those statements are false because of what they do ***not contain***.  Therefore, as the case centers around omissions, Plaintiffs here are wholly entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153-54, 92 S. Ct. 1456 (1972).  Where a securities fraud case "involve[s] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery."  *Id.* at 153.  Rather, "reliance on the omitted information may be presumed where such information is material." *Black v. Finantra Capital, Inc.,* 418 F.3d 203, 209 (2d Cir. 2005).  The presumption created in *Affiliated Ute* exists because, where the defendant's fraud consists largely of omissions, "[r]equiring a plaintiff to show . . . how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff."  *Joseph v. Wiles,* 223 F.3d 1155, 1162 (10th Cir. 2000).

Defendants' only argument against presumed reliance mandated by *Affiliated Ute* is that the presumption applies only in cases where plaintiffs base their claims primarily on omissions.  Defendants are incorrect for two reasons: (1) they ignore strong case law and the reality that they

---

[6]   Furthermore, Defendants opted to speak about the CEFs and "upon choosing to speak, one must speak truthfully . . ."  *Caiola v. Citibank, N.A.,* 295 F.3d 312, 331 (2d Cir. 2002);  *In re Access Cardio Systems, Inc.,* 404 B.R. 593, 644 (Bankr. D. Mass. 2009) ("When a defendant chooses to speak, all material information necessary to make the statement not misleading must also be divulged); *Credit Suisse,* 465 F. Supp. 2d at 57 ("'Those who choose to speak . . . must speak honestly – not in half-truths . . .'").

restrict the holding of *Affiliated Ute* too narrowly; and (2) Plaintiffs' case *is* primarily about omissions.

To begin with, the law is clear that the *Affiliated Ute* presumption applies to cases not solely alleging omissions, but where omissions play "an independent, or at least interdependent, role in the alleged fraud." *In re Parmalat Sec. Litig.,* Master Docket No. 04 MD 1653, 2008 WL 3895539, at*8 (S.D.N.Y. Aug. 21, 2008). In determining the role omissions play in a complaint for *Affiliated Ute* purposes, courts are also clear that it is "context specific." *Sharp v. Coopers & Lybrand,* 649 F.2d 175 (3d Cir. 1981), *cert denied,* 455 U.S. 398, 102 S. Ct. 1427 (1982). Scores of cases concern complaints where misstatements and omissions are discussed, but where the heart of the complaint goes to information omitted. In those cases, courts hold that the *Affiliated Ute* presumption of reliance applies. Most recently, in *In re Smith Barney Transfer Agent Litig.,* No. 05 Civ. 7583, 2013 WL 1150737, at *5 (S.D.N.Y. Mar. 21, 2013), a court faced a highly analogous situation. In that case, the complaint identified statements that the plaintiffs labeled as false and misleading. The court found that such labels did not make the case "about" misstatements, but that the crux of the case was that the statements were misleading because they failed to mention anything about a given scheme. *Id.* The court elaborated that investors simply could not know – and therefore could not rely upon – facts not disclosed concerning an arrangement created to generate profits for defendants above plaintiffs' interests. It thus presumed reliance under *Affiliated Ute. Id.,* at *6. Similar cases only highlight the appropriateness of the presumption of *Affiliated Ute* reliance in this case:

- In *Fogarazzo v. Lehman Bros., Inc.,* 263 F.R.D. 90, 106 (S.D.N.Y. 2009), plaintiffs claimed that certain analyst reports were misleading because they omitted to inform investors of a conflict of interest, and had investors known of such conflicts, they would not have relied on those reports. The court thus found that the case concerned omissions and plaintiffs were permitted to invoke the *Affiliated Ute* presumption.

13

- In *Katz v. MRT Holdings, Inc.,* No. 07-61438-CIV, 2008 WL 4725284, at *5 (S.D. Fla. Oct. 24, 2008) the plaintiffs alleged misrepresentations, but the court found that "the heart of the claim" was that defendants failed to inform investors that returns depended on certain conditions. Therefore, the *Affiliated Ute* presumption was applicable.

