# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **SDM HOLDINGS, INC.**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**UBS FINANCIAL SERVICES, INC. OF PUERTO RICO**, *et al.*,<br><br>Defendants. | Civil No. 12-1663 (CCC/BJM) |

## REPORT AND RECOMMENDATION

On behalf of thousands of investors who purchased shares in various closed-end-fund companies, lead plaintiff SDM Holdings, Inc. ("SDM"), Carmelo Román, and Ricardo Román (collectively, "plaintiffs") filed this proposed class action against UBS Financial Services of Puerto Rico, Inc. ("UBS-PR"); UBS Trust Company of Puerto Rico ("UBS-T"); UBS-PR's Chairman and CEO, Miguel Ferrer; UBS-PR's Vice-Chairman, Carlos J. Ortiz; and six closed-end-fund companies[1] (collectively, "defendants"). Compl., Docket No. 1. The complaint alleges violation of § 10(b) and § 20 of the Exchange Act of 1934 and Rule 10b-5.[2] Docket No. 1. Plaintiffs previously moved to certify the class, and the court denied that motion without prejudice. Docket Nos. 145, 160. Plaintiffs refiled the motion, Docket Nos. 168-1, 188–90, and defendants opposed, Docket Nos. 182, 183, 185.[3] This matter was referred to me for a report and recommendation. Docket No. 173.

---

[1] The complaint alleges claims related to Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico Investors Bond Fund I, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; and Puerto Rico Fixed Income Fund V, Inc. Compl. ¶¶16–21.

[2] In addition, the complaint alleges violation of the Puerto Rico Uniform Securities Act, P.R. Laws Ann. tit. 10, § 890; fraudulent inducement and misrepresentation; negligent misrepresentation; and breach of the duty of good faith and fair dealing. Docket No. 1. Plaintiffs also seek to rescind their purchase of the Funds. *Id.*

[3] Ferrer filed his opposition at Docket No. 182. UBS-PR, UBS-T, Puerto Rico Fixed Income Fund III, Inc., and Puerto Rico Fixed Income Fund V, Inc. filed a separate opposition at

For the following reasons, class certification should be **DENIED**.

## CLASS CERTIFICATION STANDARD

Federal Rule of Civil Procedure 23 "does not set forth a mere pleading standard." *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (*Wal-Mart*). Rather, a "party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.*; *accord Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) (*Halliburton II*) ("plaintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)").

To determine compliance with the Rule, "[c]ourts must engage in 'rigorous analysis.'" *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013) (quoting *Wal-Mart*, 131 S. Ct. at 2551). And although the court may not "conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974), it sometimes "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). Indeed, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 6 (1st Cir. 2005). This analysis frequently "'will entail some overlap with the merits of the plaintiff's underlying claim,' and thus require the presentation of evidence." *Kolbe*, 738 F.3d at 468 (quoting *Wal-Mart*, 131 S. Ct. at 2549).

---

Docket No. 185. Both oppositions refer to each other and incorporate by reference each other's arguments. *See* Docket Nos. 182 at 8; 185 at 38.

# BACKGROUND

The following facts are based on the allegations in the complaint and the evidence obtained during discovery.

## *The Parties*

UBS-PR is a subsidiary of UBS Financial Services, Inc. ("UBS"), and is the largest broker-dealer in Puerto Rico. Compl. ¶ 14. Miguel Ferrer ("Ferrer") served as UBS-PR's chairman and CEO, and Carlos J. Ortiz ("Ortiz") served as its vice-chairman. Compl. ¶¶ 23–24. UBS-T is an affiliate of UBS-PR. Compl. ¶ 15. One of UBS-T's divisions provided advisory services for various closed-end-fund companies. Compl. ¶ 15. The various closed-end-fund companies are organized under the laws of Puerto Rico as investment companies. Compl. ¶¶ 16–21. UBS-PR allegedly underwrote, marketed, and sold shares in the closed-end-companies (the "Funds") to lead plaintiff SDM Holdings, Inc., Carmelo Román, Ricardo Román, and thousands of other investors.

