IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CARMELO ROMAN, RICARDO ROMAN-RIVERA and SDM HOLDINGS, INC., individually and on behalf of all others similarly situated<br><br>Plaintiffs<br><br>vs.<br><br>UBS FINANCIAL SERVICES, INC. OF PUERTO RICO; UBS TRUST COMPANY OF PUERTO RICO; PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.; PUERTO RICO FIXED INCOME FUND III, INC.; PUERTO RICO FIXED INCOME FUND V, INC.; PUERTO RICO INVESTORS BOND FUND I, INC.; PUERTO RICO AAA PORTFOLIO BOND FUND, INC.; PUERTO RICO AAA PORTFOLIO BOND FUND II, INC.; MIGUEL A. FERRER; CARLOS J. ORTIZ<br><br>Defendants | CIVIL 12-1663CCC |

**STATEMENT OF REASONS ON THE SEPTEMBER 30, 2016
ORDER (D.E. 229) ADOPTING THE MARCH 1, 2016
REPORT AND RECOMMENDATION (D.E. 220)
ON CLASS CERTIFICATION**

The named plaintiffs in Civil No. 12-1663(CCC), Carmelo Román (Román), Ricardo Román-Rivera (Román-Rivera) and SDM Holdings, Inc. (SDM), individually and on behalf of others similarly situated, filed this action on August 13, 2012. It was typified as a "Class Action Complaint" and included 10 defendants: two corporate defendants, UBS Services Inc. of Puerto Rico, a broker dealer and a subsidiary of UBS Financial Services, Inc., (UBSFS) and UBS Trust Company of Puerto Rico, (UBST); individual defendants, Miguel A. Ferrer and Carlos J. Ortiz, chairman/CEO and managing director of UBSPR, and six closed-end management investment companies, identified as

CIVIL 12-1663CCC                              2

defendants Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico Investors Bond Fund I, Inc,, Puerto Rico AAA Portfolio Bond, Inc., and Puerto Rico Portfolio Bond II, Inc. (collectively "the Funds).  Plaintiffs Román and Román-Rivera alleged at paragraphs 12 and 13 of the Complaint that they purchased UBS' Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., and Puerto Rico Investors Bond Fund I, Inc. at artificially inflated prices and SDM Holdings, Inc. purchased UBS' Puerto Rico Fixed Income Fund V, Puerto Rico Fixed Income Fund III, Puerto Rico AAA Portfolio Bond Fund, and Puerto Rico AAA Portfolio Bond II also at artificially inflated prices.  The claims were brought under the Securities Exchange Act of 1934, §§ 10(b) and 20(a) and Rule 10(b)-5.  All of the allegations of their Complaint are tied to a scheme to defraud perpetrated by the corporate and the individual defendants relating to the marketing and sale of closed-end funds to plaintiffs and other investors similarly situated.

Upon motion for consolidation (d.e. 28), this earlier Civil Action No. 12-1663 was consolidated by Judge Besosa with Civil No. 12-1849(CCC), brought by Onnasis Corporation (Onnasis) and Julio Tormes-Rodríguez (Tormes) which named seven additional closed-end funds as defendants. This motion for consolidation was decided by an Order (d.e. 34) issued on October 16, 2012 by Judge Besosa to whom the earlier case had been assigned.  The consolidated action would be referred to as the "In Re UBS Financial Services, Inc. of Puerto Rico Securities Litigation." A master docket and master file were ordered to be created by the Clerk of the consolidated actions under the number of the older case, Civil No. 12-1663(FAB).  Judge Besosa entered an Order of Recusal (d.e. 42) on

CIVIL 12-1663CCC                              3

October 22, 2012 (d.e. 42).  The consolidated cases were then transferred to the undersigned's docket under master file and master docket 12-1663(CCC).

