IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CARMELO ROMAN, RICARDO
ROMAN-RIVERA and
SDM HOLDINGS, INC., individually
and on behalf of all others similarly
situated

Plaintiffs

vs.

UBS FINANCIAL SERVICES, INC.
OF PUERTO RICO; UBS TRUST
COMPANY OF PUERTO RICO;
PUERTO RICO INVESTORS
TAX-FREE FUND IV, INC.; PUERTO
RICO FIXED INCOME FUND III, INC.;
PUERTO RICO FIXED INCOME
FUND V, INC.; PUERTO RICO
INVESTORS BOND FUND I, INC.;
PUERTO RICO AAA PORTFOLIO
BOND FUND, INC.; PUERTO
RICO AAA PORTFOLIO BOND
FUND II, INC.; MIGUEL A. FERRER;
CARLOS J. ORTIZ

Defendants

CIVIL 12-1663CCC

## OPINION AND ORDER

Plaintiffs Carmelo Román, Ricardo Román-Rivera and SDM Holdings, Inc., individually and on behalf of all others similarly situated, filed on August 13, 2012, this action (d.e. 1)[1] typified as a 'Class Action Complaint' and included 10 defendants: two corporate defendants, UBS Services Inc. of Puerto Rico ("UBS PR"), a broker dealer and a subsidiary of UBS Financial

---

[1] Plaintiffs filed a Consolidated Amended Complaint (d.e. 45) and a Second Consolidated Amended Complaint (d.e. 60) which were ordered stricken by the Court on February 3, 2015 as unnecessary and to avoid confusion since the action was "no longer consolidated with 12-1849(CCC) as the latter was voluntarily dismissed." (d.e. 138). Thus, plaintiffs' claims are governed by the original complaint filed on August 13, 2012.

Services, Inc. and UBS Trust Company of Puerto Rico, ("UBS Trust"); individual defendants, Miguel A. Ferrer ("Ferrer") and Carlos J. Ortiz ("Ortiz") (collectively "Individual Defendants"), chairman/CEO and managing director of UBS PR, and six closed-end management investment companies, identified as defendants Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico Investors Bond Fund I, Inc,, Puerto Rico AAA Portfolio Bond, Inc., and Puerto Rico Portfolio Bond II, Inc. (collectively "CEFs").[2]   Plaintiffs Román and Román-Rivera alleged at paragraphs 12 and 13 of the Complaint that they purchased UBS' Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., and Puerto Rico Investors Bond Fund I, Inc. at artificially inflated prices and SDM Holdings, Inc. purchased UBS' Puerto Rico Fixed Income Fund V, Puerto Rico Fixed Income Fund III, Puerto Rico AAA Portfolio Bond Fund, and Puerto Rico AAA Portfolio Bond II also at artificially inflated prices.  The claims were brought under the Securities Exchange Act of 1934, §§ 10(b) and 20(a) and Rule 10(b)-5.  All of the allegations of their Complaint are tied to a scheme to defraud perpetrated by the corporate and the individual defendants relating to the marketing and sale of closed-end funds to plaintiffs and other investors similarly situated.

---

[2]Partial Judgment was entered dismissing plaintiffs' claims against defendants Puerto Rico Investors Tax Free Fund IV, Inc. and the Puerto Rico Investors Bond Fund I on August 28, 2013 and against defendants AAA Portfolio Bond Fund, Inc. and Puerto Rico AAA Portfolio Bond Fund II, Inc on August 21, 2017.  Accordingly, the remaining CEFs in the action are Puerto Rico Fixed Income Fund III, Inc. and Puerto Rico Fixed Income Fund V, Inc.

The Court denied on September 30, 2016 plaintiffs' Motion to Certify Class and Appoint Class Counsel.  (d.e. 229).  A Statement of Reasons followed at docket entry 230 in which the Court made a detailed legal analysis in support of its September 30, 2016 Order adopting U.S. Magistrate-Judge McGiverin's Report and Recommendation and denying class certification. Plaintiffs sought leave to appeal the denial of class certification.  On March 7, 2017, the Court of Appeals for the First Circuit entered Judgment denying the Rule 23(f) petition.  (d.e. 239).