- In *In re Dynex Capital, Inc. Sec. Litig.,* No. 05 Civ. 1897, 2011 WL 781215, at *7 (S.D.N.Y. Mar. 7, 2011), the court found the most central misstatements to the case were those that discussed losses due to market conditions yet omitted to disclose losses due to reckless underwriting and origination practices. The court noted that "the heart of the alleged deception is rooted not in statements, but in the fact that specific information about the quality of the collateral was withheld, and that information would have been important to a reasonable investor." *Id.*

The case at hand is no different. While Plaintiffs have cited certain misstatements made by the Defendants concerning the pricing of and market for CEFs, the core of the action is what Defendants did ***not*** disclose. For example, the Complaint alleges:

- "Defendants . . . never told customers and UBS PR financial advisors that market forces such as supply and demand did not, in fact, determine CEF prices." ¶46;

- "…Ferrer and Ortiz never disclosed the market imbalance to Plaintiffs and the Class." ¶62;

- "Ferrer did not disclose to the financial advisors, Plaintiffs, or the Class the liquidity problems the CEFs were having because of weakening demand, or that the high, stable CEF prices were being artificially maintained only because UBS PR was buying millions worth of CEF shares into its inventory." ¶64;

- The prospectuses "failed to disclose to investors that . . . CEF prices and liquidity were utterly dependent on the efforts of UBS PR's sales force to maintain customer demand for CEFs." ¶69;

- "Defendants did not disclose to UBS PR's customers or financial advisors that UBS PR was no longer supporting the CEF market or the firm's new CEF pricing strategy to undercut customers' limit orders and sell UBS PR's shares first. In fact, Defendants utterly omitted to tell Plaintiffs and the Class ***anything*** about inventory levels or reductions thereto." ¶88;

- "Defendants also failed to disclose the conflict of interest created by recommending CEFs to investors while dumping the firm's own shares." ¶89;

14

- "Ortiz further omitted disclosing UBSFS had recently ordered UBS PR to reduce inventory and that to comply with this directive, UBS PR had begun lowering share prices and buying fewer customer shares."  ¶92;

- Ferrer never disclosed that "there was extreme market imbalance for CEFs; that UBS PR had ramped up its inventory of CEFs and then was being forced to sell them rapidly; and that to do so, they were undercutting any pending client sell orders." ¶97; and

- Ferrer "never disclosed that the price of CEFs was completely arbitrary – set by Ortiz – and that should a client wish to sell, UBS PR would sell for one penny less so as to be able to meet its inventory reduction dictates." *Id.*

These excerpts make it abundantly clear that this case is centered on what was not told to the investing public by Defendants.  There can likewise be no question or any serious dispute that such omissions were material.[7]   In fact, a UBS financial advisor testified that such information would have been "extremely important to a client."  ¶8.  Accordingly, the *Affiliated Ute* presumption of reliance is plainly applicable here, and Defendants' motion to dismiss must be denied.[8]

### C.    Plaintiffs Have Adequately Pled Loss Causation

Defendants spend several pages discussing how the prices of CEFs allegedly rose and fell during various years and how this somehow negates a showing of loss causation.  (Defs' Br. at 19-21).   However, Defendants' arguments are wholly inappropriate at the motion to dismiss stage and ignore the applicable standard for pleading loss causation.

The Federal Rules of Civil Procedure require only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Furthermore, neither "the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss."  *Dura Pharmaceuticals Inc. v. Broudo,* 544

---

[7]  Defendants have not raised a materiality defense or argument.

[8]  Plaintiffs have not and do not suggest an efficient market for reliance purposes.  Thus, they do not address the arguments made by Defendants.  Defs' Br. at 17-19.

U.S. 336, 346, 125 S. Ct. 1627 (2005).  As stated in *In re Credit Suisse-AOL Sec. Litig.,* 465 F. Supp. 2d 34, 46 (D. Mass. 2006), "[i]n other words, the Plaintiff needs only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" Numerous courts have applied this lenient pleading standard when resolving loss causation arguments on a motion to dismiss.  *See, e.g. Hoff v. Popular, Inc.,* 727 F. Supp. 2d 77, 94 (D.P.R. 2010) (Gelpí, J.) (loss causation requirements do not impose a large burden on plaintiffs); *Brumbaugh v. Wave Sys. Corp.,* 416 F. Supp. 2d 239, 256 (D. Mass. 2006) (in light of *Dura,* court must conclude that plaintiffs had furnished defendants with some indication of the losses they had in mind); *Asher v. Baxter Int'l, Inc.,* No. 02 CV 5608, 2006 WL 299068, at *7 (N.D. Ill. Feb. 7, 2006) (loss causation does not impose a great burden at pleading stage; must simply give notice of connection to loss); *In re ICG Comm. Inc. Sec. Litig.,* No. 1:00CV01864, 2006 WL 416622, at *9-10 (D. Colo. Feb. 7, 2006) (no fine details needed to establish a causal link at motion to dismiss stage); *In re CMS Energy Sec. Litig.,* 403 F. Supp. 2d 625, 628-30 (E.D. Mich. 2005) (recognizing *Dura* does not modify short and plain pleading requirement).