## *Sale of the Funds*

The Funds were not traded on a public exchange and did not trade on an efficient market. *See* Compl. ¶ 1; Docket Nos. 73 at 22 n.8; 168-1 at 11; 185-7 at 58. Rather, UBS-PR sold the Funds through approximately 145 Financial Advisors ("FAs"), who functioned as brokers for 23 different Funds. Docket Nos. 185-5 at 191, 272–73. The FAs' discussions with customers were individualized to meet the specific needs of each customer, and those discussions were interactive and varied based on each customer's situation, needs, objectives, and questions asked. Docket No. 185-5 at 272–73. This being the case, plaintiffs acknowledged that "most, if not all, of investors' information regarding the [Funds] came from their FAs." Docket No. 168-1 at 13. And their expert, Dr. Edward S. O'Neal, testified that whether "an individual investor decided to purchase or sell a [F]und could depend" on what the FA told the investor. Docket No. 185-7 at 206.

Testimony from the plaintiffs representing the putative class confirmed that the information each of them had available when purchasing the Funds varied. For example,

SDM's CEO, Steven Pauli, reviewed with his FA a 2009 Bloomberg article and its criticisms of risky pension-obligation bonds contained within some of the Funds. Docket No. 185-10 at 151–55. Carmelo and Ricardo Román, in contrast, allegedly were told only that their principal was safe and without risk. Docket Nos. 185-8 at 109; 185-9 at 104.

*Fraud Alleged in the Complaint*

Plaintiffs allege that defendants "through their marketing and sale of the securities, touted safety and security of those investments and represented that the sales price represented the value of the underlying investments as well as the supply and demand." Compl. ¶ 3. And though phrased differently, other allegations in the complaint similarly reiterate that defendants made affirmative misrepresentations relating to the risk and pricing of the securities. *See, e.g.*, Compl. ¶¶ 7, 23 ("Ferrer made specific oral and written representations to Plaintiffs and broker dealers, concerning the [Funds] that were contrary to then-existing facts"); ¶ 24 (same allegations with respect to Ortiz); ¶¶ 30–31; ¶ 32 ("Defendants . . . made misrepresentations about the risk, volatility, and liquidity of the [Funds]"); ¶ 35, ¶ 37, ¶ 39 ("numerous emails show [Ferrer] misstating the strength, liquidity, and stability of the [Funds] market"); ¶ 40, ¶¶ 48–49 (at a March 2009 conference, "Defendants told investors that [the Funds] liquidity was increasing and [the Funds'] prices were stable . . . These statements were, of course, false"); ¶ 60, ¶ 75, ¶ 92.

Plaintiffs also allege defendants engaged in manipulative conduct that artificially inflated the prices of the Funds. In essence, plaintiffs allege UBS-PR controlled the secondary market for the Funds and "purchas[ed] millions of dollars of [the Funds] into its own inventory while promoting the appearance of a liquid market, thereby artificially propping up prices and creating the appearance of liquidity." Compl. ¶¶ 4, 6. It is further alleged that UBS-PR later sold 75% of its inventory to offset any potential losses. Compl. ¶ 6. And once "UBS PR reduced its inventory . . . it ceased its artificial support of the market," Compl. ¶ 7, and so "the market prices of certain [F]unds . . . declined from 10–15%," *id.* ¶ 6. Other portions of the complaint describe these alleged manipulative

activities in further detail. *See, e.g.*, Compl. ¶ 28 ("Defendants used the [Funds] inventory account to purchase any excess supply of shares for which UBS PR could not find customers"); ¶ 34 ("Rather than lower [the Funds'] prices to reflect the supply/demand imbalance and volatile market, Defendants . . . obtained an increase in the inventory limits . . . . [allowing] UBS PR to artificially inflate demand"); ¶¶ 44–46, ¶ 47 ("The goal of Objective: Soft Landing was to manipulate the market for [the Funds]"); ¶ 48.