On November 10, 2014, the plaintiffs in the consolidated action originally filed as Civil No. 12-1848(CCC), Onnasis and Tormes, filed a motion for voluntary dismissal, without prejudice (d.e. 116).  Judgment was entered on November 26, 2014 ordering its dismissal, without prejudice.  The Court then entered the following Order (d.e. 138) on February 3, 2015 in Civil No. 12-1663(CCC), the sole remaining action, filed by Román, Román-Rivera and SDM:

> Since this action is no longer consolidated with 12-1849(CCC) as the latter was voluntarily dismissed (see docket entries 116 and 122), the following filings are ORDERED STRICKEN as unnecessary and to avoid confusion: **Consolidated Amended Complaint (docket entry 45) and Second Consolidated Amended Complaint (docket entry 60)**.  Plaintiffs' claims are governed by the original complaint filed on August 13, 2012 (docket entry 1).  Given that the answers on file addressed the consolidated complaints (as to consolidation of this action with 12-1849(CCC)), all defendants in this case are ORDERED to file their answers to the complaint filed on August 13, 2012 (docket entry 1), which is the one that now governs this case, by no later than FEBRUARY 20, 2015.

(Emphasis ours).

Román, Román-Rivera and SDM, who filed the earlier action, sought reconsideration of this Order which request was denied (d.e. 142).  They now argue that U.S. Magistrate-Judge McGiverin used the wrong complaint on the class certification issue and that he had to use the stricken Second Consolidated Amended Complaint (SCAC) instead of the original complaint that governed plaintiffs' claims.  Plaintiffs are in effect imputing error to the Court for having denied their motion for reconsideration before the case reached the U.S. Magistrate-Judge by way of this referral.  The Court has reexamined its denial of the Motion for Reconsideration.  It finds no justification

CIVIL 12-1663CCC                                    4

to modify its February 3, 2015 denial. After the voluntary dismissal by plaintiffs Onnasis and Tormes of their Civil No. 12-1849(CCC), there was no reason to continue to manage Civil No. 12-1663 as a consolidated action.

In any event, the final disposition of the issues referred to the U.S. Magistrate-Judge on the class certification request remains unaltered whether the analysis is made utilizing the original complaint filed by plaintiffs in Civil No. 12-1663(CCC) or the Second Consolidated Amended Complaint later filed in the two consolidated actions. The final outcome of the analysis, whether undertaken with the original or the second consolidated amended complaint as reference, is the same. The undersigned shares U.S. Magistrate-Judge McGiverin's views that "[r]egardless of whether the Court permits the amendment, individual issues of reliance predominate over common ones, and so the Court should deny class certification." R&R (docket entry 220), at p. 6. What follows is a comparison of the essential factual allegations of both the original and the SCAC.

Throughout their original class action complaint, the one that governs proceedings pursuant to the February 3, 2015 Order, and also in the Second Consolidated Amended Complaint, submitted by way of footnote number 3 in their class certification motion (d.e. 168-1, p. 7, n. 3), plaintiffs have repeated a particular pattern of conduct incurred by UBSPR and UBSFS to defraud them as investors by manipulative tactics. In addition to the acts listed above, taken from paragraphs 3, 4 and 5 which mirror each other in both complaints, the following affirmative fraudulent actions are found in both pleadings: (1) inventory reduction: aware that investor demand was significantly declining and/or insufficient to support the volume of inventory (allegation 5 of original complaint and 6 of SCAC) to avoid or offset potential losses, UBSPR's parent

CIVIL 12-1663CCC                               5

company in the spring of 2009 ordered it to substantially reduce its inventory of CEF shares by launching a plan known as "Objective Soft Landing" whereby UBSPR routinely offered and sold its CEF shares at prices that undercut pending customer sell orders (allegation 6 of the original complaint and 7 of the SCAC) resulting in the sale by UBSPR, between March and September 2009, of its inventory to investors at the expense of its supposed efforts to sell its clients' holdings (paragraph 6 of the original complaint and 7 of the SCAC); (2) market manipulation: as part of their scheme, defendants concealed how they were setting secondary market prices and artificially manipulated demand to create the appearance of liquidity of the market while simultaneously withdrawing market support, selling to the detriment of their clients who were also attempting to sell.  Allegation 6 of the Complaint and 8 of the SCAC.