Before the Court is defendants UBS PR, Ortiz and Ferrer's Motion to Compel Arbitration and to Dismiss Plaintiffs' Individual Claims (**d.e. 234**) filed on February 13, 2017 and opposed by plaintiffs on February 27, 2017 (d.e. 235).  Plaintiffs' initial opposition was based on their then-pending appeal from the Court's denial of class certification, and argued that compelling arbitration before the Court of Appeals ruled on the appeal would be premature.  A second opposition filed by plaintiffs on April 17, 2017, after the Court of Appeals denied their request for leave to appeal the denial of class certification, consists of only one argument: defendants' Motion to Compel Arbitration should be denied "on the grounds that this action is properly maintained as a class action."   Thus, plaintiffs' opposition is in fact a reconsideration of the September 30, 2016 Order denying plaintiffs' Motion to Certify Class and Appoint Class Counsel.

## DISCUSSION

**I.    MOTION TO COMPEL ARBITRATION OF CLAIMS AGAINST UBS PR, ORTIZ AND FERRER**

Defendants urge that plaintiffs are bound by the pre-dispute arbitration provision ("Arbitration provision") in UBS's Client Relationship Agreement ("Relationship Agreement"), which each acknowledged at the time their accounts with UBS PR were opened (*see* d.e. 234, Exhibits A, B and C).

The Arbitration provision of the Relationship Agreement states, in part:

**You agree . . . that any controversy, claim or issue in any controversy which may arise between you and UBS Financial Services Inc. or you and UBS Financial Services Incorporated of Puerto Rico, that occurred prior, on or subsequent to the execution of this Agreement, including but not limited to, any controversy, claim or issue in any controversy concerning any account(s), transaction, dispute or the construction, performance or breach of this Agreement or any other agreement (whether entered into prior, on or subsequent to the date hereof) shall be determined by arbitration.**

(d.e. 234, Exhibit D, pages 7-8) (bold in original).

The Relationship Agreement also includes a clause that provides:

"All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed."

(d.e. 234, Exhibit D, page 7).

Under the Federal Arbitration Act ("FAA"), "[a] written provision in [] a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract,

transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA reflects a strong federal policy favoring arbitration. *HIM Portland, LLC v. DeVito Builders, Inc.*, 317 F.3d 41, 43 (1st Cir. 2003).  "A party seeking to compel arbitration under the FAA must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope."  *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011) (internal citations omitted).

Plaintiffs' position is that because they understand the case should proceed as a class action, the parties controversies are not subject to arbitration.  It is true that, if this case were a class action, plaintiffs' client agreements with UBS PR would bar arbitration.  The Arbitration provision states that:

> No person shall . . . seek to enforce any pre-dispute arbitration Agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until:  (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court."

(d.e. 234, Exhibit D, pages 7-8).  Nevertheless, on September 30, 2016 the Court denied plaintiffs' request for class certification (d.e. 229), and subsequently the First Circuit denied their Fed. R. Civ. P. 23(f) Petition.  In denying class certification, we observed:

Throughout their original class action complaint, the one that governs proceedings pursuant to the February 3, 2015 Order, and also in the Second Consolidated Amended Complaint, submitted by way of footnote number 3 in their class certification motion (d.e. 168-1, p. 7, n. 3), plaintiffs have repeated a particular pattern of conduct incurred by UBSPR and UBSFS to defraud them as investors by manipulative tactics. In addition to the acts listed above, taken from paragraphs 3, 4 and 5 which mirror each other in both complaints, the following affirmative fraudulent actions are found in both pleadings:

(1) inventory reduction: aware that investor demand was significantly declining and/or insufficient to support the volume of inventory (allegation 5 of original complaint and 6 of SCAC) to avoid or offset potential losses, UBSPR's parent company in the spring of 2009 ordered it to substantially reduce its inventory of CEF shares by launching a plan known as "Objective Soft Landing" whereby UBSPR routinely offered and sold its CEF shares at prices that undercut pending customer sell orders (allegation 6 of the original complaint and 7 of the SCAC) resulting in the sale by UBSPR, between March and September 2009, of its inventory to investors at the expense of its supposed efforts to sell its clients' holdings (paragraph 6 of the original complaint and 7 of the SCAC); (2) market manipulation: as part of their scheme, defendants concealed how they were setting secondary market prices and artificially manipulated demand to create the appearance of liquidity of the market while simultaneously withdrawing market support, selling to the detriment of their clients who were also attempting to sell. Allegation 6 of the Complaint and 8 of the SCAC.