Furthermore, several courts have expressly rejected similar attempts by defendants to introduce factual information and analyze price movements in the loss causation realm at the motion to dismiss stage.  *See, e.g. Swack v. Credit Suisse First Boston,* 383 F. Supp. 2d 223, 241 (D. Mass. 2004) (price changes were evidence and more important for a jury rather than at motion to dismiss stage); *In re IPO Sec. Litig,* 241 F. Supp. 2d 281, 374 n.77 (S.D.N.Y. 2003); *Gebhardt v. ConAgra Foods, Inc.,* 335 F.3d 824, 831-32 (8th Cir. 2003) (declining to attach significance to price movements absent facts and expert testimony); *Tracinda Corp. v. DaimlerChrysler AG,* 197 F. Supp. 2d 42, 67-68 (D. Del. 2002) (price movements are fact intensive matters requiring expert testimony); *Lalor v. Omtool, Ltd.,* No. CIV. 99-469M, 2000

16

WL 1843247 (D.N.H. Dec. 14, 2000) (rejecting at motion to dismiss stage defendants' arguments about causes of stock price decline).  Plaintiffs are, therefore, only required at this stage to give Defendants some indication of the loss and the causal connection that they "have in mind." *Credit Suisse-AOL*, 465 F. Supp. 2d at 46.

There can be no doubt that Plaintiffs have met this standard.  Each fraudulent statement and the omitted facts that make such statements fraudulent are identified and the facts supporting an inference of why such statements were fraudulent are pleaded.  Upon Defendants ceasing to continue their fraud, the price of the CEFs declined, the CEF market became illiquid, and investors were harmed.  Plaintiffs have sufficiently pled that UBS PR's sale of its inventory "caused prices to decline" (¶101); that "investors were induced to purchase CEFs that were artificially inflated due to Defendants' misrepresentations and omissions" (*Id*.);  that "Plaintiffs' injuries are the direct and proximate result of Defendants' fraudulent activities" (¶102); "[a]s a result of Defendants' fraudulent activities, Plaintiffs have suffered millions of dollars of damages because the CEFs have declined in value or they possess unexecuted sell orders" (¶103); "as a direct and proximate consequence of Defendants' actions, including glaring omissions, Plaintiffs and the putative Class purchased millions of dollars of CEFs that had a value that has dramatically declined far below what Plaintiffs paid for them" (*Id.*); and "Plaintiffs have been injured as a result of the illiquidity of tens of millions of dollars invested in CEFs." (*Id.*).  Defendants may seek to challenge this theory with evidence at a subsequent point in the litigation, but there can be no doubt that Defendants have been given far more than "some indication" of how the Plaintiffs' losses were suffered.  *Dura,* 544 U.S. at 347.  *A fortiori*, Plaintiffs have adequately pled loss causation at the motion to dismiss stage.

### D.      Plaintiffs Have Adequately Pled Scienter

Defendants' arguments that the Complaint does not plead scienter are essentially a rehash of their contention that the Complaint does not plead a false statement or omissions.  Defs' Br. at 22-23.  However, as Plaintiffs demonstrated in the preceding sections, the Complaint alleges a scheme and a fraudulent course of conduct necessitating a strong inference of scienter because it was done knowingly and intentionally, or, at a minimum, with reckless disregard for the potential to mislead investors.  As background, on a motion to dismiss, the complaint must be viewed in its entirety and all facts alleged must be accepted as true.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S. Ct. 2499 (2007).  "Where there are equally strong inferences for and against scienter," the tie goes to the plaintiff.  *ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46, 59 (1st Cir. 2008).  Plaintiffs are not required (but have done so in this case) to plead direct evidence and, although it must be "strong," "[t]he inference . . . [of] scienter need not be irrefutable, i.e. of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs,* 551 U.S. at 324.  In the First Circuit, a plaintiff may plead a strong inference of scienter by alleging "conscious intent to defraud" or "a high degree of recklessness."  *ACA Fin.,* 512 F.3d at 58.  As demonstrated below, Plaintiffs have met this standard.