Investors were unaware of any of the foregoing, the complaint alleges, because the defendants concealed their scheme from investors. For example, the complaint alleges that "UBS PR and the Defendants promoted the [Funds'] 'extraordinary market returns' and low risk and volatility, while simultaneously not disclosing that [the Funds'] share prices and liquidity were dependant [sic] on UBS PR's continued manipulation and support of the market." Compl. ¶ 4. Other portions of the complaint make similar allegations. *See, e.g.*, Compl. ¶ 7 ("Defendants . . . did not disclose that in order to prevent a collapse of the [Funds] market, Ferrer and Ortiz directed UBS PR . . . to purchase millions of dollars of [shares of the Funds] into its own inventory").

***Attempt to Amend the Complaint***

Plaintiffs' complaint sought class certification of all persons who purchased or acquired Funds from UBS-PR from January 1, 2008 to May 1, 2012. Compl. ¶ 64. And the complaint alleged claims related to six Funds. *Id.* ¶¶ 16–21. In contrast, plaintiffs' motion seeks to certify the class for persons who purchased or acquired Funds from January 1, 2008 to September 18, 2013. Docket No. 168 at 1. And the motion also seeks certification of claims related to fifteen, rather than six, Funds. *Id.* at 1 n.1. Plaintiffs previously attempted to amend their complaint, and the court struck several filings attempting to so amend. Docket No. 138. Without filing a separate motion, plaintiffs sought to amend the complaint through a footnote in their class certification motion. *See* Docket No. 168-1 at 7 n.3.

# DISCUSSION

Plaintiffs seek class certification for all persons who purchased or acquired Funds from UBS-PR between January 1, 2008 and September 18, 2013. Defendants contend certification of the proposed class is improper because individual issues of reliance predominate, and that plaintiffs improperly attempted to amend their complaint. Plaintiffs respond that reliance can be presumed because their complaint involves primarily omissions, and that their complaint can be amended in light of events occurring after its filing. Regardless of whether the court permits the amendment, individual issues of reliance predominate over common ones, and so the court should deny class certification.

## I.    Rule 23

Plaintiffs seek to certify the class action under Rule 23(b)(3). "To certify a 23(b)(3) class, the district court must undertake a 'rigorous analysis' to determine whether plaintiffs met the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3)'s two additional prerequisites." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 18 (1st Cir. 2015) (*In re Nexium*). The two additional prerequisites require the court to find "that [1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). The predominance criterion of Rule 23(b)(3) "is far more demanding" than Rule 23(a)'s commonality requirement, as its aim is to test whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997). Defendants home in on the requirements of Rule

23(b)(3), arguing primarily that plaintiffs have failed to establish that common questions predominate.[4]

II.   **Securities Fraud**

The Supreme Court "has described the 'basic elements' of a securities fraud action under § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder as including: (1) 'a material misrepresentation (or omission)'; (2) 'scienter, i.e., a wrongful state of mind'; (3) 'a connection with the purchase or sale of a security'; (4) 'reliance'; (5) 'economic loss'; and (6) 'loss causation.'" *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 6–7 (quoting *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 193 (1st Cir. 2005)); *see also* 15 U.S.C. § 78j(b); 17 CFR § 240.10b–5. As the Court has explained, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S. Ct. 2179, 2184 (2011) (*Halliburton I*). This is so because "without the presumption of reliance, a Rule 10b–5 suit cannot proceed as a class action: Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones." *Halliburton II*, 134 S. Ct. at 2416; *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988) (*Basic*); *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009) ("without a class-wide presumption, Investors would have to prove reliance as to each class member individually").