   The fraud, as concretely charged in the allegations of both complaints, developed in the manner described above, whether as set forth in the original or in the amended complaint. The fraud consisted in manipulating the inventory, manipulating demand, controlling the secondary market, competing against their own clients, and deliberately reducing CEF inventory while touting the CEFs as safe.  These manipulations, misrepresentations and misinformation were aimed at creating the false illusion of a safe market, all of which eventually collapsed.  **The fact that plaintiffs were not made privy to the misrepresentation and falsity of defendants' actions, while the scheme was ongoing, begs the question for the whole fraudulent scheme was built on a false appearance**.  This was not the type of situation where defendants failed to disclose information or material facts which they had a duty to disclose to their clients but, rather, it constituted an intricate scheme by

CIVIL 12-1663CCC				6

a brokerage firm which preyed on investors by providing false information for an extended period purportedly leading them to make investments with the eventual outcome of their economic downfall. This conclusion is based on the allegations of named plaintiffs themselves in both the original and amended complaints and their exhibits, and on the report of their own expert Edward S. O'Neal. Plaintiffs cannot have it both ways. They cannot base their theory of liability on the affirmative fraudulent manipulations and actions perpetrated by defendants and simultaneously characterize them as simple "omissions."

It is also noted that the parties were granted a period to conduct class certification discovery by June 10, 2015 (d.e. 159), before referral of the class certification motion to the U.S. Magistrate-Judge. The Magistrate-Judge made findings of fact "based on the allegations in the complaint and the evidence obtained during discovery." R&R, at p. 3. Discovery included, among other things, the depositions of the parties' experts Edward S. O'Neal and Doel García utilized by the Magistrate-Judge in his analysis and conclusions (d.e. 185-5 and d.e. 185-7) on discussions between individual investors and financial advisors (FAs) on the investors' situations, needs and objectives. See also references to deposition "[t]estimony from plaintiffs." R&R, pp. 3-4, 15. The Court has considered the report of plaintiffs' expert and there is nothing in that report nor do plaintiffs point to any specific data or opinion by their expert that alters the findings of fact and conclusions of law reached by the U.S. Magistrate-Judge in his Report and Recommendation.

The R&R sets forth the following basic findings of fact relevant to plaintiffs' request for class certification under Fed. R. Civ. P. 23(b)(3), highlighting that Rule 23(b)(3) has two additional prerequisites not included in Fed. R. Civ. P. 23(a): "that [1] the questions of law or fact common to class

CIVIL 12-1663CCC            7

members predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   R&R, at p. 6.

- (1)   The Funds were not traded on a public exchange and did not trade on an efficient market.  See Compl. ¶ 1; Docket Nos. 73 at 22 n. 8; 168-1 at 11; 185-7 at 58.

- (2)   UBS-PR sold the Funds through approximately 145 Financial Advisors ("FAs"), who functioned as brokers for 23 different Funds.  Docket Nos. 185-5 at 191, 272–73.

- (3)   The FAs' discussions with customers were individualized to meet the specific needs of each customer, and those discussions were interactive and varied based on each customer's situation, needs, objectives, and questions asked. Docket No. 185-5 at 272–73.

- (4)   This being the case, plaintiffs acknowledged that "most, if not all, of investors' information regarding the [Funds] came from their FAs." Docket No. 168-1 at 13.

- (5)   Plaintiffs' expert, Dr. Edward S. O'Neal, testified that whether "an individual investor decided to purchase or sell a [F]und could depend" on what the FA told the investor. Docket No. 185-7 at 206.

- (6)   Testimony from the plaintiffs representing the putative class confirmed that the information each of them had available when purchasing the Funds varied.

R&R, p. 3.