The fraud, as concretely charged in the allegations of both complaints, developed in the manner described above, whether as set forth in the original or in the amended complaint. The fraud consisted in manipulating the inventory, manipulating demand, controlling the secondary market, competing against their own clients, and deliberately reducing CEF inventory while touting the CEFs as safe. These manipulations, misrepresentations and misinformation were aimed at creating the false illusion of a safe market, all of which eventually collapsed. **The fact that plaintiffs were not made privy to the misrepresentation and falsity of defendants' actions, while the scheme was ongoing, begs the question for the whole fraudulent scheme was built on a false appearance**. This was not the type of situation where defendants failed to disclose information or material facts which they had a duty to disclose to their clients but, rather, it constituted an intricate scheme by a brokerage firm which preyed on investors by

providing false information for an extended period purportedly leading them to make investments with the eventual outcome of their economic downfall. This conclusion is based on the allegations of named plaintiffs themselves in both the original and amended complaints and their exhibits, and on the report of their own expert Edward S. O'Neal. Plaintiffs cannot have it both ways. They cannot base their theory of liability on the affirmative fraudulent manipulations and actions perpetrated by defendants and simultaneously characterize them as simple "omissions."

Statement of Reasons (d.e. 230), pp. 4-6.

We further held:

The R&R sets forth the following basic findings of fact relevant to plaintiffs' request for class certification under Fed. R. Civ. P. 23(b)(3), highlighting that Rule 23(b)(3) has two additional prerequisites not included in Fed. R. Civ. P. 23(a): "that [1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." R&R, at p. 6.

(1) The Funds were not traded on a public exchange and did not trade on an efficient market. See Compl. ¶ 1; Docket Nos. 73 at 22 n. 8; 168-1 at 11; 185-7 at 58.

(2) UBS-PR sold the Funds through approximately 145 Financial Advisors ("FAs"), who functioned as brokers for 23 different Funds. Docket No. 185-5 at 191, 272–73.

(3) The FAs' discussions with customers were individualized to meet the specific needs of each customer, and those discussions were interactive and varied based on each customer's situation, needs, objectives, and questions asked. Docket No. 185-5 at 272–73.

(4)This being the case, plaintiffs acknowledged that "most, if not all, of investors' information regarding the [Funds] came from their FAs." Docket No. 168-1 at 13.

(5) Plaintiffs' expert, Dr. Edward S. O'Neal, testified that whether "an individual investor decided to purchase or sell a [F]und could depend" on what the FA told the investor. Docket No. 185-7 at 206.

(6) Testimony from the plaintiffs representing the putative class confirmed that the information each of them had available when purchasing the Funds varied.

R&R, p. 3.

These findings are followed by the Magistrate-Judge's legal analysis. U.S. Magistrate-Judge McGiverin's analysis is essentially based on the reliance element of a securities fraud action brought under section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. The element of reliance is widely discussed in *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2185 (2011) *(Halliburton I)* and *Halliburton v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014) (*Halliburton II*). *Although Halliburton I* and *II* are securities fraud class actions seeking to recover from defendants on a "fraud-on-the-market theory", not plaintiffs' theory in this case, both cases establish that whether common questions of law or fact predominate in a securities fraud action turns on the element of reliance. *See Halliburton II*, p. 2416. The fraud-on-the-market presumption of reliance was discarded in the analysis of our case since the U.S. Magistrate-Judge observed that: "Although the complaint alleged the fraud-on-the-market doctrine applied here (referring to *In Re Polimedica Corp.*), Compl, paragraph 92, plaintiffs' expert conceded the market for the Funds was not efficient and plaintiffs now concede that doctrine does not apply in this case. Docket Nos. 168-1, at 11; 185-7 at 58." R&R, p. 8. The Magistrate-Judge also found inapplicable the "*Affiliated Ute* presumption of reliance" which arises in circumstances primarily involving a failure to disclose. *Affiliated Ute Citizens of the State of Utah et. al. v. United States et. al.*, 406 U.S. 128, 92 S.Ct. 1456 (1972). *Affiliated Ute* held that the Bank and its two employees who failed to disclose to plaintiffs, holders of Ute Distribution Company stocks, material facts that reasonably could have been expected to influence the plaintiffs' decisions to sell, such as that their shares were selling for a higher price, justified a presumption of reliance. The defendants in *Affiliated Ute* had an obligation to disclose material facts that plaintiffs, as investors, could have considered important in their decision to sell their stock. *I McLaughin on Class Actions*, pp. 1304-05, explains the reach and application of the *Affiliated Ute* presumption of reliance, stating:

The Supreme Court thus mitigated the difficulty of proving reliance on an alleged non-disclosure in the face of a duty to disclose by holding that for a Rule 10b-5 claim "involving primarily a failure to disclose," rather than misrepresentations, the reliance element may be satisfied with allegations "that the facts withheld [are] material."