Plaintiffs have set forth direct evidence of Defendants' culpable state of mind.  To begin with, allegations that executives intentionally or recklessly ignored internal information causing their public statements to be misleading are classic evidence of scienter.  *See, e.g. Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 367-68 (1st Cir. 1994); *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir. 2002).  Indeed, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of the facts or access to information contradicting their public statements."  *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000).  Here, the Complaint alleges with specificity that the Individual

Defendants possessed, or received, information that contradicted or made patently misleading public statements they were then making to investors. *See, e.g.,* ¶59 (UBS PR's Group Management Board, including Ferrer and Ortiz, met to discuss "market drag" and the "weak secondary market" for CEF shares); ¶3 (Ferrer instructed advisors to effectively mislead customers with an "okay" sign that would be seen as zero percent fees as opposed to three percent); ¶45 (at the direction of Ortiz, and with Ferrer's knowledge, UBS priced CEFs to achieve stability and reduce volatility and not based on true market conditions); ¶¶49, 77 (Ortiz himself petitioned UBSFS for inventory increases); ¶72 (Ortiz directed the Head Trader to alter CEF inventory sheets to reflect illusory amounts as opposed to the actual number of shares the firm owned); ¶75 (Ortiz received a string of emails from financial advisors discussing price abuse and manipulation); ¶81 (Ortiz received an email directing inventory reduction); ¶82 (Ortiz created, and Ferrer was aware of,  "Operation: Soft Landing"); ¶85 (Ortiz directed the Head Trader to "wipe" pending limit orders and bid pennies below customers' orders); ¶95 (Ortiz himself attempted to sell his CEFs above pending customer sell orders); and ¶¶76-84 (detailing involvement of UBSFS in "Operation: Soft Landing" and knowledge of scheme).  In short, Defendants completely failed to inform the investing public of the realities long known to them concerning CEFs.  Therefore, Plaintiffs have pled a model inference of scienter as Ortiz and Ferrer had direct knowledge of UBS PR's pricing of, propping up of, and subsequent manipulation of sales of CEFs.  See *Ambert v. Caribe Equity Group, Inc.*, Civil No. 11-1254 (JAF), 2011 WL 4626012, at *5 (D.P.R. Sept. 30, 2011) (scienter found when defendants allegedly knowingly and willfully omitted material facts.).

Alternatively, Plaintiffs have put forth circumstantial evidence to support an inference of scienter.  To begin with, CEFs represent the "core business" of UBS PR, generating 50% of

annual total revenues for UBS PR, which, in 2008, produced approximately $94.5 million.  ¶3.

Courts have repeatedly drawn the inference that facts critical to a business's core operations

generally are so apparent that their knowledge may be attributed to the company and its key

officers.  *Crowell v. Ionics, Inc.,* 343 F. Supp. 2d 1, 19 (D. Mass. 2004).  Here, Defendants

cannot legitimately dispute that CEFs were of vital importance to UBS PR's operations.  The

strong inference is supported by the reality that Defendants knew about material adverse facts

that existed during the Class Period.

Finally, the Complaint alleges a strong motive for the fraudulent scheme in that not only

did the CEFs produce 50% of UBS PR's revenue, but they also dictated the incomes of Ferrer

and Ortiz.  Defendants here attempt to claim that Plaintiffs have offered the fees as the sole basis

for scienter.  As the above discussion demonstrates, Plaintiffs have already set forth a strong

inference of scienter based on the conscious wrongdoing of Ferrer and Ortiz, but the lucrative

fees and salaries only serve to strengthen the inference.  As the Complaint states, Ferrer's and

Ortiz's income "[was] tied directly" to the sale of CEFs. ¶50.  Likewise, despite weak demand

for CEFs, Defendants issued two new offerings and received a 50% higher commission for doing

so.  ¶65.  These allegations clearly support Plaintiffs' argument that scienter has been sufficiently

pled.