The element of reliance establishes "the causal connection between the alleged fraud and the securities transaction," *Desai*, 573 F.3d at 939, and is therefore "often referred to in cases involving public securities markets . . . as 'transaction causation.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). The Supreme Court has recognized a rebuttable presumption of reliance in only two conceptually distinct

---

[4] Ferrer's opposition also attacks the plaintiffs' ability to meet Rule 23(a)'s requirements. Ultimately, class certification should be denied in this case under Rule 23(b)(3) because plaintiffs have failed to establish that common issues predominate over individual ones.

situations. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). The first rebuttable presumption arises under the fraud-on-the-market doctrine. *Id.* (citing *Basic*, 485 U.S. at 247); *see also Wal-Mart*, 131 S. Ct. at 2552 n.6 ("23(b)(3)'s requirement . . . would often be an insuperable barrier to class certification . . . . But the problem dissipates if the plaintiffs can establish the applicability of the so-called 'fraud on the market' presumption"). The second rebuttable presumption arises "if there is an omission of a material fact by one with a duty to disclose." *Stoneridge*, 552 U.S. at 159 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972) (*Affiliated Ute*)).

The First Circuit has explained the fraud-on-the market presumption of reliance and its relationship to market efficiency with the following syllogism: "(a) an investor buys or sells stock in reliance on the integrity of the market price; (b) publicly available information, including material misrepresentations, is reflected in the market price; and therefore, (c) the investor buys or sells stock in reliance on material misrepresentations." *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 8. An "efficient" market is a necessary predicate for the presumption to apply. *Id.* Indeed, when the market is not efficient, the syllogism above "breaks down," as "there is no assurance that the market price was affected by the defendant's alleged misstatement at all." *Id.* Although the complaint alleged the fraud-on-the-market doctrine applied here, Compl. ¶ 92, plaintiffs' expert conceded the market for the Funds was not efficient and plaintiffs now concede that doctrine does not apply in this case. Docket Nos. 168-1 at 11; 185-7 at 58.

The other rebuttable presumption of reliance arises in circumstances involving "primarily a failure to disclose." *Affiliated Ute*, 406 U.S. at 153–54. In *Affiliated Ute*, members of the Ute Native American Tribe held shares of stock, and officers of the bank that was the transfer agent for a tribal corporation induced them to sell their stock at below-market rates. *Id.* Unbeknown to the Utes, the officers purchased a significant number of the shares, arranged sales to non-Native American investors, and received

gratuities and commissions. *Id.* The Supreme Court held the sellers had a right to know the bank officers were in a position to gain financially from the sales and that the stock was selling at a higher price. *Id.* Because the case involved "primarily" omissions, positive proof of reliance was unnecessary. *Id.* Rather, in such a case, demonstrating a material omission by one who had a duty to disclose is "all that is necessary." *Id.*

Seeking to establish that the *Affiliated Ute* presumption of reliance permits class certification in this case, plaintiffs assert the complaint alleges primarily omissions. Defendants, on the other hand, contend *Affiliated Ute* is inapplicable because the complaint alleges primarily affirmative misrepresentations and market manipulation. Because *Affiliated Ute*'s presumption of reliance "is limited to omissions as opposed to affirmative misrepresentations," it is necessary to "analyze the complaint to determine whether the offenses can be characterized primarily as omissions or misrepresentations." *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000). This is so even in a case alleging a "mix" of affirmative misrepresentations and omissions because rather than confounding the jury with an instruction "to presume reliance with regard to omitted facts, [but] not to presume reliance with regard to misrepresented facts," the court must make a "context-specific determination of where that burden more appropriately lies." *Id.* (collecting and quoting cases) (citations omitted).

As courts have noted, articulating this rule is easier than applying it because "every misstatement both advances false information and omits truthful information." *Id.*; *see also, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) ("in most securities fraud cases, an affirmative misstatement can be cast as an omission and vice versa"). Because an "artfully-pleaded complaint can recharacterize as an omission conduct which more closely resembles a misrepresentation," *Joseph*, 223 F.3d at 1162, the "labels by themselves . . . are of little help," *Wilson v. Comtech Telecomms., Corp.*, 648 F.2d 88, 93 (2d Cir. 1981). For this reason, the court must look to "the nature of the allegations contained in the complaint, bearing in mind that the

*Affiliated Ute* presumption of reliance exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible to prove." *Joseph*, 223 F.3d at 1162; *accord Desai*, 573 F.3d at 941; *Wilson*, 648 F.2d at 93. Importantly, "[n]o court of appeals has applied the *Affiliated Ute* presumption in a case involving a claim that primarily alleges affirmative misrepresentations." *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219 (D.C. Cir. 2010) (collecting cases) (*Affiliated Ute* inapplicable to securities fraud perpetrated through "Ponzi scheme").