These findings are followed by the Magistrate-Judge's legal analysis. U.S. Magistrate-Judge McGiverin's analysis is essentially based on the reliance element of a securities fraud action brought under section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.  The element of reliance is widely discussed in Erica P. John Fund, Inc. v. Halliburton Co., 131 S.Ct. 2179, 2185 (2011) (Halliburton I) and Halliburton v. Erica P. John Fund, Inc., 134 S.Ct. 2398 (2014) (Halliburton II).  Although Halliburton I and II are securities fraud class actions seeking to recover from defendants on a "fraud-on-the-market theory", not plaintiffs' theory in this case,

CIVIL 12-1663CCC                              8

both cases establish that whether common questions of law or fact predominate in a securities fraud action turns on the element of reliance. See Halliburton II, p. 2416.  The fraud-on-the-market presumption of reliance was discarded in the analysis of our case since the U.S. Magistrate-Judge observed that: "Although the complaint alleged the fraud-on-the-market doctrine applied here (referring to In Re Polimedica Corp.), Compl, paragraph 92, plaintiffs' expert conceded the market for the Funds was not efficient and plaintiffs now concede that doctrine does not apply in this case. Docket Nos. 168-1, at 11; 185-7 at 58." R&R, p. 8.  The Magistrate-Judge also found inapplicable the "Affiliated Ute presumption of reliance" which arises in circumstances primarily involving a failure to disclose.  Affiliated Ute Citizens of the State of Utah et. al.  v. United States et. al., 406 U.S. 128, 92 S.Ct. 1456 (1972).  Affiliated Ute held that the Bank and its two employees who failed to disclose to plaintiffs, holders of Ute Distribution Company stocks, material facts that reasonably could have been expected to influence the plaintiffs' decisions to sell, such as that their shares were selling for a higher price, justified a presumption of reliance.  The defendants in Affiliated Ute had an obligation to disclose material facts that plaintiffs, as investors, could have considered important in their decision to sell their stock.  I McLaughin on Class Actions, pp. 1304-05, explains the reach and application of the Affiliated Ute presumption of reliance, stating:

> The Supreme Court thus mitigated the difficulty of proving reliance on an alleged non-disclosure in the face of a duty to disclose by holding that for a Rule 10b-5 claim "involving primarily a failure to disclose," rather than misrepresentations, the reliance element may be satisfied with allegations "that the facts withheld [are] material."
>
> Most courts enforce clear-cut limitations on the Affiliated Ute presumption of reliance– it applies only where there is no affirmative statement alleged to have been misleading. Of course,

CIVIL 12-1663CCC                                    9

> "[a]ll misrepresentations are also non-disclosures, at least to the extent that there is a failure to disclose which facts in the representation are not true." Courts have consistently held, however, that the Affiliated Ute presumption of reliance does not arise where securities fraud plaintiffs challenge an affirmative statement, even if the affirmative statements are alleged to be misleading because additional material information was omitted.

This is precisely what the U.S. Magistrate-Judge concluded in our case. At page 13 of the R&R, U.S. Magistrate-Judge McGiverin states the reasons underlying his primary determination that "plaintiffs cannot rely on the Affiliated Ute presumption of reliance:"

> Although plaintiffs claim they are entitled to the Affiliated Ute presumption because the defendants concealed the manipulative conduct, courts have held the presumption inapplicable in such circumstances because any "fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself." Joseph, 223 F.3d at 1163; accord Desai, 573 F.3d at 941. And though plaintiffs contend their complaint primarily alleged the nondisclosure of the underlying assets of the Funds, that contention is belied by the well-pleaded allegations in the complaint. Indeed, the complaint makes only one cursory reference to the Funds' underlying assets—"municipal bonds"—and does not refer to the risky pension obligation bonds. See Compl. ¶ 2. After reviewing the complaint, I find the allegations therein primarily allege affirmative misrepresentations and market manipulation. Accordingly, plaintiffs cannot rely on the Affiliated Ute presumption of reliance. See, e.g., Desai, 573 F.3d at 941 ("manipulative conduct has always been distinct from actionable omissions").