Most courts enforce clear-cut limitations on the Affiliated Ute presumption of reliance– it applies only where there is no affirmative statement alleged to have been misleading. Of course,

"[a]ll misrepresentations are also non-disclosures, at least to the extent that there is a failure to disclose which facts in the representation are not true." Courts have consistently held, however, that the <u>Affiliated Ute</u> presumption of reliance does not arise where securities fraud plaintiffs challenge an affirmative statement, even if the affirmative statements are alleged to be misleading because additional material information was omitted.

This is precisely what the U.S. Magistrate-Judge concluded in our case. At page 13 of the R&R, U.S. Magistrate-Judge McGiverin states the reasons underlying his primary determination that"plaintiffs cannot rely on the *Affiliated Ute* presumption of reliance:"

Although plaintiffs claim they are entitled to the *Affiliated Ute* presumption because the defendants concealed the manipulative conduct, courts have held the presumption inapplicable in such circumstances because any "fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself." *Joseph*, 223 F.3d at 1163; *accord Desai*, 573 F.3d at 941. And though plaintiffs contend their complaint primarily alleged the nondisclosure of the underlying assets of the Funds, that contention is belied by the well-pleaded allegations in the complaint. Indeed, the complaint makes only one cursory reference to the Funds' underlying assets—"municipal bonds"—and does not refer to the risky pension obligation bonds. *See* Compl. ¶ 2. After reviewing the complaint, I find the allegations therein primarily allege affirmative misrepresentations and market manipulation. Accordingly, plaintiffs cannot rely on the *Affiliated Ute* presumption of reliance. *See, e.g., Desai*, 573 F.3d at 941 ("manipulative conduct has always been distinct from actionable omissions").

The corollary to this fundamental determination is immediately thereafter explained by the U.S. Magistrate-Judge in the following observation: "Because the *Affiliated Ute* presumption and the fraud-on-the-market presumptions do not apply in this case, individual issues of reliance will overwhelm the common issues [and t]he court should deny class certification." R&R, at pp. 13-14. The individualized proof of reliance as to each putative class member would include issues touched upon by the U.S. Magistrate-Judge, such as the individual investors' knowledge of and experience in the market, needs and advise he/she received relevant to an investment. Making reference to the deposition testimonies of Doel García (d.e. 185-5, pp. 191, 272-73) and Edward S. O'Neal (d.e. 185-7, p. 206), he made the following factual determinations: (1) the 145 financial advisors (FAs)

functioned as brokers in the sale of the Funds, (2) the discussions that FAs had with customers were interactive and varied based on each customer's situations, needs, objectives and questions asked, (3) plaintiffs acknowledged that "most, if not all of investors' information regarding the Funds, came from their Fas, (4) plaintiffs' expert testified that whether "an individual investor decided to purchase or sell a Fund could depend" on what the FAs told the investors, (5) the evidence indicates that the FAs were not required to make uniform representations to investors, and (6) the information provided depended on the investor's portfolio and the dialogue between the FA and the investor, as confirmed by the deposition testimony of the named class plaintiffs.

The following cases cited by the Magistrate-Judge, all of which are securities fraud actions, fully support his primary determination on the inapplicability to this case of the *Affiliated Ute* presumption of reliance.

Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely. Moreover, it would fail to serve the *Affiliated Ute* presumption's purpose since this is not a case where reliance would be difficult to prove because it was based on a negative. We therefore hold the *Affiliated Ute* presumption of reliance inapplicable here. *See Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988) (applying the presumption in non-disclosure cases, but not in falsehood or distortion cases), judgment vacated on other grounds, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed. 2d 584 (1989).

*Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000).

Omissions are generally actionable under Rule 10b-5(b). As we explained above, they stem from the failure to disclose accurate information relating to the value of a security where one has a duty to disclose it.

.   .   .