## III.  <u>Plaintiffs Have Stated a Claim Against the Defendant Funds</u>

Contrary to the Defendants' assertion, Ferrer's actions are clearly attributable to eight of

the Defendant Funds because he was a director (which Defendants do not dispute) and principal

officer of these Funds.[9]  With respect to the Puerto Rico Fixed Income Funds I-V, Puerto Rico

---

[9]  Because Ferrer was not an officer of the two remaining funds (PR Investors Tax Free Fund, Inc. and PR Investors Bond Fund I), Plaintiffs do not pursue claims against these funds on the grounds of agency liability.  In addition, Defendants moved to dismiss on behalf of only two

AAA Portfolio Bond Fund I, Puerto Rico AAA Portfolio Target Maturity Fund, Inc. and the Tax

Free Puerto Rico Target Maturity Fund, Inc., Defendant Ferrer served as the President of each

Fund (the highest ranking officer) and also (upon information and belief) acted as the Chairman

of the Board of Directors.  *See* Prospectus Excerpts, attached hereto as Exhibit 6.  All the officers

of these funds are also employees of the Defendants UBS Puerto Rico and/or UBS Trust

Company of Puerto Rico, companies which Ferrer also heads.  *Id.*  Because during the relevant

period Ferrer held such positions for the eight Funds identified above, his actions bind the Funds

on the basis of agency liability.  *Belmont v. MB Investment Partners,* 708 F.3d 470, 494-95

(3d Cir. 2013).[10]  As the court in *In re Centennial Technologies Litig.*, 52 F. Supp. 2d. 178, 185-

186 (D. Mass. 1999) observed:

> The language of Section 10(b), although not explicitly saying so, implies
> that entities may be held liable under agency principles.  Entities can act
> only through their officers and employees.  *See Holmes v. Bateson,* 583
> F.2d 542, 560 (1st Cir. 1978).  Therefore, if agency principles were not
> meant to be a viable basis for liability under Section 10(b), the text of
> Section 10(b) would need to be modified to declare, in effect if not
> precisely in these words, that it is unlawful for *natural persons* to engage
> in the prohibited conduct.  That is not, however, what Section 10(b)
> provides."

52 F. Supp. 2d at 185 (emphasis in original); s*ee also*, *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d

130, 144 (D. Mass. 2006) (finding that under federal securities law, agency liability remains a

viable theory of liability).

---

funds (Puerto Rico Fixed Income Fund III, Inc. and Puerto Rico Fixed Income Fund V, Inc.) but
this brief applies to all Funds except the two noted above (PR Investors Tax Free Fund, Inc. and
PR Investors Bond Fund I) who separately moved to dismiss the Complaint.

[10]   Defendants only challenge the attribution of Ferrer's actions to the Funds with respect to the
federal 10b-5 claim and not as to the Puerto Rico state law claims.  Under Puerto Rico law, the
doctrine of agency (vicarious) liability for the acts of an agent or employee is codified at 31
L.P.R.A. §5142.  Pursuant to Puerto Rico law, the Funds can be held vicariously liable for the
alleged violations of the PRSA and the statutory and common law claims asserted in the
Complaint.

Moreover, Defendants' argument that the Funds are liable only if Ferrer was speaking in his capacity as a director or officer of the Funds lacks support in the case law defining agency liability.  Indeed, the court in *Centennial Technologies* specifically rejected this argument and noted that normal agency principles do not impose such a status requirement.  52 F. Supp. 2d at 185-186.  Ostensibly, Ferrer, as President of the Funds, had authority to promote sales of Fund shares.  Additionally, determining whether Ferrer was authorized to engage in conduct that would bind the Funds requires development of a factual record and is not appropriate for resolution on a motion to dismiss.

Defendants' reliance on *Janus Capital Grp., Inc.v. First Derivative Traders*, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011) is misplaced.  The issue in *Janus Capital Grp.* was whether an independent firm can be deemed the maker of a written material misrepresentation in another entity's prospectus solely on the basis of having assisted with the preparation of the prospectus. In this case, the Funds are not "independent" of Ferrer; rather, as their agent, Ferrer's conduct is attributable to them under the normal principles of agency liability.  Nothing in *Janus Capital Grp*. indicates that the Court sought to disturb well settled agency principles such as a corporation can only act through its employees or agents and therefore shares responsibility for their actions.  *See, In re Merck & Co., Inc. Securities, Derivative and "ERISA" Litigation*, Civil Action Nos. 05–1151, 05–2367, 2011 WL 3444199, at *24 (D.N.J. Aug. 8, 2011) (noting that "*Janus* does not alter the well-established rule that "a corporation can act only through its employees and agents."); *see also City of St. Clair Shores General Employees' Retirement Sys. v. Lender Processing Services, Inc.*, No. 3:10-cv-1073-J-32, 2012 WL 1080953, at *2 (M.D. Fla. Mar. 30, 2012) (denying motion to dismiss 10(b) claims, in part, by noting that an officer and/or employee's relationship to a corporate entity is different than the relationship of adviser at issue

in *Janus*); *U.S. SEC v. Brown*, 878 F. Supp. 2d 109, 116 (D.D.C. 2012) (noting that *Janus* did not change principles regarding agency and that officers can be held liable for statements in Company filings).  Plaintiffs have, therefore, pled a Section 10(b) claim against the eight (8) Defendant Funds.[11]