*Joseph* aptly illustrates how to determine whether the *Affiliated Ute* presumption applies. 223 F.3d at 1162–63. In that case, the plaintiff attempted to benefit from the presumption by arguing the complaint alleged primarily omissions. *Id.* The plaintiff's complaint was artfully pleaded, as it intertwined affirmative acts with omissions. 223 F.3d at 1163. For example, it alleged that defendant "consistently *omitted to disclose that its financial statements had been falsified* and that its sales, revenues, assets, and shareholders' equity had been artificially inflated." *Id.* (emphasis in original). Refusing to be led astray by artful pleading, the *Joseph* court reviewed the nature of the allegations in the complaint and held the *Affiliated Ute* presumption inapplicable. *Id.* It held so because the complaint essentially alleged the defendant "engaged in a pattern of deception which involved manipulating financial data, disseminating false information about the company, concealing the truth about the company's true financial outlook, and hiding the existence of the fraudulent scheme itself." 223 F.3d at 1162–63. The court reasoned that "[a]ny fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself," and so the concealment does not "transform the alleged malfeasance into an omission rather than an affirmative act." *Id.* at 1163. To find *Affiliated Ute* applicable in such circumstances would "swallow the reliance requirement almost completely" and "fail to serve" the presumption's purpose. *Id.*

Finding persuasive *Joseph*'s reasoning, the Ninth Circuit similarly held *Affiliated Ute* inapplicable where the complaint alleged affirmative misrepresentations and

manipulative conduct (i.e., "activities designed to affect the price of a security artificially by simulating market activity that does not reflect genuine investor demand"). *Desai*, 573 F.3d at 940–41; *see also* Hazen, 3 Law Sec. Reg. § 12.1 ("the following factors are 'classic elements' of a market manipulation: (i) restriction of the 'float' or floating supply of the securities in the public market; (ii) price leadership by the manipulator; (iii) dominating and controlling the market for the security; and (iv) a collapse of the market for the security after the manipulative activity has ceased").

The primary crux of the class-action complaint in this case similarly alleges that defendants made affirmative misrepresentations and engaged in market manipulation. Specifically, the complaint primarily alleges UBS-PR's FAs misrepresented to investors that the Funds were safe investments, and that UBS-PR engaged in manipulative conduct to control artificially the price of the Funds—all of which was unbeknown to investors. To illustrate that this is the primary gravamen of the complaint, I recount the allegations therein by separating them into three broad categories: allegations relating to (1) the risk and pricing of the securities; (2) market manipulation activities by the defendants; and (3) concealed information.

With respect to the risk and pricing of the Funds, plaintiffs allege that defendants "through their marketing and sale of the securities, *touted* safety and security of those investments and *represented* that the sales price represented the value of the underlying investments as well as the supply and demand." Compl. ¶ 3 (emphasis added). And though phrased differently, other allegations in the complaint similarly press that defendants made affirmative misrepresentations relating to the risk and pricing of the securities. *See, e.g.*, Compl. ¶¶ 7; 23 ("Ferrer made specific oral and written representations to Plaintiffs and broker dealers, concerning the [Funds] that were contrary to then-existing facts"); 24 (same allegations with respect to Ortiz); ¶ 30; ¶ 31; ¶ 32 ("Defendants . . . made misrepresentations about the risk, volatility, and liquidity of the [Funds]"); ¶ 35; ¶ 37; ¶ 39 ("numerous emails show [Ferrer] misstating the strength,