The corollary to this fundamental determination is immediately thereafter explained by the U.S. Magistrate-Judge in the following observation: "Because the Affiliated Ute presumption and the fraud-on-the-market presumptions do not apply in this case, individual issues of reliance will overwhelm the common issues [and t]he court should deny class certification." R&R, at pp. 13-14. The individualized proof of reliance as to each putative class member would include issues touched upon by the U.S. Magistrate-Judge, such as the individual investors' knowledge of and experience in the market, needs and advise he/she received relevant to an investment. Making reference to the deposition

CIVIL 12-1663CCC				10

testimonies of Doel García (d.e. 185-5, pp. 191, 272-73) and Edward S. O'Neal (d.e. 185-7, p. 206), he made the following factual determinations:[1] (1) the 145 financial advisors (FAs) functioned as brokers in the sale of the Funds, (2) the discussions that FAs had with customers were interactive and varied based on each customer's situations, needs, objectives and questions asked, (3) plaintiffs acknowledged that "most, if not all of investors' information regarding the Funds, came from their FAs, (4) plaintiffs' expert testified that whether "an individual investor decided to purchase or sell a Fund could depend" on what the FAs told the investors, (5) the evidence indicates that the FAs were not required to make uniform representations to investors, and (6) the information provided depended on the investor's portfolio and the dialogue between the FA and the investor, as confirmed by the deposition testimony of the named class plaintiffs.

The following cases cited by the Magistrate-Judge, all of which are securities fraud actions, fully support his primary determination on the inapplicability to this case of the Affiliated Ute presumption of reliance.

> Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the Affiliated Ute presumption to swallow the reliance requirement almost completely. Moreover, it would fail to serve the Affiliated Ute presumption's purpose since this is not a case where reliance would be difficult to prove because it was based on a negative. We therefore hold the Affiliated Ute presumption of reliance inapplicable here. See Abell v. Potomac Ins. Co., 858 F.2d 1104, 1119 (5th Cir. 1988) (applying the presumption in non-disclosure cases, but not in falsehood or distortion cases), judgment vacated on other grounds, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed. 2d 584 (1989).

Joseph v. Wiles, 223 F3d 1155, 1163 (10th Cir. 2000).

---

[1] Findings 1, 2, 3 and 4 are set forth at page 3 of the Report and Recommendation. Findings 5 and 6 are at page 15 of the Report and Recommendation.

CIVIL 12-1663CCC		11

> Omissions are generally actionable under Rule 10b-5(b). As we explained above, they stem from the failure to disclose accurate information relating to the value of a security where one has a duty to disclose it.
>
> . . .
>
> Manipulative conduct, by contrast, is actionable under Rule 10b-5(a) or (c) and includes activities designed to affect the price of a security artificially by simulating market activity that does not reflect genuine investor demand. See Santa Fe, 430 U.S. at 476-77, 97 S.Ct. 1292; Ernst and Ernst v. Hochfelder, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed. 2d 668 (1976) ("[Manipulation] connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.") In order to succeed, manipulative schemes must usually remain undisclosed to the general public. See Santa Fe, 430 U.S. at 477, 97 S.Ct. 1292. If such nondisclosure of a defendant's fraud was an actionable omission, then every manipulative conduct case would become an omissions case. If that were so, then all of the Supreme Court's discussion of what constitutes manipulative activity would be redundant. We decline to read the Supreme Court's case law on manipulative conduct as little more than an entertaining, but completely superfluous, intellectual exercise. See Stoneridge, 128 S.Ct. at 769, (listing the three types of section 10(b) actions); Cent. Bank, 511 U.S. at 177, 114 S.Ct. 1439 (same).

Desai v. Deutsche Bank Securities LTD, 573 F3d 931, 940-41 (9th Cir. 2009)

The above constitutes the statement of reasons in support of the Court's prior September 30, 2016 Order (d.e. 229) adopting the U.S. Magistrate-Judge's Report and Recommendation (d.e. 220).

SO ORDERED.

At San Juan, Puerto Rico, on November 22, 2016.

											S/CARMEN CONSUELO CEREZO
											United States District Judge