Manipulative conduct, by contrast, is actionable under Rule 10b-5(a) or (c) and includes activities designed to affect the price of a security artificially by simulating market activity that does not reflect genuine investor demand. *See Santa Fe*, 430 U.S. at 476-77, 97 S.Ct. 1292; *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed. 2d 668 (1976)

("[Manipulation] connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.") In order to succeed, manipulative schemes must usually remain undisclosed to the general public. *See Santa Fe*, 430 U.S. at 477, 97 S.Ct. 1292.  If such nondisclosure of a defendant's fraud was an actionable omission, then every manipulative conduct case would become an omissions case.  If that were so, then all of the Supreme Court's discussion of what constitutes manipulative activity would be redundant. We decline to read the Supreme Court's case law on manipulative conduct as little more than an entertaining, but completely superfluous, intellectual exercise.  *See Stoneridge*, 128 S.Ct. at 769, (listing the three types of section 10(b) actions); *Cent. Bank*, 511 U.S. at 177, 114  S.Ct. 1439 (same).

*Desai v. Deutsche Bank Securities LTD*, 573 F.3d 931, 940-41 (9th Cir. 2009).

Statement of Reasons (d.e. 230), pp. 6-11.

Defendants have met their burden by demonstrating that a valid agreement exists, that they are entitled to invoke the arbitration clause, that plaintiffs are bound by the clause and that the claim asserted comes within the clause's scope.  *See Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 8 (1st Cir. 2014) ("[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.") Accordingly, we will enforce the Arbitration provision.

The issue then turns on the proper disposition of the case.  Section 3 of the FAA states that where the issues before a court are arbitrable, the Court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  Nevertheless, the First Circuit has held that a court "may court may dismiss, rather than stay, a

case when all of the issues before the court are arbitrable." *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 156 (1st Cir. 1998).

The Arbitration provision in the instant case is broadly worded: "You agree . . . that any controversy, claim or issue in any controversy which may arise between you and UBS Financial Services Inc. or you and UBS Financial Services Incorporated of Puerto Rico, that occurred prior, on or subsequent to the execution of this Agreement, including but not limited to, **any controversy, claim or issue in any controversy concerning any account(s), transaction, dispute or the construction, performance or breach of this Agreement or any other agreement** (whether entered into prior, on or subsequent to the date hereof) shall be determined by arbitration." (d.e. 234, Exhibit D, pages 7-8) (emphasis ours). Plaintiffs' claims as detailed in the complaint against UBS PR, Ortiz and Ferrer[3] fall within the broad scope of this provision. Therefore, the claims against UBS PR, Ortiz and Ferrer are DISMISSED, without prejudice.

## II.    MOTION TO STAY CLAIMS AGAINST REMAINING DEFENDANTS

Defendants also argue that "[b]ecause plaintiffs' remaining claims against UBS Trust and the [CEFs] are co-extensive with the arbitrable claims against the other defendants, the Court should stay the Action as to the remaining defendants pending the outcome of the arbitration proceedings." (d.e. 234, page 12). In instances "[w]here a case involves both arbitrable and

---

[3]The Arbitration provision is enforceable against plaintiffs' claims against defendants Ortiz and Ferrer since they were acting as agents of UBS PR. *See Grand Wireless,* 748 F.3d at 13 (finding that an agent is entitled to the protection of her principal's arbitration clause when the claims against her are based on her conduct as an agent).

non-arbitrable claims, whether the non-arbitrable claims should be stayed pending resolution of the arbitrable claims is generally discretionary with the court." *Baggesen v. Am. Skandia Life Assurance Corp.*, 235 F. Supp. 2d 30, 33 (D. Mass. 2002).

Plaintiffs' arbitrable claims are inextricably entwined with the non-arbitrable claims and the outcome of the non-arbitrable claims will depend on the arbitrators decisions.  Accordingly, the claims against UBS Trust and the remaining CEFs are hereby STAYED pending the outcome of the arbitration.

## CONCLUSION

For the reasons stated, defendants' Motion to Compel Arbitration (**d.e. 234**) is GRANTED.  The Court ORDERS plaintiffs Carmelo Román, Ricardo Román-Rivera and SDM Holdings, Inc. and defendants UBS PR, Ortiz and Ferrer to submit to arbitration and plaintiffs' claims against defendants UBS PR, Ortiz and Ferrer are DISMISSED, without prejudice.  The case is STAYED as to the remaining defendants UBS Trust and the remaining CEFs in the action, Puerto Rico Fixed Income Fund III, Inc. and Puerto Rico Fixed Income Fund V, Inc., pending the outcome of the arbitration proceedings. Partial judgment to be entered by separate order.

SO ORDERED.

At San Juan, Puerto Rico, on August 21, 2017.


S/CARMEN CONSUELO CEREZO
United States District Judge