## IV.    Plaintiffs Have Adequately Plead Violations of Puerto Rico Law

### A.    SLUSA Does Not Bar Plaintiffs' Puerto Rico Law Claims

Defendants mistakenly contend that the claims arising under Puerto Rico state law are pre-empted by SLUSA.  "SLUSA's preemptive effects are narrow and limited, prohibiting only class actions brought by private individuals that are based on state law and allege fraud in the sale of covered securities."  *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 118 (2d Cir. 2001).  Consequently, for SLUSA to apply, the securities must fall within the definition of "covered securities" and the alleged fraud must occur "in connection" with such "covered securities."

There is no doubt that the CEFs are not "covered" securities within SLUSA's pre-emptive reach.  The term "covered securities" means a security that satisfies the standards of paragraphs (1) or (2) of section 18(b) of the Securities Act of 1933 (codified at 15 U.S.C. §78bb(f)(5)(E)) and are thus those that are "traded nationally and listed on a regulated national exchange," *Kircher v. Putnam Funds Trust,* 547 U.S. 633, 637 (2006), or those that are "issued

---

[11]  In *Janus* the Court recognized that the issue of who is a "maker" (assuming this issue applies in an omissions case) can depend on the "surrounding circumstances." *Janus*, 131 S. Ct. at 2302. Because the issue of whether Ferrer's conduct can be attributed to the Funds as a "maker" under 10b-5 requires factual development, it is not appropriate for resolution on a motion to dismiss. *See generally, City of St. Clair Shores General Employees' Retirement Sys.*, 2012 WL 1080953, at *2, n.2 (observing that there are factual issues intertwined with the issue raised in *Janus* that merit questioning whether the issue is more appropriately addressed at a later stage).

by an investment company that is registered, or that has filed a registration statement."   15 U.S.C. §77r(b).[12]

The securities owned by the Funds here do not meet the definition of "covered securities," and as such, are unaffected by SLUSA.  This fact has actually been ***conceded by the Defendants themselves in their promotional materials***.  Specifically, the 2008 UBS Puerto Rico Family of Funds Brochure (attached as Exhibit F to Defs' Br.) makes clear that the "[s]hares of the UBS Puerto Rico funds do not trade on any exchanges."  *Id.* at 3.  The same brochure also provides that Puerto Rico Funds "are not registered as investment companies with the United States Securities and Exchange Commission [] and the shares that they offer to investors are also not registered with the SEC."  *Id.* at 2.

Defendants' argument that the securities owned by the Funds are "covered securities" merely because the Funds themselves invested in securities that meet that definition is entirely unavailing and attempts to misapply the definition of covered securities to which the "in connection" part of the statute applies.  Courts have rejected the very argument Defendants make here and have held that the proper application of SLUSA's "in connection" language requires that the alleged fraud be connected to the covered security, ***not*** that the covered security is made part of the Defendants' portfolio.  For instance, the court in *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 399 (S.D.N.Y. 2010) stated:

> …stretching SLUSA to cover this chain of investment – from Plaintiffs' initial investment in the Funds, the Funds' reinvestment with Madoff, Madoff's supposed purchases of covered securities, to Madoff's sale of those securities and purchases of Treasury bills – snaps even the most flexible rubber band.

---

[12]  The relevant part of the governing statute, 15 U.S.C. §77r(b), provides that "covered securities" are (1) listed on the New York Stock Exchange, the American Stock Exchange or some other national securities exchange; or (2) are issued by an investment company registered under the Investment Company Act of 1940.  15 U.S.C. §77r(b).

*Id.* at 399.