liquidity, and stability of the [Funds] market"); ¶ 40; ¶¶ 48–49 (at a March 2009 conference, "Defendants told investors that [the Funds] liquidity was increasing and [the Funds'] prices were stable . . . These statements were, of course, false"); ¶ 60; ¶ 75; ¶ 92. These allegations are not the type covered by the *Affiliated Ute* presumption because it is feasible to prove whether the plaintiffs relied on the alleged misrepresentations made by defendants. It is practicable to prove, for example, whether a particular plaintiff relied on the alleged misrepresentations made during the March 2009 conference. And that some investors attended the conference while others did not is certainly problematic for class-certification purposes.

As to the second category, a substantial portion of the complaint is dedicated to defendants' alleged manipulative conduct that artificially inflated the price of the Funds. In essence, plaintiffs allege UBS-PR controlled the secondary market for the Funds and "purchas[ed] millions of dollars of [the Funds] into its own inventory while promoting the appearance of a liquid market, thereby artificially propping up prices and creating the appearance of liquidity." Compl. ¶¶ 4, 6. It is further alleged that UBS-PR later sold 75% of its inventory to offset any potential losses. Compl. ¶ 6. And once "UBS PR reduced its inventory . . . it ceased its artificial support of the market," Compl. ¶ 7, and so "the market prices of certain [F]unds . . . declined from 10–15%," Compl. ¶ 6. Other portions of the complaint describe these alleged manipulative activities in further detail. *See, e.g.*, Compl. ¶ 28 ("Defendants used the [Funds] inventory account to purchase any excess supply of shares for which UBS PR could not find customers"); ¶ 34 ("Rather than lower [the Funds'] prices to reflect the supply/demand imbalance and volatile market, Defendants . . . obtained an increase in the inventory limits . . . . [allowing] UBS PR to artificially inflate demand"); ¶¶ 44–46; ¶ 47 ("The goal of Objective: Soft Landing was to manipulate the market for [the Funds]"); ¶ 48. Because these allegations relate to defendants' alleged market manipulation, the *Affiliated Ute* presumption of reliance is inapplicable. *See, e.g.*, *Joseph*, 223 F.3d at 1162–63.

The third category of allegations in the complaint relates to information concealed from investors. As in *Joseph*, the allegations in the complaint intertwine omissions with affirmative acts of misrepresentation and manipulative conduct. 223 F.3d at 1162–63. For example, plaintiffs allege that defendants "knew but did not disclose to" plaintiffs that the Funds' prices were set by Ortiz and that "UBS PR and the Defendants promoted the [Funds'] 'extraordinary market returns' and low risk and volatility, *while simultaneously not disclosing* that [the Funds'] share prices and liquidity were dependant [sic] on UBS PR's continued manipulation and support of the market." Compl. ¶ 4 (emphasis added). Other portions of the complaint make similar allegations. *See, e.g.*, Compl. ¶ 7 ("Defendants . . . did not disclose that in order to prevent a collapse of the [Funds] market, Ferrer and Ortiz directed UBS PR . . . to purchase millions of dollars of [shares of the Funds] into its own inventory").

Although plaintiffs claim they are entitled to the *Affiliated Ute* presumption because the defendants concealed the manipulative conduct, courts have held the presumption inapplicable in such circumstances because any "fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself." *Joseph*, 223 F.3d at 1163; *accord Desai*, 573 F.3d at 941. And though plaintiffs contend their complaint primarily alleged the nondisclosure of the underlying assets of the Funds, that contention is belied by the well-pleaded allegations in the complaint. Indeed, the complaint makes only one cursory reference to the Funds' underlying assets—"municipal bonds"—and does not refer to the risky pension obligation bonds. *See* Compl. ¶ 2. After reviewing the complaint, I find the allegations therein primarily allege affirmative misrepresentations and market manipulation. Accordingly, plaintiffs cannot rely on the *Affiliated Ute* presumption of reliance. *See, e.g.*, *Desai*, 573 F.3d at 941 ("manipulative conduct has always been distinct from actionable omissions"). Because the *Affiliated Ute* and the fraud-on-the-market presumptions do not apply in this case, individual issues of reliance

will overwhelm the common issues. Accordingly, the court should deny class certification.