Similarly, in *Pension Comm. of U. of Montreal Pension Plan v. Banc of Am. Securities, LLC*, 750 F. Supp. 2d 450, 453-54 (S.D.N.Y. 2010), the defendants argued that SLUSA's preemptive effect was triggered by virtue of certain hedge funds investing in "covered securities."  The court rejected this argument, holding that SLUSA did not preempt plaintiffs' state-law claims "[b]ecause plaintiffs purchased shares in hedge funds, rather than covered securities." *Id.* at 453-54.  Indeed, the most recent decision of the Puerto Rico District Court impliedly endorsed the view of *Montreal Pension*.  In particular, a careful reading of *Hidalgo-Velez v. San Juan Asset Management, Inc.,* Civil No. 11-2175-CCC, 2012 WL 4427077, at *1 (D.P.R. Sept. 24, 2012) – a case on which the Defendants primarily rely – reveals the very point that Plaintiffs are making here:  unless the "covered securities" are "at the heart" of the case, as opposed to merely being part of the funds' portfolios, the "in connection" prong of SLUSA is not satisfied and, consequently,  SLUSA does not apply.[13]  Here, Defendants unequivocally disclaimed any such connection by warning the investors that "[a]n investment in the Fund is not equivalent to an investment in the underlying securities of the Fund [and that they] should not view the Fund as a vehicle for trading purposes."  (Exhibit B to Defs' Br. at 2)

Therefore, the securities purchased by the Plaintiffs are not "covered securities" nor do the Plaintiffs allege fraud "in connection" with "covered securities."  Thus, Plaintiffs' claims are not preempted as they are entirely out of SLUSA's preemptive reach.

---

[13]  *Hidalgo-Velez*'s position on this point is demonstrated by the court's reliance on *Backus v. Conn. Cmty. Bank, N.A.,* Civ. No. 3:09-CV-1256, 2009 WL 5184360 (D. Conn. Dec. 23, 2009) – a case involving an investment into securities that were found to lay "at the heart" of the case. *Id.* at *5.  Accordingly, *Hidalgo-Velez* saw no conflict with the decision in *Montreal Pension,* as that case, unlike *Backus,* did not concern transaction in securities that were "at the heart" of the case.  *Montreal Pension,* 750 F. Supp. 2d at 456 n.31 ("[T]he distinction between purchases of shares in the Funds and the Funds' purchases of a portfolio of investments that included covered securities is of paramount importance to the SLUSA analysis.).

**B.      The PRUSA Claim Is Not Time Barred Because of Defendants' Fraudulent
Concealment.**

Defendants argue that Plaintiffs' PRUSA claim is time barred because it was not filed

within the two-year term that commenced to run after the sale contracts had been executed.

Defs' Br. at 29.  Defendants claim that this term is one of repose and not subject to tolling based

on *Cooperativa de Ahorro y Crédito Aguada v. Kidder, Peabody & Co.,* 799 F. Supp. 261, 263

n.4 (D.P.R. 1992) (Fuste, J.) ("the two-year statute of limitations is a civil law caducity period.

The lapse of time extinguishes the cause of action.").

Although *Cooperativa* found the stated term to be one of repose, there is no Puerto Rico

Supreme Court opinion finding it to be so.  In addition, although the Court stated in *dicta* that the

doctrine of fraudulent concealment does not apply to a term of repose, the Court did not

expressly hold it to be so, and there is no Puerto Rico Supreme Court decision so holding.  The

*Cooperativa's* Court findings are, therefore, nothing more than informative authority.

Moreover, the most recent Puerto Rico Supreme Court ruling construing the application

of the fraudulent concealment theory to the accrual of a limitations term in a commercial statute,

such as PRUSA, held that said theory ***does*** apply to such a term.  *See COSSEC v. Gonzalez

Lopez,* 179 D.P.R. 793, 809, 813 (P.R. 2010) ("Despite what may appear to be mechanical

application of the statute of limitations in question, an exception has been recognized: fraudulent

concealment." *Id*. at 809 (Our translation)).

The doctrine of fraudulent concealment "operates to toll the statute of limitations 'where

the party injured by the fraud remains in ignorance of it without any fault or want of diligence or

care on his part . . . until the fraud is discovered, though there be no special circumstances or

efforts on the part of the party committing the fraud to conceal it from the knowledge of the other

party.'  Even without affirmative acts on the part of defendants, then, a federal cause of action

will accrue at the time when plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains."  *Cook v. Avien, Inc.,* 573 F.2d 685, 694-695 (1st Cir. 1978).