Notwithstanding the above, plaintiffs shift gears and contend class certification is proper because reliance can be presumed from a "common scheme to misrepresent the fundamentals" of the Funds that resulted in uniform misrepresentations to the putative class of plaintiffs. For support, they rely on non-securities-fraud cases like *Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) (Sotomayor, J.).

As an initial matter, the Supreme Court has recognized only two presumptions of reliance in § 10(b) fraud cases.[5] *See Stoneridge*, 552 U.S. at 165. For this reason, courts are wary of recognizing new presumptions of reliance. *See, e.g.*, *Desai*, 573 F.3d at 942 (class certification denied where fraud-on-the-market doctrine and *Affiliated Ute* presumption inapplicable). Indeed, the Supreme Court has cautioned that "[t]hough it remains the law, the § 10(b) private right should not be extended beyond its present boundaries." *Stoneridge*, 552 U.S. at 165. And the Court has rebuffed efforts to establish the element of reliance in a § 10(b) suit by relying on authority concerning common-law fraud actions, reasoning that § 10(b) "does not incorporate common-law fraud into federal law." *Id.* at 162.

But even if plaintiffs are correct to rely on non-securities cases to establish the element of reliance, a dubious proposition in light of *Stoneridge*, *Moore* counsels the opposite result they suggest. *See Moore*, 306 F.3d at 1255. In *Moore*, plaintiffs sought class certification and alleged the defendant "engaged in a common scheme to misrepresent one of its products." *Id.* at 1249. The trial court denied class certification, reasoning plaintiffs failed to satisfy Rule 23(b)(3)'s predominance requirement because

---

[5] Although some lower courts have recognized the so-called "fraud-created-the-market" presumption of reliance, plaintiffs do not contend that presumption is applicable here. *See Joseph*, 223 F.3d at 1163–64 (fraud-created-the-market presumption of reliance permits plaintiffs to bring a § 10(b) action where the "fraud allowed securities that otherwise would have been unmarketable to come into and exist in the market").

there was no evidence of uniform misrepresentations to the putative class of plaintiffs. *Id.* at 1252. The Second Circuit affirmed, holding that "a common course of conduct is not enough to show predominance, because a common course of conduct is not sufficient to establish liability of the defendant to any particular plaintiff." *Id.* at 1255. This is so because "each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss." *Id.* Accordingly, plaintiffs were also required to show that "members of the class received materially uniform misrepresentations." *Id.*

The plaintiffs here have similarly failed to establish that the class received materially uniform misrepresentations. The evidence indicates that the FAs were not required to make uniform representations to the investors. Rather, the information provided to each investor depended on the investor's portfolio and the dialogue between the FA and the investor. This was confirmed by the deposition testimony of the plaintiffs representing the putative class. For example, SDM's CEO, Steven Pauli, had different information available to him about the Funds than Carmelo and Ricardo Román. Thus, even if plaintiffs are correct to rely on *Moore*, the record in this case does not support their assertion that the putative class of plaintiffs received materially uniform representations.

Also unavailing is plaintiffs' repeated claim that *In re Nexium*, 777 F.3d at 9, counsels a different result. Plaintiffs read this case for the proposition that "it may be fairly presumed that no 'economically rational' investor would have purchased [the Funds], or at least not at their advertised 'market prices,' had they known that Defendants had set the prices at a level that concealed their true credit risks." Docket No. 188 at 7. Contrary to plaintiffs' suggestion, *In re Nexium* (a class action case raising antitrust claims) did not recognize a new presumption of reliance in securities cases. 777 F.3d at 32. Rather, the court noted that in securities class actions, plaintiffs may establish a presumption of reliance under the fraud-on-the-market doctrine. *Id.* at 26. The court