Here, the allegations made in the Complaint adequately assert facts that are sufficient for the theory of fraudulent concealment to apply.  *See* ¶¶108, 119.[14]  Therefore, the two-year limitations term applicable to this action did not accrue until the SEC announced its investigation in May 2012.  *Id.*  The instant action filed on August 13, 2012 was thus timely filed.

## V.   <u>Control Person Liability Is Adequately Pled</u>

To establish a *prima facie* case of control person liability, Plaintiffs must solely allege that there was a primary violation of the securities laws and that defendants exercised actual power or control over the primary violators.  *See, e.g. Winters v. Steinberg,* 529 F. Supp. 2d 237, 253 (D. Mass. 2008).   Defendants here merely argue that Plaintiffs have not pled a primary violation under Section 10(b).  As stated above, however, Plaintiffs have, in fact, alleged a viable claim under Section 10(b), including how Defendants **knowingly** omitted material information. As held by Judge Gelpí in *Hoff,* when a plaintiff has pleaded a Section 10(b) claim sufficiently, a motion to dismiss based on control person should be denied.  727 F. Supp. 2d at 96.  As such, the motion to dismiss the control person claim here should likewise be denied.  *See also Crowell,*

---

[14]  "Plaintiffs and the Class had no knowledge that Defendants were engaged in the wrongdoing described herein.  As a result of the fraudulent concealment by the Defendants, the Plaintiffs and the Class could not have discovered previously that UBS PR manipulated the market for the Funds until the SEC announced its investigation in May 2012.  There is no way that Plaintiffs and the Class, who are unsophisticated investors, could have discovered the fraud prior to this date."  ¶119

343 F. Supp. 2d at 13 (finding that if plaintiff made out a primary violation of Rule 10b-5, there was no dispute that a control person liability claim could be found).[15]

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss should be denied.[16]


Dated:  April 4, 2013                    **ESPADA, MINAÑA, & PEDROSA LAW OFFICES, PSC.**


/s/ Luis E. Minana
Luis E. Minaña, Esq.
USDC-PR No. 225608
122 Calle Manuel Dómenech Altos
Urb, Baldrich
San Juan, PR  00918
minanalaw@prtc.net
minanalaw@yahoo.com
Tel.:  (787) 758-6500
Fax:  (787) 773-0500


and

Héctor Eduardo Pedrosa-Luna, Esq.
USDC-PR No. 223202
P.O. Box 9023963
San Juan, PR  00902-7511
Tel.:  (787) 920-7983
Fax:  (787) 764-7511

---

[15]  Defendants have not argued that any entity failed to "control" Defendants, nor could they.  As to UBSFS, the Complaint repeatedly sets forth how it controlled the actions, decisions, and publications of UBS PR and the Individual Defendants.  *See, e.g.,* ¶¶ 42, 49, 53.

[16]  Should the Court find that Plaintiffs have failed to meet any particular pleading standard to state a claim for relief, Plaintiffs respectfully request that leave to amend be granted pursuant to Fed. R. Civ. P. 15(a) to remedy any perceived deficiencies, as well as to incorporate subsequently uncovered facts.  *See Resolution Trust Corp. v. Gold,* 30 F.3d 251, 253 (1st Cir. 1994) (leave to amend shall be freely granted when justice so requires).

Eric Quetglas-Jordan
**QUETGLAS LAW OFFICES**
USDC-PR No. 202514
PO Box 16606
San Juan, PR 00908-6606
Tel:  (787) 722-0635/(787) 722-7745
Fax:  (787) 725-3970

*Co-Liasion Counsel*

David R. Scott, Esq. (admitted *pro hac vice*)
Amanda Lawrence, Esq. (admitted *pro hac vice*)
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
 156 South Main Street
P.O. Box 192
Colchester, CT  06415
Tel.:  (860) 537-5537
Fax:  (860) 537-4432

Joseph P. Guglielmo, Esq. (admitted *pro hac vice*)
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY  10174
Tel.:  (212) 223-6444
Fax:  (212) 223-6334

*Lead Counsel for Plaintiffs*

**QUINN, CONNOR, WEAVER, DAVIES &
ROUCO, LLP**

Richard P. Rouco
2700 Highway 280
Mountain Brook Center, Suite 380
Birmingham, AL  35223
Tel:  (205) 870-9989

*Counsel for Plaintiffs*

29