further noted that in such cases, the Supreme Court has held that the presence of a de minimis number of uninjured class members is permissible at the class-certification stage. *Id.* at 26 (citing *Halliburton II*, 134 S. Ct. at 2412). *In re Nexium* then extended this logic to the antitrust case before the court and held that "the presence of a de minimis number of uninjured class members is permissible at class certification." *Id.* at 25. In such a circumstance, the court further held that class certification is appropriate if a "mechanism *can* be identified" to determine which class members were injured and which were not. *Id.* at 32.

Because plaintiffs have failed to establish that a class-wide presumption of reliance applies here, their reliance on *In re Nexium* is misplaced. This is so because defendants are not trying to rebut the presumption of reliance by claiming some of the plaintiffs in the putative class were not injured; rather, they contend, correctly, that plaintiffs have failed to establish that they are entitled to a recognized presumption of reliance. For this reason, it is also unnecessary in this case to determine whether a proper "mechanism *can* be identified" to identify injured and uninjured putative class members. *See id.*

Moreover, a variant of the argument pressed by the plaintiffs in this case has been considered and rejected by other courts. Having failed to establish that the fraud-on-the market doctrine or *Affiliated Ute* presumption of reliance applied, the plaintiffs in *Desai* argued that investors "typically rely on the 'integrity of the market,' that is that no one has destroyed its efficiency" through the use of a manipulative scheme. 573 F.3d at 942. The plaintiffs in that case thus sought recognition of a new presumption of reliance in cases "when manipulation allegedly destroys the efficiency of the market, and with it the reliability of the market's price." *Id.* Noting the Supreme Court has recognized only two presumptions of reliance, *Desai* summarily disposed of the argument and affirmed the district court's denial of class certification. *Id.* In sum, plaintiffs have failed to establish

that they are entitled to a class-wide presumption of reliance, and so the court should deny class certification as to their § 10(b) and Rule 10b-5 claims.

### III.    Controller Liability

Plaintiffs also seek class certification for their § 20 claims against Ferrer and Ortiz. *See* 15 U.S.C. § 78t. Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a securities fraud violation. *Id.* § 78t(a). As the First Circuit has explained, § 20 "only creates liability derivative of an underlying securities violation." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 67 (1st Cir. 2008); *see also In re Stone & Webster Sec. Litig. (Stone & Webster II)*, 424 F.3d 24, 27 (1st Cir. 2005) ("[I]t is an essential element of the § 20(a) controlling person claims in question that plaintiffs show a Rule 10b–5 violation by the controlled entity."). For this reason, the derivative § 20 claim "needs no separate discussion." *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68, 70 (1st Cir. 2012). In this case, plaintiffs have failed to establish that class certification is proper as to their § 10(b) and Rule 10b-5 claims. Because their § 20 claim is derivative of their Rule 10b-5 claim, and because this latter claim is unfit for class certification, class certification as to their § 20 claim should similarly be denied.

### IV.    State Law Claims

Plaintiffs additionally seek to certify their state law claims. Their attempt to gain class certification of their Puerto Rico Uniform Securities Act ("PRUSA") claim fares no better than their Rule 10b-5 claim, as this court has previously held that the former claim "is for all practical purposes a verbatim repetition of" the latter claim. *Valles Salgado v. Piedmont Capital Corp.*, 452 F. Supp. 853, 860 (D.P.R. 1978) (citing P.R. Laws Ann. tit. 10, § 890). Claiming their common law claims (negligent misrepresentation, and fraudulent inducement and misrepresentation) are "similarly susceptible" to class certification, plaintiffs do not advance a different theory for establishing class certification as to these claims. Accordingly, the court should deny class certification as

to these remaining common law claims because class certification is improper as to plaintiffs' Rule 10b-5 and PRUSA claims.

## CONCLUSION

For the foregoing reasons, class certification should be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 1st day of March 2016.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge